Sanford L. Michelman (SBN 179702)
smichelman@mrllp.com
Mona Z. Hanna (SBN 131439)
mhanna@mrllp.com
Melanie Natasha Howard (SBN 250936)
mhoward@mrllp.com
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, 10th Floor
Irvine, CA  92614
Telephone:   (714) 557-7990
Facsimile:   (714) 557-7991

David C. Lee (SBN 193743)
dlee@mrllp.com
Ilse C. Scott (SBN 233433)
iscott@mrllp.com
**MICHELMAN & ROBINSON, LLP**
One Post Street, Suite 2500
San Francisco, CA  94104
Telephone:   (415) 882-7770
Facsimile:   (415) 882-1570

*Attorneys for Plaintiff and Proposed Class*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID LOWERY, individually and on behalf of himself and all others similarly situated,<br><br>             Plaintiffs,<br>      v.<br><br>SPOTIFY USA INC., a Delaware corporation,<br><br>             Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |

Plaintiff David Lowery, individually and on behalf of himself and all those similarly situated (each, a "Class Member" and, collectively, the "Class") allege as follows:

## NATURE OF THE ACTION

1.     This is a class action brought by Plaintiff, on behalf of himself and the numerous other similarly-situated holders of mechanical rights in copyrighted musical works that Defendant Spotify USA Inc. ("Spotify" or "Defendant") has used without mechanical licenses in an egregious, continuous and ongoing campaign of deliberate copyright infringement.

2.     Specifically, Spotify has — and continues to — unlawfully reproduce and/or distribute copyrighted musical compositions (the "Works") to more than 75 million users via its interactive commercial music streaming service, as well as its offline listening service.  Spotify reproduces and/or distributes the Works despite its failure to identify and/or locate the owners of those compositions for payment or to provide them with notice of Spotify's intent to reproduce and/or distribute the Works.

3.     Spotify's infringement of Plaintiff's and the Class Members' mechanical rights is knowing and willful.  Indeed, Spotify has publicly admitted its failures to obtain licenses for the musical works it distributes or reproduces or to pay royalties to copyright owners for its use of their Works.  Moreover, Plaintiff is informed and believes that Spotify has created a reserve fund of millions of dollars wherein the royalty payments Spotify wrongfully withholds from artists are held.  The existence of this fund reflects Spotify's practice and pattern of copyright infringement, wherein Spotify reproduces and/or distributes the Works without first obtaining appropriate authorization or license.  Such use of the Works creates substantial harm and injury to the copyright holders, and diminishes the integrity of the Works.

## JURISDICTION AND VENUE

4.     This action is a civil action over which this court has original jurisdiction under 28 U.S.C. §§ 1331 and 1338 in that the claims herein arise under federal copyright law (17 U.S.C. § 101, *et seq.*) (the "Copyright Act").  Jurisdiction also exists pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the sum or value of $5,000,000 (exclusive of interest and costs), is a class

SF23463

1    action in which a member of the proposed class, including Plaintiff, is a citizen of a

2    state different from Defendant Spotify, and the number of members of the proposed

3    class exceeds 100.

4          5.      Venue in this District is proper under 28 U.S.C. § 1391(b) and/or 28

5    U.S.C. § 1400(a).   On information and belief, a substantial part of the acts of

6    infringement complained of herein occurs or has occurred in this District, and

7    Defendant is subject to personal jurisdiction in this District.

8                   **THE PARTIES**

9          6.      Plaintiff and the Class are individuals and entities residing in the United

10   States and each of whom, during the Class Period (as defined herein), own the

11   reproduction and distribution rights of copyrighted musical works reproduced and

12   distributed by Defendant Spotify USA Inc.

13         7.      Plaintiff David Lowery is an individual who is a resident of Georgia.

14         8.      Defendant Spotify USA Inc. is a Delaware corporation with its principal

15   place of business at 45 W. 18th Street, 7th Floor, New York, New York 10011.

16   Spotify is duly qualified to do and is doing business in California.  Through its

17   interactive Internet-based services, Defendant enters into commercial transactions,

18   contracts and other arrangements with residents of California.  Performance of

19   various of Defendant's contracts results in the knowing and repeated unlicensed

20   reproduction and distribution of musical works over the Internet to California

21   residents.  Defendant's online activities knowingly and purposely interact with

22   computers of residents in California, including Class Members.

23              **FACTUAL BACKGROUND**

24         9.      Plaintiff David Lowery has been a fixture of the music industry for

25   decades, and like the members of the class, has made his livelihood creating and

26   performing music.  Mr. Lowery is a prolific songwriter and producer, and is the

27   author or co-author of more than 150 songs for his popular groups Cracker and

28   Camper Van Beethoven.

**CLASS ACTION COMPLAINT**

SF23463

10.     Mr. Lowery and the Class are the copyright owners or owners of exclusive rights in numerous copyrighted compositions in the United States, and have the mechanical rights to these works of music.

11.     Pursuant to the Copyright Act, Plaintiff and the Class possess exclusive rights regarding the reproduction and/or distribution of the copyrighted Works, including the associated licensing rights to such activities.

12.     Plaintiff and the Class distribute, sell and/or license the Works in the form of CDs, cassettes, and other tangible media throughout the United States, including in California.  Plaintiff and the Class reproduce, distribute, sell, and/or license the Works in the form of digital audio files delivered and performed via the Internet.

13.     Plaintiff and the Class have invested and continue to invest substantial money, energy, time, effort and creative talent to create and develop the Works.

14.     Spotify is an interactive commercial music streaming service (among other services) that operates an Internet website (www.spotify.com) permitting users to customize listening choices for recorded music and to create Internet "radio stations."  Its Internet services are downloadable to computers and handheld devices (via mobile applications) making its streaming capabilities widely available to millions of users.  Indeed, Spotify has optimized its website for use on iOS and Android-based devices thereby reaching vast markets of users.  Spotify claims to have played over 25 billion listening hours of music since its launch seven years ago. (See, Spotify's announcement, "Say hello to the most entertaining Spotify ever", attached hereto as Exhibit A).

15.     Spotify offers its services to the public on both a free non-subscription and "premium" paid subscription basis.  Paid subscribers enjoy numerous benefits unavailable to users of Spotify's free service, including but not limited to, commercial-free listening privileges, "high quality audio," fully customizable play lists, and enhanced features such as "unlimited skips," "listen offline" and "play any

track."  (See, www.spotify.com.)  Spotify's "premium" service is offered to users for a monthly fee of $9.99.  (See, www.spotify.com.)

16.     Spotify's website is currently one of the most frequently visited and used interactive streaming music sites on the Internet and boasts a library of "millions of tracks" available to users so that "the right music is always at your fingertips."  (See, www.spotify.com.)  As of June 10, 2015, Spotify claimed to have 75 million active users (and 20 million paid subscribers).  (See, Spotify's announcement, "20 Million Reasons To Say Thanks" attached hereto as Exhibit B).

17.     Spotify further claims that, "We have now paid more than $3 billion USD in royalties, including more than $300 million in the first three months of 2015 alone.  That's good for music, good for music fans . . . and good for music makers." (See Exhibit B.)  Consequently, Spotify earns millions of dollars in revenues for its services, including from residents of California.

18.     Plaintiff and the Class are informed and believe and thereupon allege that Spotify sells the right to advertise to users on its website and mobile applications to earn revenue above and beyond paid subscriptions.

19.     Spotify's Internet music service is intended to and does promote Spotify's services in a manner designed to attract users and paid subscribers of its services.

20.     Spotify regularly reproduces and/or distributes to listeners and users of its services Plaintiff's and Class Members' musical compositions, and has done so repeatedly for at least the past three years.  In the course of rendering its streaming services to users and subscribers, Spotify reproduces and/or distributes Plaintiff's and Class Members' musical compositions numerous times.

21.     Spotify has not licensed Plaintiff's and the Class Members' musical compositions or otherwise received authorization from them to reproduce or distribute such works to its users and subscribers.

**CLASS ACTION COMPLAINT**

SF23463

22.    Spotify's unlawful reproduction and/or distribution of Plaintiff's and Class Members' copyrighted works has substantially harmed and continues to harm Plaintiff and the Class Members.

23.    A non-exhaustive and illustrative list of Plaintiff's Works that Spotify has illegally reproduced and/or distributed for its users, includes, but is not limited to the following (among others):   "Almond Grove", Copyright Registration No. PAu003764032; "Get On Down the Road", Copyright Registration No. PAu003745342; "King of Bakersfield", Copyright Registration No. PAu003745341; and "Tonight I Cross the Border", Copyright Registration No. PAu003745338. Plaintiff has received Certificates of Copyright Registration from the Register of Copyrights for the Works.

24.    Spotify's egregious and willful violations of Plaintiff's and the Class Members' rights are highlighted in Spotify's recent admissions regarding its failure to:  (1) obtain licenses for the musical works it distributes and reproduces (thereby infringing multiple copyrighted works); and (2) compensate copyright owners for its use of their Works.  For example, in Spotify's May 23, 2014 Comments to the United States Copyright Office's Notice of Inquiry in connection with that Office's Music Licensing Study (hereinafter, "Comments", attached hereto as Exhibit C), Spotify admitted that in some instances "Spotify may not be able to identify the copyright owners from the sound recordings provided to Spotify."  (Comments, at 5.)  Spotify failed to pay songwriter royalties to a publishing company approximately 21% of the time.  *See* Ethan Smith, *Songwriters Lose Out on Royalties*, Wallstreet Journal, Oct. 14, 2015.

25.    The Copyright Act provides statutory penalties to discourage Spotify's infringement, including statutory damages awards of between $750 and $30,000 for each infringed work, and up to $150,000 for a willful infringement.

///

///

SF23463

## CLASS ALLEGATIONS

26.     Plaintiff Lowery brings this action on behalf of himself and on behalf of all other similarly situated owners of mechanical rights for registered musical compositions, which rights were improperly infringed by Spotify's unlicensed and/or unauthorized reproduction and/or distribution of those compositions.  The proposed class is comprised of and defined as follows:

> All owners of mechanical distribution and reproduction rights in musical compositions registered under United States federal law, which compositions were reproduced or distributed by Spotify without license or authorization since December 28, 2012.

27.     This action may be properly brought and maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed class are clearly and easily ascertainable and identifiable.

28.     The class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable.  Plaintiff is informed and believes that there are hundreds or thousands of class members and that those class members can be readily ascertained from Spotify's database files and records, and via discovery in this action.   Spotify should maintain records of the musical compositions it reproduces or distributes.   The Class Members can also be readily located and notified of this action.

29.     The claims of Plaintiff Lowery are typical of the claims of the members of the class, and his interests are consistent with and not antagonistic to those of the other class members he seeks to represent.  Plaintiff Lowery holds the rights to multiple musical compositions which Spotify has reproduced and/or distributed without license and without providing notification to Mr. Lowery.  Plaintiff and all members of the class have sustained actual pecuniary loss and face irreparable harm arising out of Spotify's continued infringement as complained of herein.

**CLASS ACTION COMPLAINT**

SF23463

30.     Plaintiff Lowery has no interests that are adverse to, or which conflict with, the interests of the absent members of the class and is able to fairly and adequately represent and protect the interests of such a class.  Plaintiff Lowery has raised a viable copyright infringement claim of the type reasonably expected to be raised by members of the class, and will vigorously pursue those claims.   If necessary, Plaintiff Lowery may seek leave of the Court to amend this Complaint to include additional class representatives to represent the class or additional claims as may be appropriate.  Plaintiff Lowery is represented by experienced, qualified and competent counsel who are committed to prosecuting this action.

31.     Common questions of fact and law exist as to all members of the class that predominate over any questions affecting only individual members of the class. These common legal and factual questions, which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any class member include, without limitation, the following:

(A)     Whether Spotify reproduced or distributed or otherwise exploited via its service registered musical compositions without first obtaining a license or other required authorization;

(B)     Whether Spotify's reproduction, distribution or other exploitation of registered musical compositions without first obtaining a license or other required authorization constitutes a violation of the Copyright Act, 17 U.S.C. §§ 106 and 501;

(C)     Whether Spotify's unauthorized reproduction, distribution or other exploitation of registered musical compositions was done willfully, thereby entitling the members of the class to increased statutory damages;

(D)     Whether Spotify made accurate royalty payments for the musical compositions it reproduced or distributed;

**CLASS ACTION COMPLAINT**

SF23463

(E)  Whether Spotify's violation of California Business & Professions Code § 17200 is continuing, thereby entitling Class Members to injunctive or other relief;

(F)  The basis and method for determining and computing damages; and

(G)  Whether Spotify's conduct is continuing, thereby entitling the members of the class to injunctive or other relief.

32.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual litigation of the claims of all class members is impracticable.  The claims of the individual members of the class may range from smaller sums to larger sums, depending upon the number of infringements.  Thus, for those class members with smaller claims, the expense and burden of individual litigation may not justify pursuing the claims individually.  And even if every member of the class could afford to pursue individual litigation—which is highly unlikely in the independent artist community—the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, contradictory, or inconsistent judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  On the other hand, the maintenance of this action as a class action presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the class. Plaintiffs anticipate no difficulty in the management of this action as a class action.

## COUNT ONE

### (Direct Copyright Infringement - 17 U.S.C. §§ 106 and 501)

33.  Plaintiff and the Class reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 32 of the Complaint with the same force and effect as if fully set for that length herein.

**CLASS ACTION COMPLAINT**

SF23463

34.     Spotify, without license, permission, or consent of Plaintiff and the Class, has made unauthorized reproductions and/or engaged in unauthorized distribution of Plaintiff's and Class Members' copyrighted musical compositions, including but not limited to, those compositions listed in paragraph 23 *infra*. Such conduct constitutes infringement of Plaintiff's and Class Members' registered copyrights in violation of 17 U.S.C. §§ 106, *et seq.* and 501.

35.     The infringement of Plaintiff's and Class Members' rights in each of their copyrighted compositions constitutes a separate and distinct act of infringement.

36.     Spotify's conduct is willful, intentional, purposeful, in disregard of and indifferent to the rights of Plaintiff and Class Members.

37.     As a direct and proximate result of Spotify's willful and infringing conduct, Plaintiff and Class Members are entitled to the maximum statutory damages or to their actual damages and Defendant's profits, whichever are higher, against Defendant pursuant to 17 U.S.C. § 504(b).  Plaintiff and Class Members will elect whether or not to seek statutory damages prior to final judgment.  Plaintiff and Class Members are also entitled to attorney's fees and costs by virtue of Defendant's infringement pursuant to 17 U.S.C. § 505.

38.     Defendant's acts have caused and will continue to cause irreparable harm and injury to Plaintiff and Class Members for which they have no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiff and Class Members are therefore entitled a preliminary injunction and a permanent injunction prohibiting infringement of Plaintiff's and Class Members' copyrights and exclusive rights under United States law.

## COUNT TWO

### (Unfair Business Practices – Cal. Bus. & Prof. Code § 17200, *et seq.*)

39.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 38 of the Complaint with the same force and effect as if fully set for that length herein.

**CLASS ACTION COMPLAINT**

SF23463

40.   On information and belief, Plaintiff alleges that Spotify:  (a) depresses the value of the royalties owed to Plaintiff and the Class Members' for use of their Works through an arbitrary and non-negotiated payment structure; and (b) captures and holds funds which are otherwise distributable and earns interest thereon, thereby profiting off its own unlawful conduct.  These business practices are unlawful and unfair pursuant to California Business & Professions Code § 17200.

41.   As a direct and proximate result of Spotify's conduct alleged herein, Plaintiff and the Class Members are entitled to recover all proceeds and other compensation received or to be received by Spotify for its failure to pay royalties. This includes any interest accrued on the royalty funds inappropriately withheld from Plaintiff and the Class Members.  Plaintiff and the Class Members have been damaged, and Spotify has been unjustly enriched, in an amount that is not as yet fully ascertained but which Plaintiff is informed and believes is not less than $150,000,000, according to proof at trial.

42.   Unless the Court enjoins and restrains Spotify's conduct, Plaintiff and the Class Members will continue to endure great and irreparable harm that cannot be fully compensated or measured in monetary value alone.  Accordingly, Plaintiff and the Class Members are entitled to temporary, preliminary and permanent injunctions, prohibiting further acts of unfair competition pursuant to California Business & Professions Code § 17203.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and on behalf of all other persons similarly situated, respectfully prays for relief against Defendant as follows:

1.   Certify this matter as a class action;

2.   Enter an order appointing Plaintiff Lowery as class representative and Plaintiff's counsel as class counsel;

3.   Enter judgment in favor of Plaintiff and the Class;

SF23463

4.     Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class (17 U.S.C. § 502), including enjoining Defendant from continued copyright infringement and violations of the relevant provisions of the Copyright Act;

5.     A temporary, preliminary, and permanent injunction enjoining and restraining Spotify, and its respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, from further violations of California Business & Professions Code § 17200;

6.     Injunctive relief that requires Spotify to pay for the services of a third party auditor to identify the owners of Works reproduced and/or distributed by Spotify despite Spotify's failure to first obtain a mechanical license prior to reproducing and/or distributing the Works, and further requiring Spotify to remove all such Works from its services until it obtains proper licenses for them;

7.     Restitution of Spotify's unlawful proceeds, including Defendants' gross profits;

8.     Award compensatory damages to Plaintiff and the Class in an amount to be ascertained at trial;

9.     Award statutory damages to Plaintiff and the Class according to proof, including but not limited to all penalties authorized by the Copyright Act (17 U.S.C. §§ 504(c)(1), 504(c)(2));

10.     Award reasonable attorneys' fees and costs (17 U.S.C. § 505);

11.     Award Plaintiff and the Class pre- and post-judgment interest to the extent allowable; and

///

///

///

///

**CLASS ACTION COMPLAINT**

SF23463

1      12.    Award such other and further relief that the Court may deem just and

2  proper.

3

4  Dated:  December 28, 2015       **MICHELMAN & ROBINSON LLP**

5

6  By _____

7      Sanford L. Michelman
    Mona Z. Hanna

8      David C. Lee
    Ilse C. Scott

9      Melanie Natasha Howard
    *Attorneys for Plaintiff and Proposed Class*

13

**CLASS ACTION COMPLAINT**

SF23463

# EXHIBIT "A"



PREMIUM        HELP        DOWNLOAD        VISIT SPOTIFY.COM

# Say hello to the most entertaining Spotify ever

Posted on 2015/05/20 by Daniel Ek

We are on a mission. With over 25 billion listening hours under the hood since our launch seven years ago, we're obsessed with figuring out how to bring music into every part of your life, wherever you are, whatever you're doing, whatever your mood. More than ever, you're telling us what you want: the best music to fit your mood and moment mixed with great entertainment throughout your day. We understand that *how* music fits into your life is as powerful as the music itself. So today we're rolling out a richer mobile music experience built around your day, bringing you the music you love when you need it most. Introducing:

- **The Now start page.** From the time you wake up until tonight's party, the Now start page serves you the right music day and night. Need a Monday morning playlist pick-me-up? Done. The right tunes to help you focus after lunch? We've got you covered. And because Now learns what you like, you'll be sure to hear the right music – selected from our in-house experts and your personal collection – whatever the occasion. Recommendations will adapt over time to fit your taste and mood.

- **Spotify Running.** Every week millions of you lace up and hit the road to Spotify. Music is the perfect running companion but sometimes you need even more motivation to push on. That's why Spotify Running is all about helping you go the extra mile. We've combined the best music on the

## Categories

Apps

Blog

Contests

Deals

Exclusives

General

Interviews

Life at Spotify

Marketing

Music

Nominations and Awards

**Exhibit A - Page 14**

# Spotify | NEWS

planet – recommendations based on your listening history, multiple-genre playlists and original running compositions written by some of the world's foremost DJs and composers – all tuned to your tempo and seamlessly transitioned to ensure you'll never miss a beat. Start running and Spotify will detect your tempo, matching the perfect music in time to your step – making you a harder, better, faster, stronger runner.

- And that's not all: this Summer we're teaming up with Nike to bring new music experiences to their audiences around the globe. And later this year, you'll be able to access the new Spotify Running experience through the Nike+ app. We're also integrating the Runkeeper app with Spotify Running later this year.

Party

Pre-release

Previews

Product

Spotify

Spotlight



Say hello to the most entertaining Spotify ever.

0:00 / 1:22

## Facebook

Spotify
8,895,250 likes

Like Page

Be the first of your friends to like this



Share

## Twitter

Follow

Tweets

**Spotify** | NEWS

On top of our improved music experience, we're also introducing an expanded world of entertainment built around you:

- **More Than Music.** For the first time, Spotify is adding video clips and audio shows to the music mix. We know there are times in the day you want to switch between music to catch up on the latest news, listen to your favourite podcast or simply watch something fun. And with a stellar range of entertainment to choose from there's something for everyone. Spotify will suggest video and audio shows for you to watch and learn what you love.

- **Spotify Originals.** We're also serving up an exciting slate of original content to entertain your day. Check out our Running Originals – music specifically designed for running that dynamically adapts to your running tempo. A total of six original tracks, all found within Spotify Running, are available at launch. We're also introducing a range of exclusive content, from Dance Move of the Day produced by Amy Poehler's Smart Girls brand, to specially curated radio shows presented by artists including Icona Pop, Jungle and Tyler the Creator.

- **Spotify now comes packed with entertainment, news and clips** from the likes of ABC, BBC, Comedy Central, Condé Nast Entertainment, ESPN, Fusion, Maker Studios, NBC, TED and Vice News, with much more to come (see Notes to Editors for full entertainment roster).



**Spotify** @Spotify                                    1h
The Fab Four are here. Re-discover The
#BeatlesOnSpotify
cards.twitter.com/cards/a9arm/1b...
Expand

**Spotify** @Spotify                                27 Dec
Get fired up on game day. Intercept
@Revis24's playlist, powered by
@bose.
cards.twitter.com/cards/a9arm/1b...
Expand

**Spotify** @Spotify                                26 Dec
"10" - @pitchfork

#BeatlesOnSpotify - spoti.fi/1NEjuCS

Tweet to @Spotify

## Archives

VISIT SPOTIFY.COM

DOWNLOAD

HELP

PREMIUM

**Spotify** | NEWS

December 2015

November 2015

October 2015

September 2015

August 2015

July 2015

June 2015

May 2015

April 2015

March 2015

February 2015

January 2015

December 2014

November 2014



For you. For now.

We're so excited to bring you a deeper, richer, more immersive Spotify experience. We want Spotify to help soundtrack your life by offering an even wider world of entertainment with an awesome mix of the best music, podcasts and video delivered to you throughout your day. And we're just getting started. The new Now experience will begin rolling out today to iPhone users in the US, UK, Germany and Sweden – with more markets and platforms to follow in the near future. Spotify Running will start rolling out to iPhone users globally today. That's entertainment.

VISIT SPOTIFY.COM   DOWNLOAD   HELP   PREMIUM

Spotify | NEWS

October 2014
September 2014
August 2014
July 2014
June 2014
May 2014
April 2014
March 2014
February 2014
January 2014
December 2013
November 2013
October 2013
September 2013
August 2013

This is Spotify Running.



0:00 / 0:52

**Share this:**

Twitter | Facebook 731 | LinkedIn 870 | Reddit | Google | More

★ Like

7 bloggers like this.

This entry was posted in GENERAL, MUSIC, PRE-RELEASE, PREVIEWS, SPOTIFY and tagged entertainment, more than music, new features, now, now start page, shows, Spotify, spotify originals, spotify running. Bookmark the permalink.

# EXHIBIT "B"

VISIT SPOTIFY.COM   DOWNLOAD   HELP   PREMIUM

**Spotify® | NEWS**

# 20 Million Reasons to Say Thanks

Posted on 2015/06/10 by The Spotify Team

What a difference a year makes! At the end of May 2014, we reached 10 million paying subscribers and 40 million active users. Today, we have **reached more than 20 million subscribers** and **more than 75 million active users.** 10 million subscribers in our first five and a half years – and another **10 million subscribers in just a single year!** That's an average of one new subscriber every three seconds over the last year. Wow. And, more people listening on Spotify means more payouts to the creators of the music you love.  As we grow, the amount of royalties we pay out to artists, songwriters and rights holders continues to climb faster than ever. We have now **paid more than $3 billion USD in royalties,** **including more than $300 million in the first three months of 2015 alone.** That's good for music, good for music fans ... and good for music makers. Take a look at what it means for four different types of artists. The blue columns show average actual payouts over the last 12 months, which started with 10 million subscribers; the green columns show our projected average payouts over the next 12 months, starting from our new baseline of 20 million paying subscribers.



## Categories

Apps

Blog

Contests

Deals

Exclusives

General

Interviews

Life at Spotify

Marketing

Music

Nominations and Awards

Party



PREMIUM    HELP    DOWNLOAD    VISIT SPOTIFY.COM

# Spotify | NEWS

Pre-release

Previews

Product

Spotify

Spotlight





**Typical One Year Payout Per Artist**

10M Subscribers (June '14 - May '15)
20M Subscribers (June '15 - May '16)

Here's how we did it.

We could have never achieved this growth without all of you: the music fans who listen, discover, share and celebrate music and artists every day. Thank you, 20 million X. 20 Million Reasons To Say Thanks



## Facebook

Spotify
8,895,308 likes

Like Page    Share

Be the first of your friends to like this

## Twitter

Tweets

Follow

Spotify @Spotify
The Fab Four are here. Re-discover The



**Exhibit B - Page 20**

PREMIUM     HELP     DOWNLOAD     VISIT SPOTIFY.COM



The Fab Four are here. Re-discover The
#BeatlesOnSpotify
cards.twitter.com/cards/a9arm/1b...
Expand

**Spotify** @Spotify                    27 Dec
Get fired up on game day. Intercept
@Revis24's playlist, powered by
@bose.
cards.twitter.com/cards/a9arm/1b...
Expand

**Spotify** @Spotify                    26 Dec
"10" – @pitchfork

#BeatlesOnSpotify – spoti.fi/1INEjuCS

Tweet to @Spotify

# Archives

**Spotify** | NEWS

Share this:

Twitter    Facebook 1K+    LinkedIn 356    Reddit    G+ Google    More

Like
6 bloggers like this.

This entry was posted in GENERAL, LIFE AT SPOTIFY, MUSIC, PRODUCT, SPOTIFY and tagged 20
million, 3 billion, 75 million, premium, Spotify, subscribers, thanks. Bookmark the permalink.

← SPOTIFY REVEALS THE TOP WEDDING SONGS GLOBALLY

TASTE REWIND →

# EXHIBIT "C"

**Before the**
**UNITED STATES COPYRIGHT OFFICE**
**Library of Congress**

| | |
|---|---|
| Notice of Inquiry ) | |
| ) | |
| Music Licensing Study:  Notice and  ) | Docket No. 2014-03 |
| Request for Public Comment          ) | |

## COMMENTS OF SPOTIFY USA INC.

James Duffett-Smith
Spotify USA Inc.
45 W. 18th Street, 7th Floor
New York, N.Y.  10011
*Head of Licensing Business Affairs,*
*Spotify USA Inc.*

May 23, 2014

**Exhibit C - Page 22**

Introduction and Summary

Spotify USA Inc. ("**Spotify**") respectfully submits these comments in response to the Copyright Office's Notice of Inquiry (the "**NOI**") for a Music Licensing Study: Notice and Request for Public Comment, published in the Federal Register on March 17, 2014.  78 Fed. Reg. 14739 (Mar. 17, 2014).  We appreciate the opportunity to participate in the Copyright Office's evaluation of the effectiveness of existing methods of licensing music for the purposes of preparing a report to Congress on potential revisions to the United States Copyright Laws (the "**Copyright Laws**").

Spotify is the largest interactive streaming music service in the United States, offering consumers the ability to receive digital audio transmissions of sound recordings and the musical works embodied therein on an interactive and noninteractive basis from a library that is currently over 20 million songs (the "**Spotify Service**").  Worldwide, the Spotify Service has more than 40 million active users, of whom 10 million are paying subscribers.

To operate the Spotify Service, Spotify needs to secure multiple rights from multiple copyright owners.  These rights include, among others, the right to reproduce sound recordings and the musical works embodied therein, the right to distribute sound recordings and the musical works embodied therein, and the right to publicly perform sound recordings and the musical works embodied therein by means of digital audio transmissions.

Spotify secures the right to reproduce, distribute, and publicly perform sound recordings either from individual sound recording copyright owners or distributors (record labels and aggregators). It has in the past in the case of noninteractive digital audio transmissions of sound recordings where only the reproduction and public performance rights of sound recording copyright owners are implicated secured rights pursuant to the statutory licenses set forth in Sections 112 and 114 of the United States Copyright Act (the "**Copyright Act**").  Spotify secures the right to reproduce and distribute the musical works embodied in sound recordings either from musical work copyright owners (typically music publishers) through its licensing administrator Harry Fox or pursuant to the statutory license set forth in Section 115 of the Copyright Act.  Spotify secures the right to publicly perform the musical works embodied in sound recordings from the three performing rights organizations ("**PROs**") in the United States (i.e., ASCAP, BMI, and SESAC).

All of these licenses are secured pursuant to the legal regime created by the Copyright Act, which has a significant impact on how Spotify operates the Spotify Service. Globally, Spotify pays out around 70% of all money that it recieves to rightsholders which from launch of the service to date has amounted to over $1bn.The process of securing all of these rights is time consuming, expensive, and often inefficient.  Spotify's parent company had already been operating a version of the Spotify Service outside of the United States for 3 years before launching in the United States on 14 July 2011, with the U.S.-delay resulting from the difficulty of securing enough rights from copyright owners such that a sufficiently compelling music product could be offered to the consumer.

Spotify welcomes the Copyright Office's inquiry into the effectiveness of the current means for licensing the rights to music in the United States.  Spotify believes that should there be changes made to the Copyright Laws in no circumstances should they be amended in a way that creates more

**Exhibit C - Page 23**

inefficiencies, more uncertainty, and more impediments to innovation that has rewarded creators, consumers, and entrepreneurs.

Spotify strives to offer American consumers a compelling product.  The company also believes that authors, artists, and copyright owners deserve to be paid fair compensation for their creative efforts. The Copyright Laws are balanced at the moment and, while in need of modernisation in some relatively small respects, do allow Spotify to conduct its business for the benefit of American consumers, authors, and creators. We would hope that through this study effort, the Copyright Office will take into account the competing – but co-dependent - interests of authors and creators, licensees, and the public and not to disturb the current balance of the Copyright Laws.

Spotify's specific responses to certain of the Copyright Office's questions are set forth below.  As a general matter, however, Spotify believes that any reforms to the Copyright Laws should ensure the following:

- Authors and performers receive fair compensation for their creative works.
- Royalties payable for "music" – sound recordings and the musical works embodied therein – have a rational relationship to one another so that the fees established for the use of one copyrighted work take into consideration the fees paid for the use of the other.
- Section 115 is modernized so that there is an efficient mechanism for licensing large numbers of musical works, the ownership of which is often split among multiple parties. This could involve licensing on a blanket basis, whether voluntary or compulsory.
- Collective action by rights owners continues to be subject to government oversight and regulation so that competitors may not act in concert to harm competition.
- Collective licensors are obligated to disclose in a transparent and real-time basis the copyrighted works and the sound recordings in which they are embodied that they are authorized to license and those to which they have lost the right to license within the past 3 months.
- The current balance in the Copyright Laws between the interests of authors, creators, licensees and the public remains.

### **Musical Works**

1. ***Please assess the current need for and effectiveness of the Section 115 statutory license for the reproduction and distribution of musical works.***

The section 115 statutory license is an indispensable component to facilitating a vibrant marketplace for making millions of sound recordings available to the public on commercially reasonable terms.

Today's on-demand streaming services compete not only on functionality but also on, among other things, the breadth of catalog made available to consumers.  That most often requires a service to offer content that suits the demands and expectations of all users – from those who want today's

**Exhibit C - Page 24**

top hits to those interested in the longest of the long tail.  This means licensing the rights to millions of individual sound recordings and the musical works embodied therein.

Spotify's catalog of available music is dynamic, in that it may increase and decrease on a day-to-day basis.  Those changes are driven by whether the rights to particular works – both the sound recordings and the musical works embodied therein – have been secured for reproduction, distribution, and public performance in the United States (and such other territories in which the Spotify Service is made available to the public).  Securing the rights to sound recordings – while challenging in its own right – is not constrained by two things that make securing rights in compositions challenging: split interests in copyrights and the difficulty of identification.

The rights to a sound recording are almost always owned by a single entity, typically a record label.  The rights to musical works, however, are often split among numerous parties, typically music publishers that represent the rights of individual songwriters.  Although the Copyright Laws provide that a nonexclusive licensee of a co-author of a joint work may not be sued for copyright infringement[1], custom and practice in the music industry has developed such that each co-author of a musical work only licenses its proportionate share in the underlying work.  This means that in order to avoid liability for copyright infringement – and the crushing statutory damages available under the Copyright Laws – Spotify must obtain licenses from each co-author owning a share in an individual work, no matter how small that co-author's interest might be

Identifying and locating the co-authors of each of millions of copyrighted musical works is a daunting task that is hampered significantly by, among other things, the lack of a modern and publicly searchable database identifying the current owners of musical works and the contact information for such copyright owners.  In instances where it is either not possible or economically feasible to identify each co-author of a copyrighted musical work, the Section 115 statutory license provides a critical mechanism for securing rights while also ensuring the payment of royalties to the owners of the copyrighted works.

As the Copyright Office knows, however, in order to avail oneself of the benefits of the Section 115 license, a statutory licensee must provide the copyright owner of a particular musical work with notice of use prior to a reproduction and distribution of the copyright work to the public.[2] Although this approach may have made sense at a time when the Section 115 license was most often utilized by record companies manufacturing and distributing phonorecords – where record labels had long-established relationships with music publishers – this approach no longer makes sense in a world where principal licensees under the Section 115 license are streaming services that are licensing millions of copyrighted musical works as opposed to 10-15 works per phonorecord for several hundred phonorecords to be manufactured and distributed to the public each year.

-----

[1] See *Davis v. Blige*, 505 F. 3d 90, 100 (2d Cir. 2007); see also 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 6.10[A][2] (2013).

[2] 17 U.S.C. § 115(b)(1).

Exhibit C - Page 25

In the case of Spotify, the company has had to secure the rights to millions of individual copyrighted works, many of which were secured pursuant to the Section 115 license.  But when doing so, Spotify first had to be able to identify the copyright owners of each work, had to obtain contact information for those owners, and then ensure that a notice of use was provided to such owners prior to first use.  To do this, Spotify had to rely upon the services of third party rights administrators, who themselves often struggle with securing the necessary information to submit a compliant notice of pursuant to the statutory license.

These problems are particularly magnified when dealing with new releases, which consumers expect a service such as Spotify to have available on the day of public release.  Where a record label licenses Spotify to use a new release on the Spotify Service to coincide with the "street date" of such release, Spotify may only make the sound recordings from that release available on the Spotify Service if Spotify has secured licenses to the underlying musical works.  In some cases Spotify may have a direct license in place, via its administrator with some of the copyright owners that own an interest in the musical works embodied in the sound recordings on the new release.  But where its administrator does not obtain a direct licence, Spotify has to obtain a license pursuant to Section 115.

A Section 115 license can only be secured, however, where Spotify can identify the copyright owners of the musical works embodied in that release.  Record label licensors of Spotify are not prepared to notify Spotify of such ownership interests and Spotify may not be able to identify the copyright owners from the sound recordings provided to Spotify.  Thus, new releases that record labels and artists want to have widespread distribution may not be made publicly available on the Spotify Service due to a lack of information that enables Spotify to avail itself of the Section 115 license.

The requirement that a rightsholder be identified before a Section 115 licence can take effect also creates strange effects when looked at in conjunction with the blanket licences provided by the PROs. Where a copyright owner is not known by Spotify's licensing administrator Harry Fox ("**HFA**"), HFA conducts copyright research to try and identify them. One source that HFA uses is the databases of the PROs, but they are considered by HFA to be secondary sources, which means that HFA will write to the person listed as the owner to confirm the accuracy of the information and the share of the copyright owned. If that person does not respond to HFA then it will not be able to comply with the formalities required for the Section 115 licence so that work will not have a mechanical licence to be made available on Spotify's services. On the other hand, if the work is listed in the PRO database then it <u>will</u> be covered by Spotify's blanket licence from the PRO. This means that in some cases, Spotify will be licensed for performing, but not mechanical rights in the same composition. This would not be an issue if there were a blanket licence available for mechanical rights, or if there were a database that could be relied on in order to comply with Section 115.

An additional inefficiency of the Section 115 license arises from the fact that each copyright owner of each work has to be notified in advance prior to first use by each licensee.  But if the intent of the license is to facilitate licensing and provide copyright owners with compensation for use, then it seems unnecessary to require streaming services to provide individual copyright owners with notice prior to use.  Copyright owners are presumably already placed on notice of a use by the record labels that are manufacturing and distributing phonorecords to the public. As a result, the

**Exhibit C - Page 26**

requirement that a notice of intent to use a musical work be served before a distribution by a service provider seems redundant. It would be better if a notice could be sent within a reasonable time after distribution (say, two weeks) to allow for efficiencies in getting new releases live. If this were coupled with a definitive register of all musical works legitimately available, then the process would be much smoother for licensees and licensors.

Alternatively, Spotify believes that the effectiveness of the Section 115 license can be ensured if uses of musical works were covered pursuant to a blanket license, in a manner similar to the Section 114 license.  Under Section 114 of the Copyright Act, a noninteractive service may publicly perform by means of a digital audio transmission any sound recording that has been released to the public with the consent of the copyright owner.[3]  If sound recordings are going to be licensable pursuant to a statutory license on a blanket basis, then Spotify respectfully suggests that it is inefficient and counterproductive to require licensing of the musical works embodied in such sound recordings on any basis other than a blanket basis. In this event though it is important that the current Section 801(b)(1) remains the standard for rate setting.

The Section 115 license could, in Spotify's view, be modified to permit the use of any musical work that has been released to the public with the consent of the copyright owner on a blanket basis.  The analog for such a model already exists in Section 114 of the Copyright Act. Additional questions would need to be answered if such a new licensing regime were created – such as to whom would payments be made, either the Copyright Office or one or more licensing collectives – but figuring out who should be paid should not interfere with the adoption of a system that would clearly be more efficient than the system that exists today.

– 2.   ***Please assess the effectiveness of the royalty ratesetting process and standards under Section 115.***

Spotify has not participated in any previous ratesetting process pursuant to Section 115 and therefore takes no position on the process at this time, although it does reserve the right to provide additional comments or suggestions in response to the comments filed by other parties in response to the NOI during the reply comments phase of the proceeding.

As to the ratesetting standard, Spotify believes that the current standard set forth in Section 801(b)(1) of the Copyright Act is probably appropriate.[4]  The four factors set forth in

---

[3] 17 U.S.C. § 114(d)(2)(C)(vii).

[4] 17 U.S.C. § 801(b)(1)(A)-(D) instructs the Copyright Royalty Judges to set rates according to the following objectives:

(A) To maximize the availability of creative works to the public.

(B) To afford the copyright owner a fair return for his or her creative work and the copyright user a fair income under existing economic conditions.

(C)  To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution,

**Exhibit C - Page 27**

Section 801(b)(1) do appear to properly balance the need to compensate copyright owners fairly while incentivizing the creation of new works with the need of licensees to earn a fair income.  The 801(b)(1) standard also allows the Copyright Royalty Board ("**CRB**") to consider factors other than evidence of what might happen in a hypothetical free market.

Spotify has followed with interest the disputes that have arisen following determinations of the CRB (and its predecessor, Copyright Arbitrary Royalty Panels ("**CARPs**")) in Section 114 ratesetting proceedings.  In those proceedings where rates have been established pursuant to the willing buyer/willing seller standard,[5] litigation has inevitably followed and Congress has all too frequently been required to step in to provide alternative options to the rates established by a CARP or the CRB.[6]

While we expect other parties with more experience in those ratesetting proceedings to comment in response to the NOI and give the Copyright Office the benefit of their experiences, Spotify believes that any effort to establish rates that reflect what would result from hypothetical negotiations between willing buyer/willing sellers is misguided.  Such rates are likely to lead to rates that are too high as they are often premised on the agreements entered into by only the largest of licensors – who have the resources to participate in a ratesetting proceeding – and where such licensors often demand "Most Favored Nations" provisions to ensure that only the highest rates are utilized in the market as opposed to rates that would arise from true free market negotiations.

Spotify therefore supports the continued use of the Section 801(b)(1) standard for the establishment of rates pursuant to Section 115.

3.    ***Would the music marketplace benefit if the Section 115 license were updated to permit licensing of musical works on a blanket basis by one or more collective licensing entities, rather than on a song-by-song basis?  If so, what would be the key elements of any such system?***

As noted above, Spotify believes that the Section 115 license is currently inefficient for a world in which consumers are increasingly consuming music via streaming or access than through the purchase of physical or digital phonorecords.  In such an environment, a blanket license would

---

capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication.

(D)  To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.

[5] "In establishing rates and terms for transmissions by eligible non-subscription services and new subscription services, the Copyright Royalty Judges shall establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller.  In determining such rates and terms, the Copyright Royalty Judges shall base their decision on economic, competitive and programming information presented by the parties…" 17 U.S.C. § 114(f)(2)(B).

[6] See the Webcaster Settlement Acts, *supra* note 1.

-7-

**Exhibit C - Page 28**

clearly be more beneficial to both copyright owners and licensees. A blanket license would ensure that payment is made for all uses of musical works while providing licensees with an effective mechanism for securing rights.

If Congress has already determined that certain uses of musical works are covered by a statutory license, then it would seem unnecessary to provide each and every copyright owner with notice of use in advance of such use so long as the copyright owner is being paid for a use. For example, Section 114 does not require a noninteractive streaming service to notify each sound recording copyright owner of a use of a sound recording. Rather, a single Notice of Use of Sound Recordings Under Statutory License is filed with the United States Copyright Office.[7] Spotify sees no reason why notice to copyright owners under Section 115 should be different than notice to copyright owners under Section 114.

The provisioning of a single notice of use for operation under the Section 115 license would clearly be the most significant improvement that could be made to that license. The second most significant change and improvement would be the designation of a single entity for the payment of statutory royalties. The entity designated to receive payments could be the Copyright Office or a private organization, similar to SoundExchange, Inc.

In the first webcaster rate proceeding, the CARP established, and the Librarian of Congress adopted, a model whereby there would be a single "Receiving Agent" that would receive payments from statutory licensees.[8] That single Receiving Agent was then required to distribute royalties to two "Designated Agents," which would then be responsible for distributing royalties to individual copyright owners.[9]

Spotify believes that such a system would work well in the context of the Section 115 statutory license. Where split ownership has arisen from the practices of the participants in the music publishing industry, Spotify believes that music publishers themselves – and not licensees – are in the best position to figure out who owns what interests in what musical works and how royalties paid for the use of musical works should be allocated. Consequently, Spotify believes that music publishers are in the best position to identify a potential receiving agent and possible, multiple designated agents.

Alternatively, if music publishers are unable to identify such entities, then Spotify would recommend that the Section 115 statutory license be modified to adopt a regime similar to that utilized in both Sections 111 and 119 of the Copyright Act, where statutory licensees make payments under those respective statutory licenses to a single entity, the Copyright Office, which then distributes royalties to copyright owners following either negotiation or litigation among the

---

[7] 37 C.F.R. § 370.2.

[8] See *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings; Final Rule*, in Docket No. 2000-9 CARP DTRA 1&2, 67 Fed. Reg. 45240, 45266-45268 (July 8, 2002).

[9] Id.

**Exhibit C - Page 29**

interested parties for a determination of allocation of funds.  We see no reason why such a model would not work under Section 115.

Providing for payment to a single entity would also exclude statutory licensees from any competing claims amongst parties claiming inconsistent ownership interests in the same work.  This would avoid the situation where the claimed ownership interests of copyright owners exceed 100% of a copyrighted work.

Spotify takes no position on the elements of Section 115 reform that would govern how the royalties would be allocated among musical work copyright owners, beyond the general principles that such allocation and distribution should be fair, timely and transparent.  It is important for Spotify that these principles are respected because otherwise Spotify can find itself in a position where it is criticised for not paying royalties, when in fact it has done so but they have not been properly distributed. As long as these principles are respected, though, we believe the parties entitled to those royalties should make such allocation and distribution decisions.

To that end, Spotify believes that any Section 115 reform that establishes a blanket licence should include the following general terms, with the specifics thereof to be established through negotiations among interested parties, either through a notice and comment rulemaking or a proceeding before either the CRB or the Copyright Office:

- **Notice of Use** – a statutory licensee should be permitted to file a single Notice of Use of Musical Works with the Copyright Office.  If material information in the Notice of Use should change (e.g., the contact information for the licensee), then the licensee should be obligated to file an Amended Notice of Use with the Copyright Office.

- **Payments / Receiving Agent** – payments by licensees operating under Section 115 should be made to a single entity – the Receiving Agent – which then assumes the obligation to allocate royalties among one or more Designated Agents.

- **Designated Agents** – Designated Agents will assume responsibility for allocating royalties among all copyright owners whose works were utilized during the period for which royalties were paid.  Copyright owners should be free to affiliate with the Designated Agent of their choice, with a single Designated Agent assuming responsibility for allocating and distributing royalties to copyright owners who fail to affirmatively affiliate with another Designated Agent.

- **Allocation and Distribution Principles** – Distribution from the Receiving Agent to Designated Agents, allocation between the Designated Agents and onward payment to copyright owners should be done in a fair, timely and transparent manner.

- **Standards for Payment and Reporting** – standards should be established that provide for a single method of calculating liabilities and for reporting uses of copyrighted works.  Currently, each copyright owner from whom a licensee may obtain a license may require its own form of reporting.  Standardization of reporting

**Exhibit C - Page 30**

should be required, similar to the manner in which reporting is required under Section 114.[10]

- **Audits** – the Receiving Agent should be authorized to conduct audits of statutory licensees under generally accepted auditing principles (e.g., no more than one audit per year, no period may be audited more than once, etc.).  If there are multiple Designated Agents, then a Designated Agent should be permitted to conduct an audit, but an audit by one Designated Agent should serve as a valid audit for the purposes of all Designated Agents such that a licensee would not be subject to multiple audits by multiple Designated Agents.[11]

4.     ***For uses under the Section 115 statutory license that also require a public performance license, could the licensing process be facilitated by enabling the licensing of performance rights along with reproduction and distribution rights in a unified manner?  How might such a unified process be effectuated?***

A licensing regime in which public performance rights and mechanical reproduction rights could be obtained from a single source or pursuant to a single license is an interesting idea and could in theory lead to efficiencies. However, the current system where the PROs are subject to regulation via the consent decrees is working well so reform may not be necessary. In the event that a unified public performance and mechanical reproduction licence is made available, it is important the the rate setting standard under 801(b)(1) continues to be respected.

5.     ***Please assess the effectiveness of the current process for licensing the public performances of musical works.***

Spotify believes that the process for licensing the public performance of musical works is largely effective and efficient, at least with respect to ASCAP and BMI.  By submitting a consent decree license request to those two entities, Spotify is entitled to publicly perform all of the works in those two entities' repertoires.  Upon executing a license with either ASCAP or BMI, Spotify is further entitled to public perform all of the works in those two entities' repertoires as of the time the license was executed for the duration of such license.

These blanket licenses are highly efficient, even though having to secure licenses from multiple PROs is, itself, inefficient.  Similar efficiencies could be achieved if SESAC, the smallest of the U.S. PROs, was itself subject to a consent decree.

In contrast to the Section 115 license, music publishers have recognized that public performance rights are efficiently administered through collective licensing.  Copyright owners of musical works are not required to join a PRO but they overwhelmingly choose to do (at least for now) because collective licensing reduces transaction costs, results in the sharing of administration

---

[10] 37 C.F.R. § 370.4.

[11] Id. § 380.6.

-10-

**Exhibit C - Page 31**

and enforcement, and permits a licensee to use large numbers of works through payments to a single entity.

If music publishers exercise any right to withdraw from a PRO in the entirety, then Spotify believes it is imperative that both the withdrawing publisher and the PRO from which the publisher withdrew provide immediate transparency as to the musical works that are no longer subject to license by the respective PRO.  Only by ensuring transparency can a party previously licensed by a PRO ensure that it will not be subject to a claim of copyright infringement and the crushing statutory damages that can arise therefrom.

Publishers have already tried to deny certain licensees of the right to know which works have been withdrawn from a PRO.[12]  Therefore, music publishers authorized or permitted to act collectively should be required to disclose those works that are removed from the repertory of a PRO.  The PRO should also be required to make available through an online portal all of the works that have been removed in an easily determinable manner.  This would mean on a bulk basis by licensor or by date, and not pursuant to queries on a work-by-work basis.

Spotify would oppose any amendments to the Copyright Laws that would undermine the collective licensing of public performance of musical works and believes that the current system where public performance rights are aggregated in the PROs and the PROs are subject to consent decrees works well.

6.     ***Please assess the effectiveness of the royalty ratesetting process and standards applicable under the consent decrees governing ASCAP and BMI, as well as the impact, if any, of 17 U.S.C. 114(i), which provides that "[l]icense fees payable for the public performance of sound recordings under Section 106(6) shall not be taken into account in any administrative, judicial, or other governmental proceeding to set or adjust the royalties payable to copyright owners of musical works for the public performance of their works."***

Spotify has not previously participated in any ratesetting process under the consent decrees governing ASCAP and BMI and therefore is reluctant to comment on the effectiveness of those processes.

However, Spotify does believe that the royalty fees to be paid by digital music services should not be set in a vacuum.  By this we mean that Spotify should not be subject to one rate setting process where it could be subject to a royalty rate of, say 50% of revenue, while subsequently or simultaneously being subject to another rate setting process where it could also be subject to a royalty rate of, say 50%.  Such a system would clearly not work as it would result in no service being able to survive.

No matter how farfetched the example in the above paragraph might seem, it is not necessarily far from reality.  For example, under the Section 114 statutory license, the CRB

---

[12] See *In re Pandora Media, Inc.*, Nos. 12 Civ. 8035 (S.D.N.Y. Dec. 13, 2013).

**Exhibit C - Page 32**

established royalty rates only on a per performance basis.[13]  Pandora Media, Inc., a public company, that would be subject to the CRB's per performance royalty rates had it not been able to elect alternative rates pursuant to the Webcaster Settlement Act of 2009,[14] reports its content acquisition costs as a percentage of its total revenue, with the vast majority of its content acquisition costs allocated to the fees payable for the right to publicly perform sound recordings.  According to Pandora's SEC filings for the period ending March 31, 2014, the company's content acquisition costs (mostly fees for sound recordings) consumed 75% total revenues for the three-month period ending March 31, 2013 and 56% of the company's total revenues for the three-month period ending March 31, 2014.[15]

If Pandora had been required to pay the CRB-established royalty rates versus those available to a "pureplay" webcaster, its content acquisitions would have increased by approximately 75% as the per performance rates would have increased from $0.0012 per performance to $0.0021 in 2013 and from $0.0013 to $0.0023 in 2014.   This would have resulted in the company paying approximately 125% of total revenues for content acquisition costs for the three-month period ending March 31, 2013 and approximately 94% of total revenues for content acquisition costs for the three-month period ending March 31, 2014.

Reasonable people would probably conclude that no company could long survive if it were paying out more than 100% of its revenues.  Yet music publishers are asking for "parity" for

---

[13] A "performance" is defined as "each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission (e.g., the delivery of any portion of a single track from a compact disc to one listener) but excluding the following:

(1) A performance of a sound recording that does not require a license (e.g., a sound recording that is not copyrighted);

(2) A performance of a sound recording for which the service has previously obtained a license from the Copyright Owner of such sound recording; and

(3) An incidental performance that both:

(i) Makes no more than incidental use of sound recordings including, but not limited to, brief musical transitions in and out of commercials or program segments, brief performances during news, talk and sports programming, brief background performances during disk jockey announcements, brief performances during commercials of sixty seconds or less in duration, or brief performances during sporting or other public events and

(ii) Other than ambient music that is background at a public event, does not contain an entire sound recording and does not feature a particular sound recording of more than thirty seconds (as in the case of a sound recording used as a theme song)." 37 C.F.R. § 380.2.

[14] Webcaster Settlement Act of 2009, Pub. L. 111-136; 123 Stat. 1926 (June 30, 2009).

[15] Pandora Media, Inc. Form 10-Q for the quarterly period ending March 31, 2014, at 27.

Exhibit C - Page 33

performance royalties for musical works to those of sound recordings.[16]  We do not know exactly what the publishers mean by "parity" – whether they mean the same percentage of revenue paid for the public performance of musical works as is paid for the public performance of sound recordings– or something else, but clearly parity between sound recording and musical work royalty rates does not work where the rates established for the use of one work are already equal to or greater than 50% on an effective basis.  Spotify USA Inc. currently pays around 70% of its revenue to rightsholders, with payments for the right to make available compositions receiving about 21% of the amount that the record labels get in accordance with the statutory rate. If "parity" means paying the same to publishers as it does to record labels, Spotify will be paying out more than 100% of its revenues to rightsholders, which is clearly unsustainable.

We therefore believe that the fees to be paid for both musical works and sound recordings should not be set in a vacuum.  There is only such much revenue that can be paid by a licensee for the use of "music" – which encompasses both sound recordings and the musical works embodied therein.  Spotify notes that the largest musical work and sound recording copyright owners are also often under common ownership (e.g., Universal Music Group and Universal Music Publishing Group, Warner Music Group and Warner/Chappell Music Publishing, etc.). Spotify values both compositions and sound recordings but is not in a position to comment on whether one set of rights is worth more than another.

7.     ***Are the consent decrees serving their intended purpose?  Are the concerns that motivated the entry of these decrees still present given modern market conditions and legal developments?  Are there alternatives that might be adopted?***

Spotify believes that the consent decrees that ASCAP and BMI have each entered into with the United States Department of Justice are generally serving their intended purpose.  The consent decrees permit any licensee to obtain a license to all of the works in the respective PROs' repertory. This is a pro-competitive benefit of the decree.

Simultaneously, the consent decrees limit the ability of music publishers to act collectively in a manner that harms competition by charging supra-competitive rates.  Nothing should be done to undermine the restraints that the consent decrees place on anticompetitive acts of the publishers. Although technology may have changed methods of consumption and distribution of music since the time in which the consent decrees were entered into, the fundamental underlying considerations relating to concerted actions by competitors still remain the same, and it is still an important objective of public policy to ensure that anti-competitive behaviour is constrained. Spotify believed that the consent

---

[16] See Yinka Adegoke, *Martin Bandier: The 2014 Billboard Power 100*, Billboard, *available at* http://www.billboard.com/biz/5869773/martin-bandier-the-2014-billboard-power-100 (Jan. 15, 2014) (quoting Sony/ATV Music Publishing chairman Bandier as saying "My biggest concern…is we wanted a fair price, that the words and music were equally as important as the recording.")

**Exhibit C - Page 34**

Spotify supports the Copyright Office's effort to provide Congress with recommendations for reforming the Copyright Laws to improve the market for licensing sound recordings and musical works, and we look forward to continued participation in that effort.

Respectfully submitted,

_____

James Duffett-Smith
Spotify USA Inc.
45 W. 18th Street, 7th Floor
New York, N.Y.  10011

*Head of Licensing Business Affairs*
*Spotify USA Inc.*

May 23, 2014

**Exhibit C - Page 35**