HENRY GRADSTEIN (89747)
hgradstein@gradstein.com
MARYANN R. MARZANO (96867)
mmarzano@gradstein.com
DANIEL B. LIFSCHITZ (285068)
dlifschitz@gradstein.com
GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd., Suite 510
Los Angeles, California 90048
Telephone: (323) 776-3100

MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
STEVEN G. SKLAVER (237612)
ssklaver@susmangodfrey.com
KALPANA D. SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
KRYSTA KAUBLE PACHMAN (280951)
kpachman@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150

STEPHEN E. MORRISSEY (187865)
smorrissey@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 3rd Avenue, Suite 3800
Seattle, WA  98101
Telephone:  (206) 373-7383
Facsimile:  (206) 516-3883

Interim Co-Lead Class Counsel

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| DAVID LOWERY, individually and on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SPOTIFY USA INC., a Delaware corporation,<br><br>Defendants. | Case No. 2:15-cv-09929-BRO-RAOx<br><br>Judge: Hon. Beverly Reid O'Connell<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR COPYRIGHT INFRINGEMENT**<br><br>**DEMAND FOR TRIAL BY JURY** |

4377239v1/015144

| | |
|---|---|
| MELISSA FERRICK, individually and doing business as Nine Two One Music and Right On Records/Publishing; JACO PASTORIUS, INC.; and GERENCIA 360 PUBLISHING, INC., individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>       v.<br><br>SPOTIFY USA INC., a Delaware corporation, and DOES 1 through 10,<br><br>              Defendants. | Case No. 16-CV-180-BRO-RAOx |

Plaintiffs Melissa Ferrick individually and doing business as Nine Two One Music and Right On Records/Publishing ("Ferrick"), Jaco Pastorius, Inc. ("Pastorius"), and Gerencia 360 Publishing, Inc. (collectively, "Plaintiffs") on behalf of themselves and all other similarly situated owners of federal copyrights in nondramatic musical works ("musical compositions" or "songs") that were reproduced and distributed without a license by Defendant Spotify USA Inc. ("Spotify" or "Defendant") and DOES 1-10 (collectively "Defendants") during the last three years, allege as follows.

## NATURE OF THE ACTION

1.      Under the Copyright Act, there are two separate copyrights in every recorded song: one in the sound recording ("phonorecord") itself, 17 U.S.C. §102(7), and one in the musical composition embodied in that phonorecord, 17 U.S.C. §102(2).  This case is brought to vindicate the rights of the owners of the copyrights in the musical compositions embodied in phonorecords that Spotify has reproduced and distributed – without a license – as part of its extraordinarily popular interactive online subscription music streaming service (the "Service").

2.      Spotify launched the Service in the United States on or about July 14, 2011.  Since that time, the Service has grown to over 70 million subscribers, raised close to $1 billion in private equity, and obtained a valuation in excess of $8 billion. To achieve that success, Spotify promised its subscribers that it would provide them with "[a]ll the music you'll ever need…for every moment."  But Spotify knew that in order to fulfill its promise, it would either have to delay the launch of the Service (and its process for immediately ingesting and offering new music) until such time as it had obtained all necessary licenses, or it would have to employ a now familiar strategy for many digital music services – infringe now, apologize later.

3.      Spotify chose expediency over licenses.  Thus, while Spotify has profited handsomely from the music that its sells to its subscribers, the owners of

1   that music (in particular, songwriters and their music publishers) have not been able
2   to share in that success because Spotify is using their music for free.

3          4.      The path that Spotify should have chosen is set forth in the Copyright
4   Act.  A service like Spotify that is interested in reproducing and distributing musical
5   compositions in phonorecords has two choices: it can negotiate direct licenses with
6   the copyright owners of those musical compositions or it can pursue compulsory
7   licenses under 17 U.S.C. §115.  Either a direct license or a compulsory license
8   would have permitted Spotify to make and distribute phonorecords embodying the
9   musical compositions as part of the Service, including by means of digital
10  phonorecord deliveries ("DPDs"), interactive streaming, and limited downloads.

11         5.      While a license under 17 U.S.C. §115 is compulsory, it is not
12  automatic.  To obtain such a license, it was Spotify's obligation to send a notice to
13  each copyright owner "before or within thirty days after making, and before
14  distributing any phonorecords of the work" of its "intention" use the work.   17
15  U.S.C. §115(b)(1).  This notice of intent (or, as it is commonly referred to, an
16  "NOI") is not merely a ministerial formality; it is a critical first step in the
17  compulsory licensing process that alerts the copyright owner to the use of its
18  musical composition and, in turn, the right to be compensated for that use.  Because
19  of its significance, the failure to timely serve or file an NOI "forecloses the
20  possibility of a compulsory license and, in the absence of a negotiated license,
21  renders the making and distribution of phonorecords actionable as acts of
22  infringement."  17 U.S.C. §115(b)(2).  Even after sending an NOI, Spotify was then
23  required to timely account to the copyright owner and pay royalties accordingly.  17
24  U.S.C. §115(c).

25         6.      For the musical compositions that are at issue in this litigation, Spotify
26  did not negotiate direct licenses and did not avail itself of the compulsory licensing
27  procedures in the Copyright Act.  Instead, Spotify chose a third path: it outsourced
28  its licensing and accounting obligations to the Harry Fox Agency ("HFA"), a music

2

publishing rights organization that was ill-equipped to obtain licenses for all of the songs embodied in the phonorecords distributed by Spotify.  As a result, neither Spotify nor HFA directly licensed or timely issued NOIs for many of the musical compositions embodied in phonorecords that Spotify was reproducing and distributing on a daily basis as part of the Service.

7.     The known failure by Spotify to obtain licenses for all of the musical compositions that it is exploiting caused it to recently announce that it "will invest in the resources and technical expertise to build a comprehensive publishing administration system to solve this problem."  *See* Ed Christman, "Spotify Announces Database To Properly Manage Royalties," *Billboard* (Dec. 23, 2015), *available at* http://www.billboard.com/articles/business/6820925/spotify-publishing-database-royalties.  That is an investment and process that Spotify should have undertaken **before** it decided to reproduce and distribute phonorecords embodying unlicensed musical compositions to the Service's millions of users, not over four years after Spotify launched the Service in the United States.  At this point, Spotify's failure to properly obtain licenses is much more than what it euphemistically describes as an "administration system" problem; it is systemic and willful copyright infringement for which actual and statutory damages are the remedy.  Therefore, Plaintiffs bring this class action for copyright infringement on behalf of themselves and all similarly situated owners of musical compositions that were reproduced and distributed by Defendants without a license during the last three years.

## THE PARTIES

8.     Plaintiff Melissa Ferrick, a resident of Newburyport, Massachusetts, is a nationally recognized singer-songwriter who has released seventeen albums over the past two decades, with a catalog of over one hundred and fifty copyrighted musical compositions.  Ferrick is an eight-time Boston Music Award winner and is regarded as one of the most prolific songwriters of her generation.  She tours

regularly throughout North America and has shared the stage with Morrissey, Marc Cohn, Paul Westerberg, Dwight Yoakam, John Hiatt, Weezer, Tegan and Sara, Bob Dylan, Ani DiFranco, k.d. Lang, Suzanne Vega, Joan Armatrading, and many others.   Ferrick signed in the early 1990s with Atlantic Records, and in 1993 released her debut album, "Massive Blur," which was then followed by "Willing to Wait" in 1995.   Critical acclaim for Ferrick's music has continued to this day. Ferrick's 2011 album "Still Right Here" debuted on Billboard's Heat-Seekers Album Chart, won an 8th annual International Acoustic Music Award, and garnered two Independent Music Award nominations.   Her 2013 album, "The Truth Is," won the 2014 Independent Music Award for Alt-Country Album of the Year and her 2015 self-titled album was referred to by the Boston Globe as "one of the year's most singular albums."   Ferrick has been a part time Associate Professor in the Songwriting Department at Berklee College of Music since 2013, and the Artistic Director for Berklee's Five Week Summer Program since 2009.   Her songs have been streamed approximately one million times by Spotify without a license.

9.     Plaintiff Jaco Pastorius, Inc. ("Pastorius") is a Florida corporation with its principal place of business in Melbourne, Florida.   It was formed on or about January 3, 1995, subsequent to the untimely death of John Francis Anthony Pastorius III, known professionally as Jaco Pastorius ("Jaco") to own Jaco's songs. Jaco was a highly acclaimed American jazz musician, composer, big band leader and electric bass player, considered by many to be the best and most influential bass guitarist in history.   Over his career, Jaco released fifteen solo albums, appeared on eight Weather Report albums, and collaborated and performed on many others from 1974-1986.   He has collaborated and guested on albums with legendary artists including Joni Mitchell, Pat Metheny, Ian Hunter, and Al Di Meola, and had numerous jazz greats perform with him on his solos projects.   He taught bass at the University of Miami in 1973 at the age 22, and went on to release his debut album in 1976, the eponymous *Jaco Pastorius*, which was considered a breakthrough album

4

for the electric bass.  It met with critical acclaim and is still viewed as the best bass album ever recorded.  Performing on the album was a veritable "Who's Who" of jazz, including Herbie Hancock, Wayne Shorter, David Sanborn, Lenny White, Hubert Laws, Don Alias, and Michael Brecker, many of whom Jaco continued to work with on future projects.  In 1976, Jaco joined Weather Report, one of the pre-eminent jazz fusion bands in the 1970s and 1980s.  Jaco was featured on the Grammy Award-nominated *Heavy Weather* in 1977, an album which showcased his bass playing and songwriting skills.  After leaving Weather Report in late 1981, he went on to pursue a big band solo project, resulting in his second solo release, *Word of Mouth*, which reunited him with Herbie Hancock, Wayne Shorter and Hubert Laws.  He died on September 21, 1987 at the age of 35.  Jaco received two Grammy Award nominations in 1977 for his debut album, including Best Jazz Performance by a Group and Best Jazz Performance by a Soloist for "Donna Lee," and received another nomination in 1978, Best Jazz Performance by a Soloist, for his work on Weather Report's Heavy Weather.  Jaco was inducted into the Down Beat Jazz Hall of Fame posthumously in 1988, one of only seven bassists ever to be so honored, and the only electric bass guitarist among the inductees.  He has been called "arguably the most important and ground-breaking electric bassist in history" (Adrian Belew, New Directions in Modern Guitar, Hal Leonard Publications (1986)), and described by William C. Banfield, director of Africana Studies, Music and Society at Berklee College, as one of the few original American virtuosos who defined a musical movement, along with Jimi Hendrix, Louis Armstrong, Thelonious Monk, Charlie Christian, Bud Powell, Charlie Parker, Dizzy Gillespie, Sarah Vaughan, Bill Evans, Charles Mingus and Wes Montgomery (William C. Banfield, Cultural Codes: Makings of a Black Music Philosophy (2009), p. 161).  Jaco's songs have been streamed millions of times by Spotify without a license.

4377239v1/015144

10.    Gerencia 360 Publishing, Inc. ("Gerencia 360 Publishing") is part of a group of music entertainment based companies started by Luis Del Villar in 2013. Gerencia 360 Publishing has a principal place of business in Downey, California. Mr. Del Villar incorporated Gerencia 360 Publishing in the State of California in 2014, together with Gerencia 360 Music, Inc., Gerencia 360 Management, Inc., and Gerencia 360 Entertainment, Inc. (collectively, "Gerencia 360 Companies").  The word "gerencia" translates from Spanish to "management" and in conjunction with "360," it defines the full scope of management provided by the Gerencia 360 Companies for its artists.  The Gerencia 360 Companies consist of a record label, music publishing company, and talent management company.  The Gerencia 360 Companies occupy a significant position in the regional Mexican music industry. Gerencia 360 Publishing owns copyrights to the songs of artists on the Gerencia 360 Music, Inc. ("Gerencia 360 Music") record label.  Gerencia 360 Music covers all genres, with a specialty in regional Mexican music.  Gerencia 360 Publishing also owns copyrights to the songs of other successful artists who do not record on the Gerencia 360 Music label.

11.    Songs owned by Gerencia 360 Publishing have been streamed multiple millions of times by Spotify without a license.  A small sampling of those songs include:

- "Adivina" – streamed over 4 million times – written by Luciano Luna Diaz and performed by Noel Torres, an internationally acclaimed singer/songwriter who is recognized as one of the leading male recording artists of the regional Mexican music genre
- "Me Interesas" – streamed over 6 million times – written by Luciano Luna Diaz and performed by Noel Torres
- "Para Que Tantos Besos" – streamed over 5 million times – written by Luciano Luna Diaz and performed by Noel Torres

4377239v1/015144

- "Amaneci Con Ganas" – streamed over 4.2 million times combined, over 2.7 million on the album and over 1.5 million times as a single – written by Maria Luisa Inzunza Favela and Jose Alberto Inzunza Favela, and performed by Noel Torres
- "Mujeres de Tu Tipo" – streamed over 3.7 million times – written by Jose Luis Del Villar and performed by Adriel Favela, a Mexican singer, songwriter and multi-instrumentalist specializing in norteño and corridos
- "Te Acuerdas De Tu Amiga" – streamed over 1.4 million times – written by Jose Alberto Inzunza Favela and Luciano Luna Diaz, and performed by Adriel Favela
- "Tomen Nota" – streamed over 1.8 million times – written by Jesus Jimenez Carrillo and performed by Adriel Favela
- "Es Tiempo De Guerra" – streamed over 1.5 million times – written by Ricardo Orrantia Martinez and Maria Luisa Inzunza Favela, and performed by Adriel Favela
- "Mi Primera Vez" – streamed over 920,000 times – written by Jose Alberto Inzunza Favela and Jose Luis Del Villar, and performed by Jonatan Sanchez, a captivating 17 year old singer and guitar player with a rapidly rising fan base
- "Mis Gustos, Mis Placeres" – streamed over 1.3 million times – written by Adriel Guadalupe Apodaca and Jose Luis Del Villar, and performed by Adriel Favela, featuring Jonatan Sanchez
- "Perfecta" – two different version streamed over a combined 580,000 times – written by Luciano Luna Diaz and Maria luisa Inzunza Favela, and peformed by Jonatan Sanchez
- "Me He Dado Cuenta" – streamed over 440,000 times – written by Jose Luis Del Villar and Omar Valenzuela, and performed by Martin

7

Castillo, an American-born alternative corrido singer, songwriter, drummer, and producer, whose solo recordings have been hits on the Mexican Regional charts, and who is widely known by fans as "the King of Corrido" (king of the ballads) and "El Toron" (the eminence)

- "Asi Sera" – streamed over 500,000 times – written by Jose Luis Del Villar and performed by Martin Castillo

12.   In 2014, SESAC, the second oldest performing rights organization in the Unites States, gave Latina Radio Performance Awards to the songs "Adivina" performed by Noel Torres, written by Luciano Luna, and co-published byDel New Music and Gerencia 360; "Me Interesas" performed by Noel Torres, written by Luciano Luna, and published by Gerencia 360; and "Me He Dado Cuenta" performed by Martín Castillo, written by Luis Del Villar and Omar Valenzuela, and published by Gerencia 360. Gerencia 360 is clearly a major force in the Latina market, owning songs with huge popularity and dominating the charts in the Mexican regional music arena.Spotify is a Delaware corporation with its principal place of business in New York, New York.  Spotify owns and operates the Service – an online interactive music streaming service, which can be principally accessed at www.spotify.com.  The Service consists of both an advertisement-supported service that is free to subscribers and a premium service that costs $9.99 per month and is advertisement-free.  Spotify is qualified to do business in State of California and has registered as a foreign corporation with the California Secretary of State.  Spotify also has a designated agent for service of process in Los Angeles, National Registered Agents, Inc., with an address of 818 W. Seventh St., Ste 930, Los Angeles, CA  90017.

13.   It is actively doing business in California with offices in Los Angeles and San Francisco.  Spotify operates the Service in California, has millions of subscribers and end users in California, has entered into contracts and other

transactions in California (including with record labels, publishers and developers), and generates millions of dollars in revenue from California residents.

14.     Spotify has previously admitted in other federal filings that personal jurisdiction is proper in California. *PacketVideo Corp v. Spotify USA Inc., et. al*, Case No. CV 11-1659-IEG-WMCx (S.D. Cal. 2011), Dkt. 14 at ¶ 9 ("Defendants do not dispute that this Court has personal jurisdiction over Spotify USA, Inc. and Spotify Limited.").

15.     Spotify's User's Terms of Use specify California as the choice of law for all disputes with its users in the United States and requires any dispute, claim, or controversy to be resolved in state or federal courts in one of two states – California being one of them.

16.     Spotify Developer's Terms of Use specify California as the choice of law for all disputes with its third-party developers worldwide and require any dispute, claim, or controversy to be resolved in state or federal courts in only one state – California.

17.     In 2013, in an attempt the invoke the provisions of the Class Action Fairness Act (CAFA) for the removal of an action filed against it California, Spotify relied on its extensive contacts with California and its residents, including declaration that those residents in 2013 had spent more than $15 million for subscriptions to Spotify's paid Premium service. (*Bleak v. Spotify USA, Inc*., Case No. CV 13-5653-CRB (N.D. Cal. 2013), Dkt. 2 at ¶ 7(d) (Declaration of Göran Sander, analyst in Spotify's Analytics teams).

18.     By its own admissions, Spotify maintains two offices in California, including one in this District.

19.     Spotify routinely seeks to employ, and does employ senior level employees in California.  Spotify currently employs the head of artist services and the head of original content licensing in its Los Angeles office.  It is also currently

seeking a Director of Publishing and Songwriter Relations in Los Angeles and a Strategic Partnership Manager for Software and Technology in San Francisco.

20.    On October 10, 2014, in collaboration with the Music Managers' Forum (MMF) and the Featured Artists Coalition (FAC),Spotify specifically hosted a meeting in Los Angeles to discuss streaming with artists as part of its artist outreach campaign.

21.    On February 13, 2016, Spotify threw a "Creators party" at Cicada in Los Angeles to appeal to artists, producers, and songwriters.

22.    Spotify has sought to transfer cases to California on the grounds that it is a more convenient forum.  *iMTX Strategic, LLC, v. Spotify USA, Inc.*, Case No. CV 15-325-GMS (D. Del. 2014) Dkt. 12 (Spotify's motion to transfer venue to the Northern District of California).

23.    In 2009, Spotify's music content team entered into a licensing deal with InGrooves, which is based in San Francisco, California.  The InGrooves catalogue includes artists like Dolly Parton, The Crystal Method, Andrew Bird, Too $hort, and Thievery Corporation.

24.    The true names and capacities (whether individual, corporate, associate or otherwise) of the defendants named herein as Does 1 through 10, inclusive, are unknown to Plaintiffs, who therefore sue said defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when such have been ascertained.  Upon information and belief, each of the Doe defendants herein is responsible in some manner for the occurrences herein alleged, and Plaintiffs' and class members' injuries as herein alleged were proximately caused by such defendants' acts or omissions.

25.    Plaintiffs are informed and believe, and on that basis allege, that at all times mentioned in this Complaint, Spotify and each of the Doe defendants were the agent of each other and, in doing the things alleged in this Complaint, were acting within the course and scope of such agency.

4377239v1/015144

## **JURISDICTION AND VENUE**

26.    This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. §101 *et seq.*

27.    This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§1331 and 1338(a).

28.    This Court has personal jurisdiction over Defendants because, among other things, they do continuous and systematic business in California and in this District and maintain one or more offices and employ personnel in California. Additionally, as described above, Defendants have conceded they are subject to personal jurisdiction in California and have directed their business conduct to California. Defendants have also committed acts of copyright infringement in California and have performed acts directed at and causing harm in California.

29.    Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and (c) and 1400(a) because Spotify is subject to personal jurisdiction in this District and because a substantial part of the events or omissions by Spotify giving rise to the claims occurred in this District.

## **CLASS ALLEGATIONS**

30.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. Proc. 23 on behalf of themselves and on behalf of a class of similarly situated copyright owners of musical compositions defined as:

> All persons or entities who own the copyright in a musical composition: (a) for which a certificate of registration has been issued or applied for; and (b) that was reproduced and distributed through interactive streaming and/or limited downloads by Defendants without a license during the last three years.

31.    This action has been brought and may be properly maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed class are readily and easily ascertainable and identifiable.

11

32.    The members of the class are so numerous that joinder of all members is impracticable.  Plaintiffs are informed and believe, and on that basis allege, that there are thousands of members in the class who can be readily located, identified from various databases and records (including those maintained by Spotify, the United States Copyright Office, and HFA) and through discovery, and notified of this action.

33.    Plaintiffs' claim for copyright infringement is typical of the claims of the members of the class, and Plaintiffs' interests are consistent with and not antagonistic to those of the other members of the class they seek to represent. Plaintiffs and all members of the class have sustained damages and face irreparable harm arising out of Defendants' continued infringement as alleged herein and, thus, are entitled to recover actual damages and/or statutory damages and obtain injunctive relief to prevent further wrongful conduct by Defendants.

34.    Plaintiffs have no interests that are adverse to, or which conflict with, the interests of the absent members of the class and they are able to fairly and adequately represent and protect the interests of such a class.  Plaintiffs believe strongly in the protection of the copyrights of songwriters and music publishers. Plaintiffs have raised a viable claim for copyright infringement of the type reasonably expected to be raised by members of the class, and will diligently and vigorously pursue that claim.  If necessary, Plaintiffs may seek leave of the Court to amend this Complaint to include additional class representatives to represent the class or additional claims as may be appropriate.  Plaintiffs are represented by experienced, qualified, and competent counsel who are committed to prosecuting this action.

35.    Common questions of fact and law exist as to all members of the class that plainly predominate over any questions affecting only individual members of the class.  These common legal and factual questions, which do not vary from class member to class member, and which may be determined without reference to the

individual circumstances of any class member, include (without limitation) the following:

> (A)   Whether Defendants reproduced and distributed musical compositions through interactive streaming and/or limited downloads without a license during the last three years;

> (B)   Whether Defendants' reproduction and distribution of musical compositions through interactive streaming and/or limited downloads without a license constitutes direct infringement in violation of the Copyright Act, 17 U.S.C. §101 *et seq.*;

> (C)   Whether Defendants' acted willfully with respect to the acts complained of herein;

> (D)   The basis and method for determining and computing damages, including statutory damages; and

> (E)   Whether Defendants' infringing conduct is continuing, thereby entitling the members of the class to injunctive or other relief.

36.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all class members is impracticable.  The claims of the individual members of the class may range from smaller sums to larger sums.  Thus, for those class members with smaller claims, the expense and burden of individual litigation may not justify pursuing the claims individually.  And even if every member of the class could afford to pursue individual litigation, the court system could not be so encumbered. It would be unduly burdensome to those courts in which individual litigation of numerous cases would otherwise proceed.   Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action presents few management difficulties, conserves the resources of

the parties and court system, and protects the rights of each member of the class. Plaintiffs anticipate no difficulty in the management of this action as a class action.

## CLAIM FOR RELIEF

### (Copyright Infringement – Against All Defendants)

37.     Plaintiffs hereby incorporate the allegations set forth above in paragraphs 1 through 20 above, as though fully set forth herein.

38.     Under §106 of the Copyright Act, the copyright owner of a musical composition has the exclusive rights to reproduce and distribute the compositions in phonorecords. 17 U.S.C. §106(1) and (3).   This includes the exclusive rights to make or authorize DPDs, interactive streams, and limited downloads of the musical compositions through subscription or non-subscription online digital music services. *See* 17 U.S.C. §115(d), 37 C.F.R. §§385.10, 385.11.

39.     Spotify's online interactive music streaming service, www.spotify.com, is offered to end users in the United States on an advertising-free paid subscription basis or an advertiser-supported no-subscription basis. Spotify distributes phonorecords embodying musical compositions to its end users through interactive streaming and limited downloads available on their computers and mobile devices. Plaintiff is further informed and believes, and on that basis alleges, that Spotify also makes server copies in the United States of phonorecords embodying the musical compositions at issue in this litigation.

40.     In order to lawfully make and distribute phonorecords embodying the musical compositions as set forth above, Spotify must have first obtained not only a license for each individual phonorecord from its owner(s), but also a separate license for the underlying musical composition that is embodied in each separate phonorecord from the copyright owner of such composition.   Spotify can either license musical compositions directly or by obtaining a compulsory license in accordance with the terms of 17 U.S.C. §115 by serving a timely NOI.   Failure to serve or file the requisite NOI "within thirty days after making, and before

14

distributing any phonorecords of the work…forecloses the possibility of a compulsory license and, in the absence of a voluntary license, renders the making and distribution of phonorecords actionable as acts of copyright infringement." 17 U.S.C. §115(b)(1) and (2).

41.   Spotify did not have and does not have a comprehensive system of music publishing administration in place necessary to license all of the songs embodied in phonorecords which it ingests and distributes by means of interactive streaming and temporary downloads.  Rather than decline to distribute phonorecords embodying musical compositions that are unlicensed, however, Spotify elected instead to engage in wholesale copyright infringement.

42.   Ferrick is the registered copyright owner of all of the musical compositions listed on Exhibit A attached hereto and incorporated herein by this reference ("Ferrick's musical compositions").  Ferrick's musical compositions have been distributed through interactive streaming and temporary downloads by Spotify approximately one million times within the last three years.  Ferrick is further informed and believes, and on that basis alleges, that server copies thereof have also been made by Spotify within the last three years.  Ferrick's musical compositions have not been licensed by Spotify either directly or by a compulsory license in accordance with 17 U.S.C. §115.

43.   Pastorius owns all interests in Jaco's registered copyrighted musical compositions that he owned at the time of his death, including any interests that were owned by his first wife ("Pastorius' musical compositions").  A representative sampling of the Pastorius musical compositions are listed on Exhibit B attached hereto and incorporated herein by this reference.

44.   Pastorius' musical compositions have been distributed through interactive streaming and temporary downloads by Spotify millions of times within the last three years.  Pastorius is further informed and believes, and on that basis alleges, that server copies thereof have also been made by Spotify within the last

15

three years.  Pastorius' musical compositions have not been licensed by Spotify either directly or by a compulsory license in accordance with 17 U.S.C. §115.

45.     Gerencia 360 Publishing is the registered copyright owner or registration pending copyright owner of all of the musical compositions listed on Exhibit C attached hereto and incorporated herein by this reference ("Gerencia 360 Publishing's musical compositions").  Gerencia 360 Publishing's musical compositions have been distributed through interactive streaming and temporary downloads by Spotify millions of times within the last three years.  Gerencia 360 Publishing is further informed and believes, and on that basis alleges, that server copies thereof have also been made by Spotify within the last three years.  Gerencia 360 Publishing's musical compositions have not been licensed by Spotify either directly or by a compulsory license in accordance with 17 U.S.C. §115.

46.     Plaintiffs are further informed and believe, and on that basis allege, that the musical compositions owned by the members of the class have been distributed by Spotify through interactive streaming and temporary downloads and that Spotify has also made server copies thereof during the last three years, all without either a direct or compulsory license.

47.     Spotify's unlawful reproduction and distribution of the musical compositions owned by Plaintiffs and the members of the class as alleged hereinabove constitutes copyright infringement under the Copyright Act.  17 U.S.C. §101 *et seq.*

48.     Spotify's acts of infringement have been willful, intentional, and purposeful, in disregard of and indifference to the rights of Plaintiffs and the members of the class.

49.     As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and the copyrights of the members of the class, pursuant to 17 U.S.C. §504(c), Plaintiffs and the class members are entitled to recover up to $150,000 in statutory damages for each musical composition infringed.

16

Alternatively, at their election, pursuant to 17 U.S.C. §504(b), Plaintiffs and the class members are entitled to their actual damages, including Spotify's profits from infringement, as will be proven at trial.

50.    Plaintiffs and the class members are also entitled to recover attorney's fees and costs pursuant to 17 U.S.C. §505, and prejudgment interest according to law.

51.    Spotify is causing, and unless enjoined by the Court will continue to cause, Plaintiffs and the class members irreparable harm for which they have no adequate remedy at law.   Plaintiffs and the class members are entitled to an injunction under 17 U.S.C. §502 prohibiting the continued infringement of their musical compositions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of all other members of the class, pray for Judgment against Spotify and the Doe Defendants, and each of them, as follows:

A.    Determining that this is a proper class action maintainable pursuant to Rule 23 of the Federal Rules Civil Procedure, certifying Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

B.    For compensatory and/or statutory damages in an amount in excess of $200 million, according to proof;

C.    A temporary, preliminary, and permanent injunction enjoining and restraining Defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in concert with them or at their direction, and each of them, from continued unlicensed reproduction and distribution of the copyrighted musical compositions owned by Plaintiffs and the members of the class;

D.    For pre- and post-judgment interest.

4377239v1/015144

1     E.     For such fees and costs (including reasonable attorney's fees) incurred

2 herein as permitted by law.

3     F.     For such other and further relief as the Court deems just and proper.

4

5 Dated:  June 27, 2016                        HENRY GRADSTEIN
                                              MARYANN R. MARZANO
6                                             DANIEL LIFSCHITZ
                                              GRADSTEIN & MARZANO, P.C.

7                                             MARC M. SELTZER
                                              STEVEN G. SKLAVER
8                                             KALPANA D. SRINIVASAN
                                              KRYSTA KAUBLE PACHMAN
9                                             SUSMAN GODFREY L.L.P.

10                                            STEPHEN E. MORRISSEY (187865)
                                              smorrissey@susmangodfrey.com
11                                            SUSMAN GODFREY L.L.P.
                                              1201 3rd Avenue, Suite 3800
12                                            Seattle, WA  98101
                                              Telephone:  (206) 373-7383
13                                            Facsimile:  (206) 516-3883

14

15

16                                            By:  /s/ Maryann R. Marzano
                                                   Maryann R. Marzano
17                                                   *Interim Co-Lead Class Counsel*

18

19

20

21

22

23

24

25

26

27

28

18

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury of the claim alleged in this Complaint.

Dated:  June 27, 2016

HENRY GRADSTEIN
MARYANN R. MARZANO
DANIEL LIFSCHITZ
GRADSTEIN & MARZANO, P.C.

MARC M. SELTZER
STEVEN G. SKLAVER
KALPANA D. SRINIVASAN
STEPHEN E. MORRISSEY
KRYSTA KAUBLE PACHMAN
SUSMAN GODFREY L.L.P.


By: */s/ Maryann R. Marzano*
Maryann R. Marzano

*Interim Co-Lead Class Counsel*

19

4377239v1/015144