**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MELISSA FERRICK, et. al.,

        Plaintiffs,

vs.

SPOTIFY USA INC, et. al.

        Defendant.

Case No. 1:16-cv-08412 (AJN)

**DEFENDANT SPOTIFY USA INC.'S
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
ITS MOTION TO STRIKE CLASS
ALLEGATIONS**

**ORAL ARGUMENT REQUESTED**

Mayer Brown LLP
1221 Avenue of Americas
New York, New York 10020
(212) 506-2500

*Attorneys for Spotify USA Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 4

LEGAL STANDARD ............................................................................................................ 5

ARGUMENT ...................................................................................................................... 6

I.      The Proposed Class Is An Impermissible Fail-Safe Class. ........................................... 7

II.     The Proposed Class Is Neither Ascertainable Nor Manageable. .................................. 8

III.    The Putative Class Does Not Satisfy Rule 23(a)(2)...................................................... 15

      A.    Plaintiffs' Allegations Are Incapable Of Class-Wide Resolution. ...................... 16

           1.    Whether A Work Has A Valid Copyright............................................. 16

           2.    Whether Spotify Has a License or Authorization To Distribute Any Particular Composition. .......................................................................... 19

           3.    The Basis and Method for Assessing Damages..................................... 21

           4.    Willful Infringement. .......................................................................... 24

      B.    In Light Of These Individualized Issues, Rule 23 And Due Process Prohibit Certification Of Plaintiffs' Proposed Class........................................... 24

IV.    Plaintiffs Cannot Establish Predominance And Superiority Under Rule 23(b)(3). ......... 27

V.     Plaintiffs Cannot Satisfy The Requirements For A Rule 23(b)(2) Injunctive Class........ 29

CONCLUSION .................................................................................................................... 30

**Page(s)**

**Cases**

*Am. W. Door & Trim v. Arch Specialty Ins. Co.*,
2015 WL 1266787 (C.D. Cal. Mar. 18, 2015).......................................................6

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997).......................................................................................27

*Appalseed Prods., Inc. v. MediaNet Digital, Inc.*,
2012 WL 2700383 (S.D.N.Y. July 6, 2012) ......................................................1

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).........................................................................................4

*Authors Guild v. Google, Inc.*,
721 F.3d 132 (2d Cir. 2013)...........................................................................6

*Estate of Berlin v. Stash Records, Inc.*,
1996 WL 374176 (S.D.N.Y. July 2, 1996) .........................................................28

*BMW of North Am., Inc. v. Gore*,
517 U.S. 559 (1996).......................................................................................29

*Brecher v. Republic of Argentina*,
806 F.3d 22 (2d Cir. 2015)......................................................................2, 8, 9

*Bryant v. Media Right Prods., Inc.*,
603 F.3d 135 (2d Cir. 2010)...........................................................................23

*In re Cellco P'Ship*,
663 F. Supp. 2d 363 (S.D.N.Y. 2009)..............................................................10

*Cornette v. Jenny Garton Ins. Agency, Inc.*,
2010 WL 2196533 (N.D. W. Va. May 27, 2010) ..............................................6

*Davis v. Blige*,
505 F.3d 90 (2d Cir. 2007)..............................................................................15

*eBay, Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006).......................................................................................30

*Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*,
140 F.2d 268 (2d Cir. 1944)...........................................................................22

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991).......................................................................................17

*Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*,
807 F.2d 1110 (2d Cir. 1986)...............................................................22

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
2015 WL 4776932 (C.D. Cal. May 27, 2015) ...........................................25, 26

*Football Ass'n Premier League Ltd. v. YouTube, Inc.*,
297 F.R.D. 64 (S.D.N.Y. 2013) ........................................................ *passim*

*Gen. Tel. Co. v. Falcon*,
457 U.S. 147 (1982)..............................................................................6

*Hicks v. T.L. Cannon Corp.*,
35 F. Supp. 3d 329 (W.D.N.Y. 2014) .......................................................7

*Hovespian v. Apple, Inc.*,
2009 WL 5069144 (N.D. Cal. Dec. 17, 2009) ..........................................6

*In re Initial Pub. Offering Sec. Litig.*,
2008 WL 2050781 (S.D.N.Y. May 13, 2008) ...........................................5

*Island Software & Computer v. Microsoft, Inc.*,
413 F.3d 257 (2d Cir. 2005)) ...............................................................24

*Jimenez v. Allstate Indem. Co.*,
2010 WL 3623176 (E.D. Mich. Sept. 15, 2010) ........................................6

*John v. Nat'l Sec. Fire & Cas. Co.*,
501 F.3d 443 (5th Cir. 2007) ...............................................................6

*Johnson v. Nextel Commc'ns, Inc.*,
780 F.3d 128 (2d Cir. 2015)............................................................27, 28

*Keane Dealer Servs., Inc. v. Harts*,
968 F. Supp. 944 (S.D.N.Y. 1997) ....................................................20, 21

*Lindsey v. Normet*,
405 U.S. 56 (1972)...............................................................................25

*Lumpkin v. E.I. Du Pont De Nemours & Co.*,
161 F.R.D. 480 (M.D. Ga. 1995) ...........................................................6

*Manning v. Boston Med. Ctr. Corp.*,
725 F.3d 34 (1st Cir. 2013) ...................................................................5

*Manno v. Tenn. Prod. Ctr.*,
  657 F. Supp. 2d 425 (S.D.N.Y. 2009).....................................................................22

*Marya v. Warner/Chappell Music, Inc.*,
  2015 WL 5568497 (C.D. Cal. Sept. 22, 2015) ........................................14, 15, 18

*Mata v. CitiMortgage, Inc.*,
  2012 WL 7985175 (C.D. Cal. July 20, 2012) ...........................................................6

*Meredith v. Smith*,
  145 F.2d 620 (9th Cir. 1944) ...................................................................................13

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
  209 F.R.D. 323 (S.D.N.Y. 2002) ...............................................................................9

*In re Napster, Inc. Copyright Litigation*,
  2005 WL 1287611 (N.D. Cal. June 1, 2005).............................................25, 26, 27

*Parker v. Time Warner Entm't Co., L.P.*,
  331 F.3d 13 (2d Cir. 2003).......................................................................................29

*Pilgrim v. Universal Health Card, LLC*,
  660 F.3d 943 (6th Cir. 2011) ..................................................................................5, 6

*Poindexter v. EMI Record Grp., Inc.*,
  2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) .........................................................10

*Resnick v. Copyright Clearance Ctr., Inc.*,
  2003 WL 22176619 (D. Mass. Sept. 22, 2003) .........................................................6

*Ross-Randolph v. Allstate Ins. Co.*,
  2001 WL 36042162 (D. Md. May 11, 2001) ..............................................................6

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010).......................................................................................30

*Sanders v. Apple, Inc.*,
  672 F. Supp. 2d 978 (N.D. Cal. 2009) .......................................................................6

*Scholz Design, Inc. v. Sard Custom Homes, LLC*,
  LLC, 691 F.3d 182 (2d Cir. 2012) ...........................................................................18

*Shoptalk, Ltd. v. Concorde-New Horizons Corp.*,
  168 F.3d 586 (2d Cir. 1999)......................................................................................18

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
2016 WL 4126543 (S.D.N.Y. Aug. 2, 2016) ......................................................23

*Spread Enters., Inc. v. First Data Merchant Servs., Corp.*,
298 F.R.D. 54 (E.D.N.Y. 2014) .............................................................................7

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) ............................................................................................29

*Stearns v. Select Comfort Retail Corp.*,
2009 WL 4723366 (N.D. Cal. Dec. 4, 2009) .......................................................6

*Stumm v. Drive Entm't*,
2002 WL 5589 (S.D.N.Y. 2002) .........................................................................10

*TufAmerica, Inc. v. Diamond*,
2015 WL 10846075 (S.D.N.Y. Mar. 24, 2015) ..................................................15

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016) ........................................................................................25

*Vinole v. Countrywide Home Loans, Inc.*,
571 F.3d 935 (9th Cir. 2009) ................................................................................6

*Vulcan Golf, LLC v. Google Inc.*,
254 F.R.D. 521 (N.D. Ill. 2008) .........................................................................27

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ..................................................................................... *passim*

*WB Music Corp. v. Rykodisc, Inc.*,
1995 WL 631690 (E.D. Pa. Oct. 26, 1995) ..........................................................6

*Wright v. Family Dollar, Inc.*,
2010 WL 4962838 (N.D. Ill. Nov. 30, 2010) .......................................................6

*Wu v. Pearson Educ. Inc.*,
2012 WL 6681701 (S.D.N.Y. Dec. 21, 2012) ......................................................6

*Xavier v. Philip Morris USA Inc.*,
787 F. Supp. 2d 1075 (N.D. Cal. 2011) ................................................................9

TABLE OF AUTHORITIES
(continued)

**Statutes and Rules**

17 U.S.C.

§ 10 (1958, 1964) ...................................................................................18
§ 102(a)(2) ...............................................................................................1
§ 102(a)(7) ...............................................................................................1
§ 106 ........................................................................................................4
§ 115(c) ............................................................................................. *passim*
§ 203 ......................................................................................................13
§ 302 ......................................................................................................18
§ 303 ......................................................................................................18
§ 405 ......................................................................................................18
§ 410(c) ............................................................................................17, 18
§ 412(2) ..................................................................................................23
§ 501 ........................................................................................................4
§ 504(c)(1) ........................................................................................22, 29
§ 504(c)(2) ..............................................................................................29

28 U.S.C. § 2072(b) ..................................................................................25

Fed. R. Civ. P.

12(f) .........................................................................................................5
23(a)(2) ............................................................................................ *passim*
23(b)(2) ..................................................................................3, 4, 29, 30
23(b)(3) ............................................................................................ *passim*
23(c)(1) .....................................................................................................5
23(d)(1)(D) ...............................................................................................5

**Other Authorities**

*Nimmer on Copyright* ..................................................................13, 19, 22

**INTRODUCTION**

Plaintiffs' copyright claims are inherently unsuitable for class adjudication. The Court should therefore strike the class allegations against Defendant Spotify USA.

Plaintiffs allege that Spotify infringed their mechanical rights in a subset of Plaintiffs' musical works by failing to obtain the proper license or authorization before making those works (also known as compositions) available on Spotify's service. Plaintiffs seek to represent a putative class of persons whose mechanical rights were allegedly violated.[1]

But courts in this Circuit have recognized that, "[g]enerally speaking, copyright claims are poor candidates for class-action treatment" because of the highly individualized factual and legal inquiries that they entail. *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 297 F.R.D. 64, 65 (S.D.N.Y. 2013). "[A]ccumulation of all the copyright claims, and claimants, into one action will not simplify or unify the process of their resolution, but multiply its difficulties over the normal one-by-one adjudications of copyright cases." *Id.* at 66. That is particularly true here: Because each putative class member's infringement claim requires numerous legal and factual inquiries specific to *each and every one* of the compositions at issue, Plaintiffs' sweeping class-wide allegations are a "'Frankenstein monster posing as a class action.'" *Id.* at 65.

For four separate reasons, Plaintiffs' complaint fails on its face to satisfy the prerequisites

---

[1] Typically, a music recording implicates at least **two** distinct kinds of intellectual property rights: (1) **the composition**, which reflects the copyright in the underlying song (*i.e.*, the words and music composed by a songwriter); and (2) **the sound recording**, which involves the particular sounds that are fixed or embodied in a recording. *See* 17 U.S.C. § 102(a)(2) (copyright in "musical works"); *id.* § 102(a)(7) (same for "sound recordings"). Rights in the sound recordings themselves typically belong to the record label responsible for making the recording. Rights in the musical composition are typically owned, at least initially, by the songwriter or music publisher. The copyright in the composition itself has multiple components; the right to distribute or reproduce the words and music of the work is referred to as the "mechanical right." The mechanical right is distinct from the right to perform the words and music of the work publicly (the "performance right"). *See Appalseed Prods., Inc. v. MediaNet Digital, Inc.*, 2012 WL 2700383, at *2 (S.D.N.Y. July 6, 2012). And there are numerous mechanisms by which a mechanical right might be licensed. *See* pp. 19-20, *infra*.

1

of Federal Rule of Civil Procedure 23. *First*, Plaintiffs have proposed an improper "fail-safe" class. The proposed class definition parrots the elements of copyright infringement. Class membership is circular because it effectively equates with liability, and any class member against whom Spotify successfully defends itself would automatically drop out of the class and not be bound by the result. That "heads-I-win, tails-you-lose" result is precisely what the prohibition on fail-safe classes is meant to prevent.

*Second*, Plaintiffs' proposed class fails to satisfy the ascertainability requirement of Rule 23—and (for related reasons) it is not manageable. There is no way to determine who qualifies as a class member without first assessing the complex and highly fact-specific questions of:

(1) which compositions are embodied in the sound recordings on Spotify's service;

(2) who owns the mechanical rights to each composition;

(3) whether each composition has a registered copyright (or an application for registration is pending); and

(4) whether Spotify reproduced or distributed the compositions without license or authorization (which itself requires complex inquiries and cannot be determined before first answering the above questions).

It is therefore inevitable that separate, individual mini-trials on the merits would be required to identify each class member. As the Second Circuit has emphasized, a proposed class is not ascertainable "'when identifying its members would . . . require a mini-hearing on the merits of each case.'" *Brecher v. Republic of Argentina*, 806 F.3d 22, 24-25 (2d Cir. 2015).

*Third*, this lawsuit lacks the commonality that Rule 23(a)(2) requires for certification of any class. The alleged "common questions" are not in fact common; they turn on individualized and fact-intensive inquiries not just for each putative class member, but for *each musical*

*composition* at issue.  The composition-by-composition inquiries that would be required include:

- who owns the asserted mechanical rights;

- whether there is a valid copyright registration (and if so, *when* registration occurred);

- whether Spotify had an express or implied license to reproduce and/or distribute the work—which itself depends on a number of complicated inquiries, including but not limited to questions of ownership;

- whether Spotify is authorized to distribute the work under Section 115(c)(3)(G) of the Copyright Act;

- whether and how the work was reproduced and/or distributed by Spotify;

- whether, if there was an infringement, that infringement was willful; and

- what damages, if any, are appropriate.

*Fourth*, even if Plaintiffs could surmount these three independent obstacles to class treatment, their class allegations fail on the pleadings because they cannot satisfy either Rule 23(b)(3)'s requirements for a damages class action or Rule 23(b)(2)'s standards for an injunction-only class action.

To certify a damages class action under Rule 23(b)(3), a plaintiff must show *both* that common issues predominate over individual ones and that the class device is a superior method of adjudicating the claims at issue.  Neither test is met here.  Plaintiffs fail the predominance test because any purportedly common issue or issues would be overwhelmed by the numerous individualized inquiries described above.  And the proposed class fails to meet Rule 23(b)(3)'s superiority requirement: a class action is not superior to other methods of adjudication when, as here, determining each putative class member's right to recovery would require a mini-trial on multiple fact-bound issues specific to each and every composition.

Plaintiffs' proposed class also cannot be certified as a Rule 23(b)(2) injunctive class action. Rule 23(b)(2) certification is improper when, as here, plaintiffs seek predominantly monetary relief. Moreover, Rule 23(b)(2) requires a single injunction providing uniform class-wide relief, but such relief is unavailable here as a matter of law because any given putative class member's eligibility for injunctive relief depends upon an individualized assessment for each composition of whether there is irreparable harm; whether a monetary remedy is adequate; and whether the putative class member would find an injunction desirable or not.

In sum, it is clear from the face of the Complaint that Plaintiffs' proposed class cannot be certified. No discovery could possibly cure these deficiencies in the class allegations. The Court should therefore strike the class allegations now, before it and the parties incur the extraordinary discovery burdens associated with a putative class action.

## BACKGROUND

Spotify is an interactive commercial music streaming service. Consol. Compl. ¶ 1.[2] Through its website (www.spotify.com) and desktop, mobile, and other applications, Spotify permits its users to stream music from Spotify's library. *Id.* ¶ 12. Plaintiffs allege that Spotify knowingly and willfully infringes their and others' rights in copyrighted musical works by failing to obtain licenses for the musical compositions embedded in the sound recordings that it distributes or reproduces. *Id.* ¶¶ 1-7. They assert claims for violations of federal copyright law, 17 U.S.C. §§ 106 & 501. *See* Consol. Compl. ¶¶ 37-51.

Plaintiffs hope to represent a class of "[a]ll persons or entities who own the copyright in a musical composition: (a) for which a certificate of registration has been issued or applied for;

---

[2] At this stage, the Court must treat as true any well-pleaded factual allegations in the complaint. But this "tenet" "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The description of Spotify used in this brief is drawn from Plaintiffs' factual allegations—which Spotify reserves the right to contest at the appropriate time.

and (b) that was reproduced and distributed through interactive streaming and/or limited downloads by Defendants without a license during the last three years." *Id.* ¶ 30. They seek statutory and actual damages, declaratory and injunctive relief, and attorneys' fees. *Id.* at 17-18.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(f), the Court may strike from a pleading any "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Rule 23(c)(1) requires courts to determine "at an early practicable time" whether the proposed class satisfies class-certification requirements, and Rule 23(d)(1)(D) allows the Court to "require that the pleadings be amended to eliminate allegations about representation of absent persons."

The Second Circuit has not addressed whether a motion to strike class allegations may be brought prior to a motion to certify a class, but a number of district courts in this Circuit "have held that such motions may be addressed prior to the certification of a class if the inquiry would not mirror the class certification inquiry and if resolution of the motion is clear." *In re Initial Pub. Offering Sec. Litig.*, 2008 WL 2050781, *2 (S.D.N.Y. May 13, 2008). Other circuits take the approach that courts may strike class allegations "[i]f it is obvious from the pleadings that the proceeding cannot possibly move forward on a classwide basis." *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 59 (1st Cir. 2013). Put another way, those courts hold that striking the class allegations is warranted when discovery would not "alter the central defect[s] in th[e] class claim[s]." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011).

That is exactly the case here: We know now that the proposed class suffers from numerous incurable defects. Moreover, the latter standard is better supported by Supreme Court precedent and reflects the prevailing practice of courts across the country. The Supreme Court has instructed that "[s]ometimes the issues are plain enough from the pleadings to determine

whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982). And federal courts therefore routinely entertain and grant motions to strike class allegations—including when the motions raise arguments that also could be raised in opposition to a motion for class certification.[3]

## ARGUMENT

Plaintiffs' class claims are untenable for four separate reasons, each of which is sufficient to preclude certification: (1) the proposed class definition results in an impermissible fail-safe class; (2) the proposed class is neither manageable nor ascertainable; (3) the allegations fail the commonality requirement of Rule 23(a)(2); and (4) Plaintiffs cannot satisfy any of the requirements of Rule 23(b).

These multiple flaws stem from the fact that "[g]enerally speaking, copyright claims are poor candidates for class-action treatment" because of the highly individualized factual and legal inquiries that they entail. *Premier League*, 297 F.R.D. at 65; *see also Authors Guild v. Google, Inc.*, 721 F.3d 132 (2d Cir. 2013); *Wu v. Pearson Educ. Inc.*, 2012 WL 6681701 (S.D.N.Y. Dec. 21, 2012); *Resnick v. Copyright Clearance Ctr., Inc.*, 2003 WL 22176619 (D. Mass. Sept. 22, 2003); *WB Music Corp. v. Rykodisc, Inc.*, 1995 WL 631690 (E.D. Pa. Oct. 26, 1995).

The *Premier League* court explained that most issues in a copyright infringement claim—

---

[3]       *See, e.g.*, *Pilgrim*, 660 F.3d at 950; *Am. W. Door & Trim v. Arch Specialty Ins. Co.*, 2015 WL 1266787, at *8 (C.D. Cal. Mar. 18, 2015); *Mata v. CitiMortgage, Inc.*, 2012 WL 7985175, at *1 (C.D. Cal. July 20, 2012); *Wright v. Family Dollar, Inc.*, 2010 WL 4962838, at *1 (N.D. Ill. Nov. 30, 2010); *Jimenez v. Allstate Indem. Co.*, 2010 WL 3623176, at *3 (E.D. Mich. Sept. 15, 2010); *Cornette v. Jenny Garton Ins. Agency, Inc.*, 2010 WL 2196533, at *2 (N.D. W. Va. May 27, 2010); *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009); *Stearns v. Select Comfort Retail Corp.*, 2009 WL 4723366, at *14 (N.D. Cal. Dec. 4, 2009); *Hovespian v. Apple, Inc.*, 2009 WL 5069144, at *2 (N.D. Cal. Dec. 17, 2009); *Ross-Randolph v. Allstate Ins. Co.*, 2001 WL 36042162, at *4 (D. Md. May 11, 2001); *Lumpkin v. E.I. Du Pont De Nemours & Co.*, 161 F.R.D. 480, 481 (M.D. Ga. 1995); *cf. John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (affirming dismissal of class allegations under Rule 12(b)(6)); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 940 (9th Cir. 2009) (affirming order granting defendant's pre-discovery motion to deny class certification).

such as "ownership," "authorization," and "knowledge or awareness of the infringing action"—"must be resolved upon facts which are particular to that single claim of infringement, and separate from all the other claims." 297 F.R.D. at 65-66. "Thus, accumulation of all the copyright claims, and claimants, into one action will not simplify or unify the process of their resolution, but multiply its difficulties over the normal one-by-one adjudications of copyright cases." *Id.* at 66. The same is true here, just as in virtually every other putative copyright class action in which courts have rejected class treatment.

## I. The Proposed Class Is An Impermissible Fail-Safe Class.

The proposed class definition suffers at the start from a fatal defect: it is an impermissible "fail-safe" class. "A fail-safe class is one whose definition shields the putative class members from receiving an adverse judgment." *Spread Enters., Inc. v. First Data Merchant Servs., Corp.*, 298 F.R.D. 54, 69 (E.D.N.Y. 2014) (quotation marks omitted). When the class is defined in terms of the defendant's liability, "either the class members win or, by virtue of losing, they are not in the class, and therefore not bound by the judgment." *Id.* As courts in this Circuit have recognized, "[a] proposed 'fail-safe' class should not be certified because it is unfair to defendants, it prevents an adverse judgment being entered against plaintiffs, and it is unmanageable because the members of the class could only be known after a determination of liability." *Id.*; *Hicks v. T.L. Cannon Corp.*, 35 F. Supp. 3d 329, 357 (W.D.N.Y. 2014) (same).

Plaintiffs' proposed class is the paradigmatic fail-safe class. The class definition includes "[a]ll persons or entities *who own the copyright in a musical composition*: (a) for which a certificate of registration has been issued or applied for; and (b) *that was reproduced and distributed* through interactive streaming and/or limited downloads by Defendants *without a license* during the last three years." Consol. Compl. ¶ 30 (emphases added). These criteria for

class membership—(i) ownership of (ii) a valid mechanical right in a (iii) registered composition that (iv) the defendant has distributed or reproduced (v) without a license—state the key elements that a plaintiff must prove to establish liability in *any* claim for copyright infringement.

If Spotify prevails against a potential class member on a defense to its infringement claim—for example, by showing that the potential class member does not own a valid mechanical right or that Spotify possessed a license—the potential class member would simply drop out (never becoming a class member at all) and not be bound by the finding. That non-class member would thus be free to re-litigate its claims without the risk of claim preclusion (*res judicata*). And this "heads-I-win, tails-you-lose" result is precisely what the prohibition on fail-safe classes is meant to prevent.

## II. The Proposed Class Is Neither Ascertainable Nor Manageable.

The Court should also strike the class allegations because the proposed class fails Rule 23's ascertainability and manageability requirements.

Ascertainability is a critical prerequisite to certification. In the Second Circuit, the law is clear that a class is ascertainable only "when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24-25 (2d Cir. 2015) (quotation marks omitted). In other words, the "touchstone of ascertainability" is that the court must have a feasible way "to determine whether a particular individual is a member" of the proposed class. *Id.* at 24. And the Second Circuit was "not persuaded" by the argument (also previously raised by Plaintiffs in this case) that ascertainability requires only that the class be defined using objective criteria; "the use of objective criteria cannot alone determine ascertainability when those criteria, taken together, do not establish the definite boundaries of a

readily identifiable class." *Id.* at 25.

As the Court put it in *Brecher*, "[a] class defined as 'those wearing blue shirts,' while objective, could hardly be called sufficiently definite and readily identifiable; it has no limitation on time or context, and the ever-changing composition of the membership would make determining the identity of those wearing blue shirts impossible." *Id.* And the class definition at issue in *Brecher*—the holders of a beneficial interest in certain Argentine bonds during an extended time period—failed the ascertainability test because "[t]he secondary market for Argentine bonds is active and has continued trading," and thus "the difficulty of establishing a particular interest's provenance," and "who holds bonds that fall inside (or outside) of the class," "make the objective criterion used here inadequate." *Id.* at 25-26.

This ascertainability requirement also overlaps with the requirement that the proposed class action must be manageable.[4] "The task inherent in ascertaining the class members also renders this case unmanageable." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 348 (S.D.N.Y. 2002); *see also, e.g.*, *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011) ("Without an objective, reliable way to ascertain class membership, the class quickly would become unmanageable.").

Here, even before reaching the individualized inquiries concerning liability, the Court would be obligated to adjudicate several difficult and highly fact-intensive questions to identify owners of registered musical works who are potentially members of the class. Plaintiffs define the putative class in pertinent part as "[a]ll persons or entities who own the copyright in a musical composition . . . for which a certificate of registration has been issued or applied for" and that "was reproduced and distributed through interactive streaming and/or limited downloads by

---

[4]     The manageability requirement is rooted in Rule 23(b)(3)(D)'s directive that a court assess "the likely difficulties in managing a class action" in determining whether a damages class action satisfies the predominance and superiority requirements of Rule 23(b)(3).

Defendants" in the last three years. Consol. Compl. ¶ 30. To meet their burden of identifying the potential class members, therefore, Plaintiffs must

- identify all of the musical ***compositions*** embodied in the sound recordings allegedly distributed by Spotify, matching a given sound recording to the underlying musical composition (which often will require ***listening to each recording***);

- ascertain whether a given composition has a ***registered*** copyright; and

- identify "all persons or entities" who ***own the rights*** to distribute or reproduce the words and music of any given composition, which in turn can be affected by numerous difficult-to-resolve issues, including fractional ownership, transfers, assignments, and abandonment of rights.

These ownership and identification issues are extraordinarily difficult, fact-intensive tasks. And they are only the tip of the iceberg. As Spotify discusses further below, Plaintiffs then face the challenge of proving additional elements on a work-by-work, claimant-by-claimant basis—including the validity of each copyright and whether Spotify has a license or authorization to distribute a particular composition.

*First*, Plaintiffs have not identified the set of compositions embodied in the sound recordings allegedly distributed by Spotify; nor can they identify a viable methodology for doing so. It would not be enough to identify a list of the sound recordings allegedly distributed by Spotify: It is black-letter law that "[s]ound recordings and their underlying musical compositions are 'separate works with their own distinct copyrights.'" *Poindexter v. EMI Record Grp., Inc.*, 2012 WL 1027639, at *2 n.3 (S.D.N.Y. Mar. 27, 2012) (quoting *In re Cellco P'Ship*, 663 F. Supp. 2d 363, 368-69 (S.D.N.Y. 2009); *accord, e.g.*, *Stumm v. Drive Entm't*, 2002 WL 5589, at *1 n.1 (S.D.N.Y. 2002) (noting the "well-established distinction between sound

recordings and musical compositions under the Copyright Act.") (quotation marks omitted).

Plaintiffs offer no workable method for matching a digital sound recording to the underlying musical composition (also known as the "work"; colloquially described as "sheet music"). As the Register of Copyrights has written, "digital music files often do not include the standard identifiers for the copyrighted works the files embody." U.S. Copyright Office, *Copyright and the Music Marketplace, A Report of the Register of Copyrights*, Feb. 2015, available at http://copyright.gov/policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf (Mancini Decl. Ex. 1), at 123. Digital recordings may have standard *sound recording* identifiers, although many do not, but "there is no comprehensive publicly accessible database that can be used to match" the standard identifying codes of a *sound recording* to a *musical work* (and vice versa). *Id.*[5]

One example of the many difficulties in linking a sound recording to the underlying composition is that many songs have the same name. For example, "Hello" on a list of sound recording titles could be the Adele megahit, the Lionel Richie classic, or other songs by Evanescence, Ice Cube, and many others. Is "California Girls" the song by the Beach Boys or the Katy Perry hit? Does "One" refer to the song by U2, the show tune from *A Chorus Line*, or one of many others (such as hits by the Bee Gees and Metallica)? And which recording embodies the same composition as John Legend's "All of Me": "All of Me (Instrumental)"; "All of Me – Solo Piano"; "All of Me – UK Radio Remix Edit"; or "All of Me (Bumper's Audition) – From 'Pitch Perfect 2' Soundtrack"? While answering these questions may be possible in an individual action based on a handful of works, it quickly becomes infeasible and unmanageable

---

[5] The Register prepared this report on the basis of "an exhaustive analysis of industry practices and considerable dialogue with music creators and the businesses that represent and invest in their interests, as well as music services and distributors and other interested parties." *Copyright and the Music Marketplace*, *supra*, at "Acknowledgements."

to do so on a class-wide basis, which would require tackling the problems over and over again.

Compiling a list of the sound recordings streamed on Spotify's service thus will not enable Plaintiffs or the Court (or, for that matter, Spotify) to identify the corresponding musical compositions. There is nothing close to a simple, accurate methodology for linking sound recordings to underlying musical compositions.

*Second*, even if Plaintiffs could somehow identify an accurate set of compositions, accurately identifying the owners of those compositions is a separate, but also extremely difficult, task. To begin with, there is no comprehensive database of ownership information. Ownership information is often completely lacking, but even if some information is available, there are many difficult-to-resolve issues that affect ownership, such as co-ownership; transfers; assignments; death of an owner; and exercise of reclaim and reversion rights.

And until those ownership issues have been resolved, assessing whether there has been an infringement of a copyright is not possible. Infringement requires the absence of a license, and knowing whether a party has a license for a given work often requires identifying the owner of that work; in particular, if the license takes a form of a "blanket license" covering all compositions owned by a rightsholder (or group of rightsholders), rather than listing out each licensed work. For example, if Spotify has a blanket license covering "all compositions owned by David Bowie," then it will be impossible to determine whether a work is covered by that license without first knowing whether David Bowie owns the work. In other words, the existence of a license will often depend on relationships between Spotify and the owner of the work—relationships that may operate through intermediaries such as publishers.

This problem is intractable. The Register of Copyrights has detailed the "lack of publicly accessible, authoritative identification and ownership data" for compositions: "'[I]t is difficult to

identify and keep track of musical work ownership due to changes when musical works and catalogs change hands.' Further complicating the situation is that the rights to musical works are often split among multiple songwriters, with differing publishers and [performing rights societies], making musical work data harder to track and maintain." *Copyright and the Music Marketplace* at 123. "Unlike sound recordings—which are typically wholly owned by an individual label—many musical works are controlled by two, three or even more publishers." *Id.* at 163.[6]

In short, as the Register has put it, "there can be little doubt that the current music licensing landscape is severely hampered by the lack of publicly accessible, authoritative identification and ownership data." *Id.* at 123. What is more, "[f]lawed or missing data is not a problem unique to major labels or famous artists"; on the contrary, "inaccurate data is especially problematic for the independent label community because it is harder to identify lesser-known artists without accurate data." *Id.* at 125 (quotation marks omitted).

The Copyright Office itself explains that its records "cannot be regarded as conclusive in all cases" (United States Copyright Office Circular 22, *How to Investigate the Copyright Status of a Work*, at 3, available at http://www.copyright.gov/circs/circ22.pdf (Mancini Decl. Ex. 2)) for many reasons, including, but not limited to, the inability to track all assignments, co-ownership

---

[6]     The often-fractional ownership of the rights to musical compositions further complicates this already complex and individualized inquiry. The default common-law rule is that a joint owner may grant a nonexclusive license in the entire work *without* the consent of the other joint owners. *See* 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 6.10 (2006). Thus, it may be necessary to identify *all* of the owners of a given composition in order to determine whether any *one* of those owners has licensed or authorized Spotify to distribute it. And while the co-owners of the copyright in a composition can override that default rule by contract, there is no way to determine whether such contracts exist, the terms of such contracts, and which works they cover without further individualized inquiries (and likely third-party discovery). What is more, an agreement among co-owners to override the default rule would "bind any third party licensee" such as Spotify only if it has "*notice* of such a restriction." *Id.* (citing *Meredith v. Smith*, 145 F.2d 620 (9th Cir. 1944)). Thus, whether Spotify was on notice of any such agreement among co-owners is yet another individualized and complicated inquiry unsuitable for class treatment.

agreements, and reversion rights (*i.e.*, when a license or transfer of certain rights in a copyrighted work expires or is terminated such that those rights revert back to the grantor, or the grantor's heirs).  *See* United States Copyright Office, *Termination of Transfers and Licenses Under 17 U.S.C. §203*, available at http://www.copyright.gov/docs/203.html (Mancini Decl. Ex. 3).

Plaintiffs say that class members can be "readily located [and] identified from various databases and records" and "through discovery"—but do not identify a single database or record to support that conclusory and implausible assertion.  Consol. Compl. ¶ 32.  That fatal omission is not surprising, given the broadly recognized lack of reliable ownership information for copyrighted musical compositions.

The recent dispute over the validity of the copyright and ownership in the song *Happy Birthday To You* (one of the most famous songs in history) powerfully illustrates the challenges presented in resolving these questions—including that questions of copyright ownership and liability are intertwined.  In *Marya v. Warner/Chappell Music, Inc.* (and for decades prior to that litigation), Warner/Chappell claimed a copyright in the composition, contending that the original authors, who wrote the song around the turn of the last century, held onto the common law rights for decades and then transferred them to Warner/Chappell's predecessor publishing company, which registered the copyright in 1935.  2015 WL 5568497, at *2 (C.D. Cal. Sept. 22, 2015).

The plaintiff argued that the registration was invalid, contending that the lyrics may have been written by someone else, that the common law rights were lost due to general publication or abandonment before registration, and that the rights were never transferred from the authors to the publishing company.  *Id*. at *5.  Further complicating matters, a charitable organization with ties to the original songwriters later intervened, claiming that *it* was the rightful owner.  Dkt. No. 266-1, *Marya v. Warner/Chappell Music, Inc.*, No. 2:13-cv-04460 (Nov. 9, 2015).  The parties

subsequently agreed to settle—after two-and-a-half years of hard-fought litigation over this one song—with the result that *Happy Birthday* has entered into the public domain. *See* Final Order and Judgment, ¶ 6, Dkt. No. 349, *id*.

The *Marya* case is far from the only example of a copyright action involving complex issues of ownership. Indeed, this Court's opinion in *TufAmerica, Inc. v. Diamond*, 2015 WL 10846075 (S.D.N.Y. Mar. 24, 2015), further underscores the difficulties of litigating this issue. After years of litigation, the Court granted summary judgment to the defendants (members of the Beastie Boys) because the plaintiffs did not have an exclusive license in the copyrighted works at issue. Instead, they had received only a non-exclusive license from some of the co-owners of the copyrighted works. *See id.* at *1. That determination was based on an in-depth interpretation of three different contracts (*id.* at *3-5)—precisely the kind of highly specific, fact-bound inquiry that is not suitable for class treatment.[7]

The *Marya* litigation involved just a *single* song, and *TufAmerica* a small handful of songs. By contrast, Plaintiffs allege that thousands of compositions are at issue here. Merely determining class membership would be entirely unmanageable—it would require litigating variations of these cases thousands of times over. Nowhere in the Complaint do Plaintiffs suggest how they, the Court, and the jury will overcome these fundamental obstacles when the entire industry has largely been unable to do so—as the federal government official in charge of administering the Copyright Act recently recognized in the report quoted above. It is plain that the proposed class is unascertainable and unmanageable.

## III. The Putative Class Does Not Satisfy Rule 23(a)(2).

All four "prerequisites" of Rule 23(a) must be satisfied before a class action may be

---

[7] Another example is *Davis v. Blige*, 505 F.3d 90, 94-95 (2d Cir. 2007), a complex infringement dispute involving co-ownership, transfer, and oral assignment of the copyrights in two compositions embodied in songs on Mary J. Blige's hit 2001 album, "No More Drama."

certified.  Plaintiffs' allegations make clear that their lawsuit fails Rule 23(a)(2)'s commonality requirement, which requires that Plaintiffs show "questions of law or fact common to the class."

This requirement "is easy to misread, since '[a]ny competently crafted class complaint literally raises common questions.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011).  Whether a practice is "unlawful" may in literal terms present a common question, for instance, but commonality is not satisfied simply by "the raising of [such] common questions—even in droves."  *Id.* at 350.  Rather, "[w]hat matters" for Rule 23(a) commonality is "*the capacity of a classwide proceeding to generate common answers apt to drive resolution of the litigation.*"  *Id.* (citation omitted; emphasis added).  For there to be "common answers," the putative class claims must depend upon a "common contention" whose "truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke."  *Id.*[8]

### A.    Plaintiffs' Allegations Are Incapable Of Class-Wide Resolution.

The Court need look no further than Plaintiffs' alleged "common questions" (Consol. Compl. ¶ 35) to see that no such common answers could possibly be generated here.  These questions are fundamentally incapable of class-wide resolution.  To begin with, they presuppose that it is feasible to identify the set of works that are the subjects of the alleged infringement, as well as the owner(s) of the mechanical rights in each such work—neither of which are common questions for the reasons just discussed.  Moreover, they require an individual trial with respect to each *musical work*, not simply for each potential class member.

### 1.    Whether A Work Has A Valid Copyright.

Plaintiffs propose a "common question" of whether streaming "constitutes direct

---

[8]    As we explain below (at pp. 27-28), even if the Court were to conclude that Plaintiffs have shown *any* common questions, the proposed class would still fail Rule 23(b)(3)'s more demanding predominance requirement, because any common questions would not predominate over the many individualized issues present here.

infringement in violation of the Copyright Act" (Consol. Compl. ¶ 35(B)).   But the relevant "issue that is central to the validity" of their claims (*Dukes*, 564 U.S. at 350) is whether streaming a *particular set of works* constitutes infringement.  And *that* question requires answering whether those works have a valid copyright, as infringement can only be asserted as to a copyrighted work.  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

In other words, Plaintiffs assume that determining whether a musical composition has a valid copyright is a simple administrative task.  Not so.  Rather, a jury would have to undertake a fact-intensive inquiry with respect to each and every work, even when registration information is available from the Copyright Office (often, it is not).  As the Copyright Office itself cautions:

> Copyright investigations often involve more than one of these [three primary] methods [examining a physical copy of the work itself, searching the Copyright Office catalogs and other records, or having the Copyright Office conduct a search].  Even if you follow all three approaches, the results may not be conclusive.  Moreover . . . the changes brought about under the Copyright Act of 1976, the Berne Convention Act of 1988, the Copyright Renewal Act of 1992, and the Sonny Bono Copyright Term Extension Act of 1998 must be considered when investigating the copyright status of a work. . . . In many cases, it is important to consult with a copyright attorney before reaching any conclusions regarding the copyright status of a work.

*How to Investigate the Copyright Status of a Work*, *supra*, at 1.

In addition, registration certificates issued by the Copyright Office identify only the copyright claimant(s)/owner(s) at the time of registration.  Transfers of copyright ownership are often not recorded with the Office, and title to the copyright often changes hands in the years after registration—including through assignments, death, and the exercise of statutory reclaim or reversion rights under the Copyright Act.  Thus, a search would need to be undertaken to identify the *current* owners of the copyright—and that search may well prove inconclusive given that there is no requirement that assignments be filed with the Copyright Office.

Moreover, Section 410(c) of the Copyright Act confirms that the registration of a work

does not necessarily establish its validity. A registration certificate issued within five years of first publication raises only a presumption of validity; the "alleged infringer may rebut that presumption." *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012). And "[t]he evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court" (17 U.S.C. § 410(c))—an inherently individualized inquiry.

Finally, Plaintiffs must demonstrate that the work has not fallen into the public domain— something that could have happened in a variety of ways, especially for older works. *See, e.g.*, 17 U.S.C. §§ 302, 303; *Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 590 (2d Cir. 1999). And federal copyright law creates an additional patchwork of regulations and formalities that can lead to works landing in the public domain.[9]

*Marya* illustrates how complex these inquiries can be for a single song. As noted above, the plaintiff had argued that the common law rights in *Happy Birthday* were lost due to, among other reasons, general publication or abandonment before registration. 2015 WL 5568497, at *8-13. And the court ultimately ruled—after extensive fact discovery—that the resolution of these issues would have required a further jury trial but for the court's determination that Warner/Chappell did not own a valid copyright to the song on other grounds (because its predecessor never acquired the rights to the song in the first place). *Id.* at *13-19.

In sum, resolution of the question whether a particular musical composition has copyright

---

[9]      Examples of works that fall into the public domain under this patchwork include works created between 1923 and 1977 that were first published without notice (17 U.S.C. § 10 (1958, 1964)); works first published without notice between 1978 and March 1, 1989 and not registered within five years (17 U.S.C. § 405); works initially published abroad without notice and in the public domain in the source country as of January 1, 1996 (*id.* § 104A); and works first published after March 1, 1989 in a country that does not have a treaty relationship with the U.S., and authored by citizens of such a country, absent a Presidential proclamation that the other country adequately protects U.S. works (*id.* § 104).

protection will require extensive, individualized factual determinations—and such determinations will be required for *each and every musical work* whose owner is identified by Plaintiffs as a potential class member.

> **2. Whether Spotify Has a License or Authorization To Distribute Any Particular Composition.**

Plaintiffs also treat as a "common question" "[w]hether Spotify reproduced and distributed musical compositions through interactive streaming and/or limited downloads without a license." Consol. Compl. ¶ 35(A). But again, the actual issue on which their claims turn is whether Spotify had a license or other form of authorization to reproduce, distribute, or otherwise exploit *specific* musical compositions, and that requires multiple factual and legal inquiries, all of which are highly individualized.

To begin with, it is necessary to determine whether the song was expressly licensed, which can occur through any one of a number of available mechanisms. These include controlled composition licenses from a record label—*i.e.*, the record label distributing the recording also has the right to pass along the mechanical license to the underlying composition (*see* 2 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 8.23[E] (2005)); direct blanket license by a publisher or its representative, such as another publisher serving as an administrator or an agency such as the Harry Fox Agency;[10] the compulsory license mechanism provided by Section 115 of the Copyright Act;[11] and blanket releases provided as part of arrangements like the

---

[10] *See* http://www.harryfox.com/publishers/what_does_hfa_do.html (Mancini Decl. Ex. 4) ("HFA is the leading provider of rights management, licensing, and royalty services for the U.S. music industry and was established in 1927 by the National Music Publishers' Association (NMPA) as an agency to license, collect, and distribute royalties on behalf of musical copyright owners.").

[11] Section 115 offers a compulsory license to make and distribute phonorecords of musical works. 17 U.S.C. § 115. The license is obtained by sending a notice of intent to the copyright owner or to the Copyright Office and paying prescribed royalties.

settlement agreement between Spotify and the NMPA.[12]  Assessing whether an effective license or release was secured for any individual song through any of these means may require third-party testimony and other evidence from the licensor, and may require an analysis of individual Section 115 notices of intent.

In addition, even if there is no evidence of an express license, there may well be facts demonstrating an implied license with respect to a particular work.  For example, a copyright owner's knowledge of and acquiescence in a defendant's use of her copyrighted material provides grounds for finding an implied license.  *See Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) ("[K]nowledge . . . coupled with [plaintiff's] silence in the face of [defendant's] use" of copyrighted material constituted implied license).

Here, some holders of mechanical rights likely knew for a long period of time that Spotify was distributing their works on its service, but did not ask Spotify to remove their works from the service.  And there are many reasons—from economic benefits to marketing and exposure on one of the world's most popular digital music services—why a rightsholder could have wanted Spotify to make her songs available.  *See*, *e.g.*, 10 Reasons Why Every Artist Should Be On Spotify, http://www.tunecore.com/blog/2014/10/10-reasons-every-artist-spotify.html (Oct. 29, 2014) (Mancini Decl. Ex. 5).

This defense might apply to Plaintiffs themselves.  For example, Ferrick declares that she is a prolific, well-known and critically-acclaimed songwriter and recording artist, who teaches at the college level.  Consol. Compl. ¶ 8.  None of the Plaintiffs even allege that they were unaware of or objected to Spotify's distribution of their music.  Plaintiffs also do not allege that they ever made any efforts to have their music removed from the Spotify service, despite the existence of a simple way

---

[12]  *See*  http://nmpa.org/press_release/nmpa-and-spotify-announce-landmark-industry-agree-ment-for-unmatched-u-s-publishing-and-songwriting-royalties/ (Mar. 17, 2016).

to do so, and to claim their songs and any royalty payments that might be owed.  *See* https://www. spotify.com/us/legal/copyright-policy/?lang=en (Mancini Decl. Ex. 6).

There is a powerful argument that their knowledge of Spotify's alleged distribution of their works on its service coupled with their failure to contact Spotify to request removal from the service constitutes acquiescence that forms a basis for an implied license.  *Keane Dealer*, 968 F. Supp. at 947.  At minimum, whether there is such an implied license is a mixed issue of law and fact that would have to be tried not only with respect to Plaintiffs themselves but also with respect to *each* and *every* absent member of the putative class—and with respect to *each* and *every* allegedly infringed composition.

Finally, Spotify may also be authorized to distribute a given work by Section 115(c)(3)(G) of the Copyright Act, which sets forth circumstances under which authorization for "digital phonorecord delivery" of a sound recording automatically *also* authorizes distribution of the underlying work, as is common for singer/songwriters who own both the sound recording and the underlying work.  The issue requires individualized inquiries into the particular contracts—often entered into decades ago—between each musical work owner and the record labels or aggregators who typically hold the digital distribution rights.  For each individual sound recording based on each individual musical work owned by each individual class member, the Court would have to decide, among other things, whether the text of any negotiated license between the musical work owner and label or aggregator authorized, either explicitly or implicitly, the digital distribution of the work.  *See* 17 U.S.C. § 115(c)(3)(G)(i)(II).

### 3. The Basis and Method for Assessing Damages.

Plaintiffs contend that "[t]he basis and method for determining and computing damages, including statutory damages," is a common question.  Consol. Compl. ¶ 35(D).  Yet their *own*

*allegations* anticipate the need for individualized inquiry into the appropriate damages for each and every class member that prevails.  Plaintiffs allege that "Plaintiffs and the class members are entitled to recover up to" the maximum statutory damages or, "at their election," to instead seek "their actual damages . . . as will be proven at trial." *Id.* ¶ 41.  Plaintiffs also allege that the "claims of the individual members of the class may range from smaller sums to larger sums." *Id.* ¶ 36.  All of these are individualized, not common, questions.

Even if Plaintiffs decided to seek only statutory damages on behalf of the proposed class in an effort to elide variations among actual damages amounts, that would not solve the problem (unless, of course, Plaintiffs agreed to seek the minimum statutory damages potentially available on behalf of putative class members).[13]  The Copyright Act provides for a range of statutory damages, to be determined "as the court considers just." 17 U.S.C. § 504(c)(1).  The factors that a court must evaluate in order to determine the correct amount—which must be awarded per infringed work—include: (i) the expenses saved and the profits reaped by the infringers; (ii) revenues lost by the owner of the work; and (iii) the value of the copyright. *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1117 (2d Cir. 1986).

Moreover, it has long been the rule in the Second Circuit that the recovery of a fractional copyright owner is "confine[d] to the [plaintiff co-owner's] own part; that is to say, to its own actual damages, to its proper share of any statutory damages, and to its proper share of the profits." *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 268, 270 (2d Cir. 1944); *accord, e.g.*, *Manno v. Tenn. Prod. Ctr.*, 657 F. Supp. 2d 425, 432-33 (S.D.N.Y. 2009) (holding that owner in "one-half interest" is "limited to 50%" of statutory damage award); 3 *Nimmer on Copyright* § 12.03.  Thus, each potential class member would be required to

---

[13]     As discussed below (at 28-29), even the potential for an award of minimum statutory damages that would be aggregated in a class action creates serious due process concerns, strongly indicating that class treatment is not a superior method of adjudication here.

demonstrate its percentage of ownership in each work at issue—another individualized showing.

In addition, in this Circuit statutory damages are not available for each individual composition in a compilation of compositions. *See, e.g.*, *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 140-141 (2d Cir. 2010). This factor thus requires further individualized inquiries into the manner in which each composition was issued.

Perhaps most fundamentally, though, whether statutory damages for each composition at issue is available at all will turn on a composition-specific comparison between when the alleged infringement first occurred and when that work was effectively registered with the Copyright Office—*i.e.*, when the complete application for a copyright for that work was submitted to the Copyright Office. That is because the Copyright Act prohibits statutory damages (and attorneys' fees) for "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412(2).

Whether statutory damages are available thus requires assessing both when the alleged infringement of a work first "commenced" *and* the work's effective registration date: "Courts in this district have held that Section 412 of the Copyright Act imposes a bright-line rule that precludes recovery of statutory damages and attorneys' fees where *the first act of infringement* in a series of ongoing infringements occurred prior to the work's copyright registration, finding such a bright-line rule preferable to case-by-case analyses." *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 2016 WL 4126543, at *2 (S.D.N.Y. Aug. 2, 2016) (emphasis added).

This is hardly an academic point: many of the compositions listed in the exhibits to Plaintiffs' complaint are marked as "Registration Pending." In fact, the vast majority of the compositions listed for newly-added plaintiff Gerencia bear that status, suggesting that the

applications for registration of those works, if submitted at all, were submitted only recently, raising serious doubts about whether statutory damages would be available for any infringement of those works. *See* Consol. Compl. Ex. C; *see also id.* Ex. A.

### 4. Willful Infringement.

Plaintiffs assert that "willful[ness]" is a common question. Consol. Compl. ¶ 35(C). But assuming *arguendo* that an infringement is found with respect to any given musical work, whether that infringement was committed willfully also requires an individualized assessment.

"To prove willfulness under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights." *Island Software & Computer v. Microsoft, Inc.*, 413 F.3d 257, 263 (2d Cir. 2005).

As explained above, the circumstances surrounding the use and licensing of musical compositions on the Spotify service are not uniform, and therefore even if an instance of infringement were found (after the requisite individualized inquiry) with respect to one or more works, the elements of willfulness will require individual factual determinations as well.

### B. In Light Of These Individualized Issues, Rule 23 And Due Process Prohibit Certification Of Plaintiffs' Proposed Class.

Spotify is entitled to an opportunity to litigate any issue that may defeat an infringement claim with respect to any individual composition—including, but not limited to, ownership, existence of copyright protection, license or other authorization, and whether Spotify's actions constituted infringement. That principle precludes certification under Rule 23, and makes clear that certification would violate due process.

"[A] class cannot be certified" if the defendant "will not be entitled to litigate its . . . defenses to individual claims." *Dukes*, 564 U.S. at 367. Indeed, the Court's rejection of

certification in *Dukes* rested on its conclusion that the lower courts had smoothed the way for class certification only by "depriv[ing] defendants of their right to litigate statutory defenses to individual claims." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1048 (2016). As the Court reiterated in *Tyson Foods*, the Rules Enabling Act, 28 U.S.C. § 2072(b), bars courts from "giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action." *Id.* After all, "[d]ue process requires that there be an opportunity to present every available defense." *Lindsey v. Normet*, 405 U.S. 56, 66 (1972).

Plaintiffs do not even try to explain how these individualized issues could be resolved by common answers, offering only the bald assertion that these questions "do not vary from class member to class member"—a contention belied by the Consolidated Complaint's own allegations. There simply is no one-size-fits-all answer for determining which musical works were allegedly reproduced and/or distributed by Spotify over the past three years; who owns those works; whether Spotify's actions were licensed or otherwise authorized; and, if infringement is proven, what remedy is appropriate. The absence of common questions precludes certification.

That outcome is not surprising—it is precisely because of the inevitable presence of such highly-individualized factual and legal inquiries that, "[g]enerally speaking, copyright claims are poor candidates for class-action treatment." *Premier League*, 297 F.R.D. at 65; *see also* p. 6, *supra* (collecting cases).

Plaintiffs may seek to rely (as they did before) on a pair of California cases, *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2015 WL 4776932 (C.D. Cal. May 27, 2015), and *In re Napster, Inc. Copyright Litigation*, 2005 WL 1287611 (N.D. Cal. June 1, 2005). But those decisions are both unpersuasive and readily distinguishable.

In *Flo & Eddie*, the plaintiffs contended that Sirius XM performed pre-1972 sound

recordings, in violation of state law, without obtaining licenses from or paying royalties to the owners of the recordings. Sirius allegedly had engaged in a *uniform* practice of not seeking *any* licenses or paying *any* royalties for performances of pre-1972 recordings. 2015 WL 4776932, at *3, *9. Thus, the single issue on which the litigation centered was whether California law recognizes a legally protectable copyright *at all* in pre-1972 sound recordings. *See id.* at *9.

Moreover, *Flo & Eddie* involved claimed infringement of *sound recordings* (*see* 2015 WL 4776932, at *10-11), not, as here, alleged infringement of the *underlying musical compositions*—an area that raises substantially more difficult questions of ownership. Thus, the analysis here requires an additional, complex, step beyond what was at issue in *Flo & Eddie*: determining from a sound recording what composition is embodied in that sound recording. In addition, the *Flo & Eddie* court concluded that the need to litigate numerous individualized issues ordinarily attendant to proving copyright ownership would not arise—but *only* because the court found that (i) Sirius conceded that it possessed a list of all the sound recordings played on the service by name; and (ii) the court found that Sirius made no showing that the rightful owner of the sound recordings would be disputed or that the verification process would be drawn out. *Id.* at *11, *15-16. That is not the situation here, where it is clear at the outset that there will be individualized fact-intensive issues to be resolved.

In *Napster*, the plaintiffs sought to hold companies that controlled Napster vicariously liable for the direct copyright infringement committed by Napster's users who downloaded and uploaded copyrighted works. It was undisputed that Napster did not attempt to license ***any*** works at all. Rather, the issue on which the case would rise or fall was whether the defendants were aware of the undisputedly infringing activities taking place on Napster's network—an issue amenable to class-wide resolution, especially in light of a notice of infringement that Napster had

received that "listed over 90,000 copyrighted musical works that were allegedly owned by members of the proposed class." 2005 WL 1287611, at *4. Moreover, the proposed class was limited to publisher-principals represented by the Harry Fox Agency, reducing—though hardly eliminating—the burden of establishing class membership and copyright ownership. *Id.* at *3.[14]

## IV. Plaintiffs Cannot Establish Predominance And Superiority Under Rule 23(b)(3).

In addition to meeting Rule 23(a)'s mandates, Plaintiffs "must satisfy at least one of the three requirements listed in Rule 23(b)." *Dukes*, 564 U.S. at 345. They cannot carry that burden.

Even if Plaintiffs could identify *any* genuinely common questions, it is clear—as just discussed—that individualized issues of law and fact will overwhelm any such questions. The proposed class therefore flunks Rule 23(b)(3)'s insistence that "questions of law or fact common to class members predominate over" individualized issues and that a class action is "superior to other available methods for fairly and efficiently resolving the controversy."

*First*, Plaintiffs cannot satisfy the predominance requirement. The Supreme Court has explained that "the predominance criterion is far more demanding" than "Rule 23(a)'s commonality requirement." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). And when, as here, "liability for a significant bloc of the class members and damages for the entire class must be decided on an individual basis, common issues do not predominate over individual ones." *Johnson v. Nextel Commc'ns, Inc.*, 780 F.3d 128, 148 (2d Cir. 2015).

As one court in this district has put it, "even if [the] named plaintiff could prove that defendants have pursued a general scheme of copyright infringement by releasing phonorecords without properly obtaining licenses, this proof of defendant's conduct does not assist any

---

[14]     Another court expressly declined to follow *Napster* in denying class certification in a trademark infringement case, noting that *Napster* offered little assistance with "the likely difficulties of managing a class action of this scale," including "the possibility of hundreds if not thousands of individual hearings related to ownership, distinctiveness and the applicability of affirmative defenses." *Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 537 (N.D. Ill. 2008).

putative class member, including named plaintiff, in prosecuting its claim." *Estate of Berlin v. Stash Records, Inc.*, 1996 WL 374176, at *2 (S.D.N.Y. July 2, 1996).  That is (at least) equally true here:  Virtually every aspect of this case also requires individualized inquiries.

Specifically, the compositions embodied in the sound recordings allegedly reproduced or distributed by Spotify cannot be ascertained without multiple-step factual inquiries—and separate composition-specific factual inquiries would be required to identify each composition's owners.  *See* pp. 8-15, *supra*.  In addition, mini-trials would be needed to adjudicate the other individualized issues for each work, including copyright validity, the existence of a license or other lawful basis for Spotify's alleged actions, whether those actions constituted infringement, and entitlement to and amount of damages.  *See* pp. 16-24, *supra*.

When, as here, common issues do not predominate over individual questions, the Court should strike the class allegations.  Neither this Court nor the parties should have to bear the costs and burdens of class action litigation (especially expensive and time-consuming discovery) in these circumstances.

*Second*, given the need to resolve the many individualized issues discussed above for each putative class member, Rule 23's "superiority" requirement is not met.  Rather, "an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried."  Fed. R. Civ. P. 23(b)(3), 1966 Adv. Comm. Note.  "Because liability for a significant bloc of the class members and damages for the entire class must be decided on an individual basis, common issues do not predominate over individual ones and a class action is not a superior method of litigating the case."  *Johnson*, 780 F.3d at 148.

Finally, a class action is not the superior method of adjudicating these claims asserted by Plaintiffs because aggregating Plaintiffs' claims for statutory damages would be likely to violate

Spotify's due process rights by creating the risk of a "grossly excessive" damages award that is unconstitutionally punitive.

As the Second Circuit has noted, combining "minimum statutory damages awards . . . with the class action mechanism . . . may expand the potential statutory damages so far beyond the actual damages suffered that the statutory damages come to resemble punitive damages—yet ones that are awarded as a matter of strict liability, rather than for the egregious conduct typically necessary to support a punitive damages award." *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408 (2003) ("Due Process . . . prohibits the imposition of grossly excessive or arbitrary punishments"); *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996)).

Those concerns are at their apex in putative copyright class actions, where a single claim of copyright infringement can result in statutory damages ranging from $750 up to *$30,000* (17 U.S.C. § 504(c)(1)-(2))—or up to *$150,000* if the infringement was willful (*id.* § 504(c)(2)). Moreover, "the availability of statutory damages" in these amounts is more than sufficient "to give litigation value to each individual case," which "diminish[es]" any purported "economic need" for class treatment. *Premier League*, 297 F.R.D. at 66.

**V.  Plaintiffs Cannot Satisfy The Requirements For A Rule 23(b)(2) Injunctive Class.**

Plaintiffs' class allegations also fail the requirements for pleading an injunctive class under Rule 23(b)(2).  That rule permits certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  It "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360.

Plaintiffs' allegations cannot satisfy Rule 23(b)(2) for the additional reason that class-wide injunctive relief is unavailable as a matter of law. Because class members in a Rule 23(b)(2) class cannot opt out and thus are not required to receive notice of a pending class action, "Rule 23(b)(2) applies only when a *single injunction* or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360 (emphasis added). That cannot happen here, because at a minimum some—and likely most—class members are ineligible for injunctive relief. In order to be eligible for injunctive relief for copyright infringement, a plaintiff must plead and prove, among other things, that "it has suffered an irreparable injury" and that "remedies at law, such as monetary damages, are inadequate to compensate for that injury." *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010) (*eBay* standard applies to copyright infringement cases).

Under these standards, irreparable harm cannot be asserted on a class-wide basis. The Second Circuit has recognized that presuming irreparable harm in a copyright infringement case "is inconsistent with the principles of equity set forth in *eBay*." *Salinger*, 607 F.3d at 79. Thus, the Court would have to evaluate each class member's injury claim to determine whether the asserted injury is irreparable and whether monetary damages are an adequate remedy.

Moreover, as discussed above, there are powerful reasons why some putative class members may want their works to remain available for distribution on Spotify, and thus would not want to seek injunctive relief. Indeed, they would see the requested injunction as affirmatively harmful to their interests. *See* p. 20, *supra*.

## CONCLUSION

For all of the foregoing reasons, Spotify respectfully requests that the Court enter an order striking the class allegations from the Consolidated Complaint.

Dated: December 8, 2016                **MAYER BROWN LLP**

                                        By: */s/ A. John P. Mancini*_____
                                        A. John P. Mancini
                                        1221 Avenue of the Americas
                                        New York, New York 10020
                                        *jmancini@mayerbrown.com*
                                        T 212.506.2295
                                        F 212.849.5895

                                        Archis A. Parasharami
                                        Daniel E. Jones (*pro hac vice* pending)
                                        1999 K Street, N.W.
                                        Washington, D.C. 20006
                                        *aparasharami@mayerbrown.com*
                                        *djones@mayerbrown.com*
                                        T 202.263.3328
                                        F 202.263.5328


                                        ***Attorneys for Defendant Spotify USA Inc.***