**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MELISSA FERRICK, et al.,

               Plaintiff,

     vs.

SPOTIFY USA INC., et al.,

               Defendants.

No. 1:16-cv-08412 (AJN)

**CORRECTED**
**PLAINTIFFS' OMNIBUS RESPONSE TO OBJECTIONS TO**
**PLAINTIFFS' MOTION FOR FINAL APPROVAL**

1

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................ 1

II.     WIXEN'S CLIENTS LACK STANDING TO OBJECT AND WIXEN DOES NOT

        HAVE ITS CLIENTS' CONSENT TO ACT .................................................. 1

III.    THE OBJECTIONS TO THE SETTLEMENT SHOULD BE OVERRULED ................. 4

        A.      The Settlement Amounts Are Fair and Reasonable and Represent Substantial

                Recoveries for the Class.................................................................... 5

        B.      The Approved Notice Programs Provided the Best Practicable Notice to Class

                Members and Satisfied Rule 23 and Due Process ................................... 7

                1.      Notice Provided Was Sufficiently Clear and Not Misleading.................. 7

        C.      Class Counsel's Fee Request is Reasonable ......................................... 8

                1.      Fees Should Be Awarded on the Full Value of the Settlements............... 9

                2.      Class Counsel's Fee Request Is Reasonable and Adheres to Prevailing

                        Law in This Circuit and District ............................................... 10

        D.      The Remaining Miscellaneous Objections Have No Merit ................................ 12

IV.     THE ARGUMENTS OF SERIAL OBJECTORS LACK CREDIBILITY ..................... 17

V.      CONCLUSION.................................................................................... 19

5431693v1/015144

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Federal Cases</u>

*Auscape Int'l v. Nat'l Geographic Soc'y*,
  2002 U.S. Dist. LEXIS 26318, at *3-4 (S.D.N.Y. Oct. 8, 2002) ................................................ 3

*Bezdek v. Vibram USA, Inc.*,
  809 F.3d 78, 84 n.3 (1st Cir. 2015) ...................................................... 18

*Central States S.E. and S.W. Areas Health and Welfare Fund v.*
  *Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007) ...................................... 11

*Diversified Grp., Inc. v. Daugerdas*,
  304 F. Supp. 2d 507 (S.D.N.Y. 2003) ................................................ 3

*Fleisher v. Phoenix Life Ins. Co.*,
  No. 11-CV-8405 (CM, 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) ........................... 10, 11

*Garber v. Office of Comm'r of Baseball*,
  No. 12-CV-03704 (VEC), 2017 WL 752183 (S.D.N.Y. Feb. 27, 2017). ............................... 19

*Gilliam v. Addicts Rehabilitation Center Fund*,
  2008 WL 782596, at *5 (S.D.N.Y. Mar. 24, 2008) ............................................... 10

*Greco v. Ginn Dev. Co., LLC*,
  635 F. App'x 628 (11th Cir. 2015) .............................................. 19

*Guzman v. Joesons Auto Parts*,
  No. 11-cv-4543, 2013 WL 2898154 (E.D.N.Y. June 13, 2013) ................................. 10

*Hutson v. Notorious B.I.G., LLC*,
  2015 WL 9450623, at *3 (S.D.N.Y. Dec. 22, 2015) ................................................ 14

*Hyun v. Ippudo USA Holdings*,
  No. 14-cv-8706, 2016 WL 1222347, at *3 (S.D.N.Y. Mar. 24, 2016) .................................... 10

*In re Beacon Assocs. Litig.*,
  No. 09 CIV 3907 CM, 2013 WL 2450960 (S.D.N.Y. May 9, 2013) ..................................... 10

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012) ......................................... 10

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  MDL No. 12-2389, 2015 WL 6971424, at *10 (S.D.N.Y. Nov. 9, 2015) ................................ 15

*In re Lloyd's Am. Trust Fund Litig.*,
  No. 96-cv-1262, 2002 WL 31663577, at *26 (S.D.N.Y. Nov. 26, 2002) ................................ 11

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  246 F.R.D. 156 (S.D.N.Y.2007) .............................................. 7

*In re Payment Card Interchange Fee Lit.*,
  991 F. Supp. 2d 437 (E.D.N.Y. 2014) .............................................. 11

i

*In re Prudential Sec., Inc.*,
  1995 WL 798907, at *13 (S.D.N.Y. Nov. 20, 1995) ................................................ 2

*In re Warner Commc'ns Sec. Litig.*,
  618 F. Supp. 735 (S.D.N.Y. 1985) ........................................................................ 2

*Johnson v. City of New York*,
  No. 08-cv-3673, 2010 WL 5818290, at *4 (E.D.N.Y. Dec. 13, 2010) .................................. 11

*McDaniel v. Cty. of Schenectady*,
  595 F.3d 411 (2d Cir. 2010) ........................................................................ 10, 11

*Moloney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*,
  No. 06-cv-4270, 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) ................................... 10

*Morris v. Affinity Health Plan, Inc.*,
  859 F. Supp. 2d 611 (S.D.N.Y. 2012) .................................................................. 10

*People United for Children, Inc. v. City of New York*,
  2007 WL 582720, at *3 (S.D.N.Y. Feb. 26, 2007) ....................................................... 2

*Stinson v. City of New York*,
  256 F. Supp. 3d 283 (S.D.N.Y. 2017) ................................................................ 2, 4

*Velez v. Novartis Pharm. Corp.*,
  No. 04 CIV 09194 CM, 2010 WL 4877852, at *8, *18 (S.D.N.Y. Nov. 30, 2010) ............... 9, 10, 15

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96, 115 (2d Cir. 2005) ....................................................................... 7

## Other Authorities

*In re Checking Account Overdraft Litig.*,
  830 F. Supp. 2d at 1362 ............................................................................... 18

*Managing Class Action Litigation: A Pocket Guide for Judges*,
  at 15 (2d ed. 2009) .................................................................................. 18

*Newberg on Class Actions* § 15:37 ..................................................................... 18

5431693v1/015144

I. **INTRODUCTION**

The Settlement with Spotify presents an excellent result for Class Members. With a combined value of more than $112.55 million, it offers $43.45 million in immediate compensation to Class Members, provides significant future payments to Class Members through the royalty payment program, with an estimated value of $63.1 million, and also tackles the extraordinary problem of matching pending and unmatched works so that artists can receive payment for which they have previously been uncompensated. Underscoring the fairness and reasonableness of the Settlement, remarkably few objections have been filed. From a universe of at least 535,401 potential Class Members who received the mail or e-mail Notice, just 13 unique objections were filed by individuals or law firms.

As explained below, some of the objectors below lack standing and their objections should be stricken on that basis. Additionally, the few objections that have been raised lack merit. The Settlement is fundamentally sound and provides substantial benefits to more than 535,401 potential Class Members. It more than fulfills the standards for final approval set forth in Federal Rule of Civil Procedure 23(e) as described in the accompanying motion for final approval filed forthwith. And the attorneys' fees sought in Class Counsel's application are fair, reasonable, and entirely consistent with Second Circuit precedent. Accordingly, the objections should be overruled as they do not provide a basis for preventing approval of the settlement.

II. **WIXEN'S CLIENTS LACK STANDING TO OBJECT AND WIXEN DOES NOT HAVE ITS CLIENTS' CONSENT TO ACT**

Wixen Music Publishing, Inc. ("Wixen") is an independent music licensing administration company based in Calabasas, California. Counsel for Wixen, Donahue Fitzgerald, purported to file an objection on behalf of 510 individuals and entities (the "Wixen clients"), claiming that Wixen had the authority to object on behalf of the Wixen clients. A

1

threshold issue with the Wixen clients' objection is that these objections are not properly before the Court at all because 1) the Wixen clients lack standing to object with respect to musical works after having opted out those works; and 2) Wixen never obtained consent to act on behalf of its hundreds of clients.

Even assuming that Wixen's clients authorized Wixen to submit objections in their names—which as explained below, they did not—Wixen's clients lack standing to object to how their identified works would be treated under the settlement because Wixen filed both objections and requests for exclusion from the Settlement Class for those works in its clients' names. Supp. Cirami Decl. ¶ 19 (Wixen submitted timely requests for exclusion); Dkt. 208 (Wixen objection). A person cannot both opt out of a class and object to a settlement. *See, e.g.*, *Stinson v. City of New York*, 256 F. Supp. 3d 283 (S.D.N.Y. 2017) ("Class members who opt-out of the settlement extinguish their ability to object to it and those objections need not be considered."); *People United for Children, Inc. v. City of New York*, 2007 WL 582720, at *3 (S.D.N.Y. Feb. 26, 2007) ("Plaintiff Conchita Jones also raised a number of objections at the fairness hearing; however Ms. Jones has opted out of the class and therefore I need not address the substance of her claims here."); *In re Prudential Sec., Inc.*, 1995 WL 798907, at *13 (S.D.N.Y. Nov. 20, 1995) ("Any secondary market purchaser who wanted to exclude him or herself could have done so and the Hutman objectors have each filed exclusion requests and lack standing to object here."); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 753 (S.D.N.Y. 1985) (noting that two objectors had opted out of the class and concluding that "[t]herefore, they no longer have standing to challenge the settlement and their objection is dismissed").[1]

---

[1] There is a dispute pending as to whether Wixen's requests for exclusion are valid. *See* Dkt. 257. For example, Wixen has failed to show that it had any authority to submit requests for exclusion in its clients' names and, moreover, many of the exclusions omit copyright registration numbers, which is required to opt out under the Preliminary Approval Order. Dkt. No. 177, at ¶ 16.

2

Wixen's objections are also procedurally improper because Wixen lacks the authority to object on behalf of the more than 500 individuals and entities it purports to represent.  Wixen filed an objection listing the names of all of its clients as claimed objectors.  Dkt. 208.  Wixen's sole authority for its purported ability to object on behalf of its clients is from Wixen's Administration Agreement, where the rights granted to Wixen include:  the right to sign agreements, collect previously unpaid royalties, receive monies, issue licenses, pay royalties, register copyrights, interact on behalf of clients with collection, performing and/or mechanical rights societies throughout the territory of the world.  Declaration of Randall D. Wixen, Dkt. 208-1, ¶ 8.  Even assuming that those Administration Agreements exist—Wixen has refused to produce them—the Administration Agreement provides no basis for Wixen's purported authority to file objections—or otherwise pursue legal actions—in its clients' names.  Wixen has no other alleged basis for claiming it had the right to seek to object on its clients' behalf.

Similarly, the Donahue Fitzgerald firm had no legal authority to bind the Wixen clients by filing objections on their behalf to a Settlement from which some or all might benefit.  It appears there is no engagement letter between Donahue Fitzgerald and the Wixen clients.  Wixen did not produce engagement letters in response to subpoenas served by Class Counsel and Spotify those letters.   Wixen took the position that any engagement letters are privileged, which is contrary to law, and produced a privilege log that failed to affirm the existence of such agreements.  *See* Pachman Decl., Ex. 1.  *See, e.g., Diversified Grp., Inc. v. Daugerdas*, 304 F. Supp. 2d 507, 514 (S.D.N.Y. 2003) ("Under federal common law, attorney fee arrangements, including the general purpose of the work performed, are not generally protected from disclosure by the attorney-client privilege."); *Auscape Int'l v. Nat'l Geographic Soc'y*, 2002 U.S. Dist. LEXIS 26318, at *3-4 (S.D.N.Y. Oct. 8, 2002) ("[L]etters to prospective clients to encourage their involvement in a class action and a proposed form of retainer agreement, regardless of

3

whether the sending of them was in furtherance of the interests of existing clients, are not communications between attorney and client and are not confidential.").

Furthermore, Wixen's objections on behalf of its clients result from improper conduct because Wixen counsel encouraged them to opt out, and in the absence of receiving affirmative express consent to do so, nonetheless proceeded file objections in their names. Wixen sent a letter to its clients in August 2017 indicating that it would opt out on its clients' behalf. *See* Dkt. 249-3 ("As a matter of practicality, if we do not hear from you by August 15, 2017, we will proceed on your behalf in our best business judgment."). But even assuming *arguendo* that Wixen or its attorneys had the authority to opt out on Wixen's clients' behalf – which they did not – Wixen and its attorneys certainly did not have the ability to object on their behalf without obtaining Wixen clients' express consent. *See Stinson v. City of New York*, 256 F. Supp. 3d 283 (S.D.N.Y. 2017) (holding that attorneys did not have standing to object on behalf of their clients because only class members themselves can object). As to objections specifically, the letter (Dkt. 249-3) did not even address Wixen's intent to file objections on Wixen clients' behalf. Indeed, Mr. Wixen confirmed in his deposition that Wixen sent a copy of the objection to Wixen clients *after* it had already been filed. Pachman Decl., Ex. 2 (Wixen Tr.) at 217:10-218:17.

Thus, while the merits of Wixen's objections are addressed below, the objections are procedurally improper and should be stricken.

## III.   THE OBJECTIONS TO THE SETTLEMENT SHOULD BE OVERRULED

Because objections to the Settlements largely overlap and often are repetitive, they are addressed by general topic below. None of the objections provide any basis to question the fairness, reasonableness, or adequacy of the Settlement.

A.      **The Settlement Amounts Are Fair and Reasonable and Represent**
        **Substantial Recoveries for the Class**

Four of the objections voice dissatisfaction with the amount of the applicable Settlement, in the form of generalized complaints that Spotify is not paying enough.  Dkts. 183, 184, 208, 211.  Objections that concern the *amount* of a settlement are routinely rejected in this Circuit. *See e.g.*, *In re Nissan Radiator/Transmission Cooler Litig.*, 2013 WL 4080946, at *14 (S.D.N.Y. May 30, 2013) (overruling an objection that a "settlement should have provided more compensation for plaintiffs"); *Johnson v. Brennan,* 2011 WL 357376, at *11-12 (S.D.N.Y. Sept. 16, 2011) (same, collecting cases). "[M]embers who are not satisfied with the level of compensation provided may opt-out of the class and pursue their own claims." *Nissan*, 2013 WL 4080946, at *14.

Respectfully, these objections misunderstand the lens through which class settlements must be evaluated. Settlements, by their nature, rarely confer optimal relief; they are assessed, instead, for fairness, adequacy, and reasonableness, *not* – as some objectors seem to presume – whether the settlement reflects a result equivalent to a victory at trial.  "It is well-settled that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair."  *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 270 (S.D.N.Y. 2012) (citation omitted).  Thus, the complaint that the settlement is "inadequate" because Mr. Ellis previously filed a lawsuit to recover "upwards of $405,000,000.00" is legally misguided.  Dkt. 183.  So, too, is the speculative objection that the settlement is "far from sufficient" because Mr. Turney's songs "alone are worth that amount." Dkt. 184.[2]

---

[2] It appears from Mr. Turney's objection that his songs in fact are not on Spotify, which is another aspect of the settlement that he thinks is unfair.  Dkt. No. 184, at 1.  If so, he is not a class member and lacks standing to object to the settlement.

None of the objectors challenge the analysis required under the totality of the *Grinnell* factors in assessing the reasonableness of the settlements. Plaintiffs' analysis of those considerations, therefore, stands essentially unrebutted. Nonetheless, we point out here why the value of the settlements readily satisfies the adequacy and reasonableness threshold.  Even before including the payment from Spotify for future monetary and nonmonetary relief, the value of the future royalty payment program and notice and administration costs, the Settlement has a value of $43.45 million.  With the future royalty payment program and notice and administration costs, the settlement is valued at over $112.55 million.  As detailed in Plaintiffs' Final Approval papers, this estimate of the substantial value of the Settlements is conservative, and understates the value class members will receive from the future royalty payment program.  Dos Santos Decl., Ex. B, ¶¶ 28, 35; n. 2, 10, 14.  For example, the $63.1 million value of the future royalty payment program does not include benefits to the Class with respect to future compositions, as actions taken by Spotify under the terms of the Settlement will improve on an ongoing basis the matching of tracks with compositions published and registered with the Copyright Office by Class Members.  Dos Santos Decl., Ex. B; n. 2.

Moreover, the resolution of another copyright infringement dispute against Spotify confirms that this settlement represents a victory for the Class.  Specifically, Spotify previously reached a deal with the NMPA regarding the licensing of songs available on Spotify.  The NMPA settlement is a $30 million dollar settlement,[3] whereas the total value of the Ferrick settlement is at least $112.55 million.  Objectors who are unhappy with the amount of the initial cash component of the settlements also completely ignore the substantial value conferred by

---

[3] See Ed Christman, Spotify and Publishing Group Reach $30 Million Settlement Agreement Over Unpaid Royalties (Mar. 17, 2016), at http://www.billboard.com/articles/business/7263747/spotify-nmpa-publishing-30-million-settlement-unpaid-royalties.

other important aspects of the Settlement – the future royalty payment program and notice and administration costs, as well as the various forms of nonmonetary relief conferred by the settlement.  To the extent that objectors say that the settlement overall is unfair, their statements are unsupported and for that reason can be disregarded.  *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 246 F.R.D. 156, 168 (S.D.N.Y. 2007) (finding that "conclusory statements are not sufficient to weigh against approval of the Settlement as fair and reasonable").

> **B.** **The Approved Notice Programs Provided the Best Practicable Notice to Class Members and Satisfied Rule 23 and Due Process**

The Court-approved Notice Program satisfies constitutional due process requirements and adequately provided class members with notice of the Settlements. Any objector's arguments to the contrary are without merit, and repeatedly have been rejected by a number of courts.

> 1. Notice Provided Was Sufficiently Clear and Not Misleading

Three objectors, Terrence Davis, Laureen Hellouin, and Phynjuar Saunders-Thomas, have raised issues concerning the clarity of the Notice.  Dkts. 186, 218, 234.  The Notice provided to Class Members was clear, reasonable, and in no way misleading. Rule 23 only requires that class members be "given information reasonably necessary to make a decision whether to remain a class member and be bound by the final judgment or opt out of the action." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 115 (2d Cir. 2005). One objector erroneously claims that the Notice was ambiguous. But, as courts have made clear, "notice need not include 'every material fact' or be 'overly detailed.'" *Id.*  The Notice in this case sufficiently informed class members of the terms of the Settlements in a manner that allows them to make an informed decision regarding whether the Settlements serve their interests or they should opt-out or object.

7

Indeed, none of the information objectors claim was omitted from the Notice was even possible for the Notice to disclose.  Objector Hellouin and Saunders-Thomas, for example, argue there was insufficient information regarding numbers and formulas that would enable a class member to determine the damages they would be awarded if they participated in the Settlement. Dkts. 218, 234.  But the Settlement clearly describes a Plan of Allocation:

> Each Authorized Claimant shall receive a Settlement Payment in accordance with the Allocation Plan described herein, which may be modified by Class Counsel depending on the Valid Claim Forms received and the number of opt outs, if any, subject to Court approval. Each Authorized Claimant shall receive a minimum pro rata payment from a fixed portion of the Net Settlement Fund, regardless of the number of times their claimed Works have been streamed or downloaded. Additionally, Authorized Claimants whose Claimed Works have been streamed more than 100 times (or such other threshold as may be appropriate after consideration of the Valid Claim Forms submitted) shall receive a payment from the Settlement Fund which shall be a percentage of the remaining Net Settlement Fund determined by dividing (i) the total number of streams (through the Preliminary Approval Date) for the Claimed Musical Works of the Authorized Claimant by (ii) the total number of streams for all Claimed Musical Works (through the Preliminary Approval Date) identified by all Authorized Claimants. In the event that an Authorized Claimant is only a partial owner of the copyright for a particular Claimed Musical Work, the number of streams for that Musical Work shall be discounted in accordance with that Authorized Claimant's ownership share.

Settlement Agreement (Dkt. 176-3 at ¶ 3.5(a)).  The objectors do not provide any detail as to what is wrong with the Plan of Allocation other than the inability of a Class Member to calculate potential payment; but given that Class Members' potential payment is tied to the number of participants in the Settlement, there is no way Class Counsel could have provided additional information in the Notice.

### C.   **Class Counsel's Fee Request is Reasonable**

Class Counsel achieved an outstanding result in the face of significant risks. Counsel advanced substantial costs, invested time and labor without the guarantee of any compensation, and bypassed other profitable work to vigorously pursue these claims. Class Counsel's fee

8

request is commensurate with the risk taken and result achieved, and is entirely consistent with prevailing law in the Second Circuit and this District. Nonetheless, several objectors voice dissatisfaction with Class Counsel seeking fees.  Notably, in each case these objectors incorrectly assumed that Class Counsel were seeking 33% of the Net Settlement ***plus*** $5 million on top of that recovery (a $19.48 million fee).  But Class Counsel's request is much lower – Class Counsel seeks only 14% of the Gross Settlement Fund, or using a less-accepted and more conservative methodology, 25% of the cash fund, plus up to $5 million in attorneys' fees Spotify agreed to pay in conjunction with the prospective relief provided by the Settlement (a $15.86 million fee).[4] Not a single objector, however, submitted an expert declaration or provided any evidence undermining the conclusions reached by Class Counsel and their nationally recognized experts that the fee request is fair, reasonable, and adequate.  *See* Motion for Attorneys' Fees filed forthwith.  For the reasons explained below, the objections to Class Counsel's fee request should be overruled.

> 1.    <u>Fees Should Be Awarded on the Full Value of the Settlements</u>

As outlined in Plaintiffs' motion for final approval, the combined value of the settlements, including notice and administration costs and the future royalty payment program, is $112.55 million.  Further, this does not include the value of the additional non-monetary, prospective relief.  Several objectors, however, claim that the value of the common fund, for the purpose of awarding attorneys' fees under the percentage-of-fund approach, should be limited to the immediate cash payment. Dkts. 204, 208, 211, 234, 244.  The objectors' attempt to excise the value of the future monetary relief, such as the royalty payment program, from the value of the common fund fails because it conflicts with Second Circuit precedent.  *See See, e.g.*, *Velez v. Novartis Pharm. Corp.*, No. 04 CIV 09194 CM, 2010 WL 4877852, at *8, *18 (S.D.N.Y. Nov.

---

[4] (0.25 * $43,450,000.00) = $10,862,500.00 + $5,000,000.00 = $15,862,500.00

30, 2010) (calculating value of settlement broadly including monetary and non-monetary relief).

Furthermore, each of these objectors also incorrectly assumed that Class Counsel were seeking

33% of the Net Settlement Fund ($43.45 million) *plus* $5 million on top of that recovery, which

would result in a $19.48 million fee.  But counsel are seeking 14% of the Gross Settlement Fund,

or 25% of the cash fund, plus up to $5 million in attorneys' fees Spotify agreed to pay in

conjunction with the prospective relief provided by the Settlement (a $15.86 million fee).  None

of the objectors have explained why the fees are excessive.  *See In re Bear Stearns Companies,*

*Inc. Sec., Derivative, & ERISA Litig.,* 909 F. Supp. 2d 259, 264 (S.D.N.Y. 2012) (overruling

generic objection that fees were excessive).

> 2.   Class Counsel's Fee Request Is Reasonable and Adheres to Prevailing
>        Law in This Circuit and District

Many objectors who challenge Class Counsel's fee request ignore prevailing law in the

Second Circuit and this District. Dkts. 204, 208, 211, 234, 244.  Multiple cases in this District

fully support requested fees of 30% (greater than Class Counsel's request here) of the applicable

Settlement Amounts:  *Hyun v. Ippudo USA Holdings*, No. 14-cv-8706, 2016 WL 1222347, at *3

(S.D.N.Y. Mar. 24, 2016) (applying percentage method and awarding fees in amount of one third

of the settlement fund "where the parties were able to settle relatively early and before any

depositions occurred," as the method "avoids the lodestar method's potential to 'create a

disincentive to early settlement'" (quoting *McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 418

(2d Cir. 2010)); *Villalva-Estrada v. SXB Rest. Corp.*, No. 14-cv-10011, 2016 WL 1275663, at *3

(S.D.N.Y. Mar. 31, 2016) (approving fee representing 37.5% of common fund while noting that

fees of 30% to 33.3% "are not uncommon in this Circuit" (quoting *Guzman v. Joesons Auto*

*Parts*, No. 11-cv-4543, 2013 WL 2898154 (E.D.N.Y. June 13, 2013))).  Indeed, "[d]istrict courts

in the Second Circuit routinely award attorneys' fees that are 24.59 percent or greater," *Fleisher*

10

*v. Phoenix Life Ins. Co.*, No. 11-CV-8405 (CM, 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) (quoting *Velez*, 2010 WL 4877852, at *21),[5] including percentage-based awards that exceed the 14% requested here, *see, e.g.*, *Davenport*, slip op. at 24 (approving fee award of 30.1% of total settlement amount); *Central States S.E. and S.W. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007) (affirming 30% award of a $42.5 million settlement).[6]

The objectors also neglect to analyze the market rate for a contingent fee in private commercial cases.  Class Counsel's requested fee falls well within the market rate for contingent fees in private commercial cases, further demonstrating its reasonableness.  Sklaver Decl. in Support of Motion for Final Approval and Attorneys' Fees ¶ 19.  "This fact is highly relevant to determining the appropriateness of the award because the Court's ultimate task is to 'approximate the reasonable fee that a competitive market would bear.'" *Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405 (CM), 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) (quoting *Johnson v. City of New York*, No. 08-cv-3673, 2010 WL 5818290, at *4 (E.D.N.Y. Dec. 13, 2010)); *see also McDaniel*, 595 F.3d at 422 (noting that the district court's focus should be "on mimicking a market"); *see also In re Lloyd's Am. Trust Fund Litig.*, No. 96-cv-1262, 2002 WL 31663577, at

---

[5] *See also In re Beacon Assocs. Litig.*, No. 09 CIV 3907 CM, 2013 WL 2450960 (S.D.N.Y. May 9, 2013) ("In this Circuit, courts routinely award attorneys' fees that run to 30% and even a little more of the amount of the common fund."); *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611 (S.D.N.Y. 2012) (a fee of one-third of the recovery "is reasonable and consistent with the norms of class litigation in this circuit." (quoting *Gilliam v. Addicts Rehabilitation Center Fund*, 2008 WL 782596, at *5 (S.D.N.Y. Mar. 24, 2008)); *Moloney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, No. 06-cv-4270, 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (collecting cases awarding over 30% and noting that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit."); *In re Payment Card Interchange Fee Lit.*, 991 F. Supp. 2d 437, 446 (E.D.N.Y. 2014) (surveying cases and concluding "it is very common to see 33% contingency fees in cases with funds of less than $10 million, and 30% contingency fees in cases with funds between $10 million and $50 million").

[6] Objector Silverman cites *In re Philip Servs. Corp. Sec. Litig.*, No. 98 CIV. 835 (AKH), 2007 WL 959299, at *2 (S.D.N.Y. Mar. 28, 2007) to argue that as settlement awards go up, the percentage of the settlement fund attributable to attorneys' fees goes down, specifically to 11 to 19 percent.  While there are a number of cases suggesting otherwise, *see* p. 9-10, *supra*, here, Class Counsel only seeks a fee of 14% of the gross settlement fund.  Silverman's objection was based on the mistaken premise that Class Counsel was seeking a $19.48 million recovery.

*26 (S.D.N.Y. Nov. 26, 2002) ("[T]he percentage approach most closely approximates the manner in which private litigants compensate their attorneys in the *marketplace contingency fee model*.").

Collectively, these factors support Class Counsel's fee request here.

### D.      The Remaining Miscellaneous Objections Have No Merit

The remaining objections to the reasonableness of the Settlement are more difficult to categorize, but are largely conclusory, vague, not supported by specific factual or legal support, and should thus be overruled.

Wixen filed an objection in the name of its clients arguing that the Settlement is not procedurally fair on the grounds that the Settlement is 1) a "collusive effort" between Spotify and Class Counsel; 2) requires class members to submit copyright registration numbers in conjunction with opt out requests or objections; and 3) bars class members from employing agents and delegates to file requests for exclusion on their behalf.  As noted above, the Court can summarily reject the Wixen client objections as unauthorized for lack of standing.

Even taken on their own terms, however, Wixen's scattershot objections are meritless. First, as described above in the preliminary approval papers, the settlement discussions were extensive and involved two in-person mediation sessions with the experienced Hon. Layn Phillips (retired), numerous teleconferences spanning ten months, multiple rounds of mediation briefing, and the analysis of extensive data provided by Spotify.  In his deposition, Randall D. Wixen ("Mr. Wixen"), President and CEO of the Wixen entity, admitted that he had no knowledge of the parties' engagement of a mediator, the number of mediation sessions the parties attended, documents exchanged between the parties, and the extent of the negotiations. Pachman Decl., Ex. 2 (Wixen Depo. Tr.) at 199:5-15.  The parties' extensive arms-length mediation process including through the engagement of Judge Phillips, a highly respected

12

mediator, controverts Wixen's baseless claims regarding collusion.  *See* Dkt. 169 (Phillips Decl.) ¶ 9 ("I also am familiar with the process by which the parties negotiated the settlement, and, I believe that the settlement was reached by the parties acting at arm's-length, carefully and in good faith.").  Wixen ignored Judge Phillips' declaration submitted with Plaintiffs' Motion for Preliminary Approval and instead asserted, without any factual basis, that the parties' settlement discussions were "collusive."

Second, Wixen's contention that it is procedurally unfair to require class members to submit copyright registration numbers in conjunction with their objections or requests for exclusion is similarly without merit.  Copyright registration numbers are routinely required to establish standing in litigation.[7]  To state a claim for copyright infringement, courts in this Circuit have held that a complaint must allege which specific original works are the subject of the claim, that plaintiff owns the copyright, that the works have been registered in compliance with the copyright statute and by what acts and during what time defendant has infringed the copyright. *See Calloway v. The Marvel Entertainment Group,* No. 82-cv-8697, 1983 WL 1141 (S.D.N.Y. June 30, 1983) (dismissing complaint which failed to state copyright registration numbers and alleged dates of infringement); *see also*, *e.g.*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 158 (2010) ("[Section 411] establishes a condition—copyright registration—that plaintiffs ordinarily must satisfy before filing an infringement claim and invoking the Act's remedial provisions.").  It follows that the requirements for filing requests for exclusion and objections would require a similar showing.

---

[7] Mr. Wixen agreed that copyright registration numbers are required for other official records, like probate proceedings and loan documentation.  *Id.* at 232:18-233:19.  Mr. Wixen gave the example of the settlement of a prior dispute between the NMPA and the major record companies involving unpaid late fees, and suggested that his clients were not required to provide copyright registration numbers purportedly showing the common usage of copyright registration numbers in connection with that settlement, *id.* at 224:18-225:12, but the example he gave was not a class action and did not involve any allocation of settlement proceeds based on individual songs.  *See* nmpalatefeesettlement.com/faq.php (describing a settlement between parties that was not a class action settlement and was not pending in any court and describing allocation of proceeds based on participating publishers' overall market share).

Moreover, the settlement agreement requires that class members submit copyright registration numbers for good reason—so that the musical work that is being excluded can be identified.  Compositions cannot be identified solely by the name of an owner and title of a song.  Copyright ownership frequently changes hands and held in common with multiple parties.  And many songs have the same or similar titles, making it difficult or impossible to identify the composition in question.

Additionally, Wixen contends that it is overly burdensome to require class members to submit copyright registration numbers for copyrights registered pre-1978.  But class members already have a duty to submit those numbers when enforcing their copyrights in any type of litigation.

Moreover, Wixen overlooks the fact that the Settlement actually seeks to remedy this problem; Spotify has agreed to invest time and resources to initiate and support an industry-wide effort (to include representatives of composers, publishers, streaming services, labels, and others) with the goal of obtaining and digitizing all U.S. Copyright Office registration records for musical works registered before January 1, 1978, and making that information more accessible to the Class.  Dkt. 176-3 at ¶ 7.2.  To the extent these systems are not already available, Mr. Wixen acknowledged in his deposition that individuals and entities could reference archive.org to compile this information.  Pachman Decl., Ex. 2 (Wixen Depo. Tr.) at 194:19-195:12.

Third, Wixen's objection that the settlement is improper because it prohibits class members from engaging agents or delegates to file requests for exclusion on their behalf is misguided.  Just as agents or delegates cannot file copyright litigation on behalf of their clients, agents or delegates cannot file requests for exclusion on their behalf.  The legal holder of the copyright must do so. *See Hutson v. Notorious B.I.G., LLC*, 2015 WL 9450623, at *3 (S.D.N.Y. Dec. 22, 2015) (plaintiff must be "the legal or beneficial owner of an exclusive right under a

14

valid copyright at the time of the alleged infringement" to have standing to sue).  Moreover, there was nothing in the Settlement Agreement that prevented agents or delegates from *assisting* with filing requests for exclusion.

Wixen also objected to the Settlement on the grounds the Settlement fund amount is too small and attorneys' fees are too large.  These arguments are addressed in detail at pp. 4-6, 8-11, *supra*.  As to the amount of the Settlement fund, Wixen's objections are unfounded.  Not only is the $43.45 million in cash payment from Spotify an incredible result, but the total monetary value of the settlement is $112.55 million.  Wixen did not take into account the total value of the settlement, which is contrary to the law of this Circuit.  *See, e.g.*, *Velez v. Novartis Pharm. Corp.*, No. 04 CIV 09194 CM, 2010 WL 4877852, at *8, *18 (S.D.N.Y. Nov. 30, 2010) (both monetary and non-monetary relief considered in calculating value of settlement).  But even the up-front monetary payment of $43.45 million is a substantial result.  Wixen actually acknowledged this in a letter to its clients when it wrote: "Considering that 96% of NMPA members opted in to the NMPA settlement and are presumably barred from participating in the *Ferrick* settlement, the financial terms of the *Ferrick* settlement are likely to be several times better than the NMPA settlement."  Dkt. 249-3.  Additionally, as addressed in more detail in the Motion for Attorneys' Fees, Wixen's objection was based on the assumption that Class Counsel was seeking 33% of the Net Settlement Fund plus $5 million.  Class Counsel is only requesting 14% of the total settlement amount for a total fee of $15.86 million (or 25% of the cash fund, plus up to $5 million in attorneys' fees Spotify agreed to pay in conjunction with the prospective relief provided by the Settlement).  This is line with what other courts have awarded in similar cases. *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, MDL No. 12-2389, 2015 WL 6971424, at *10 (S.D.N.Y. Nov. 9, 2015), *aff'd sub nom. In re Facebook, Inc.*, 674 Fed.Appx. 37 (2d Cir. 2016) (summary order) (awarding a fee of 33% of a $26.5 million settlement fund).  As discussed in

15

the fee motion, based on the benchmarks used in the Second Circuit and the lodestar cross-check, the fee sought by Class Counsel is reasonable.

Finally, Wixen complains the Settlement forces Class Members to license their works to Spotify on a prospective basis.  But the fact that the Settlement provides a mechanism for ensuring that members of the Class will receive the future royalties they are owed is a substantial **benefit** of the settlement, not a reason for faulting it.  After all, plaintiffs brought this case to ensure that members of the Class would be paid the royalties they are owed. In any event, any member of the Class who for some reason was not interested in obtaining future royalties based on Spotify's use of their songs could have chosen to opt out of the Class.

Moreover, Wixen fails to consider the alternative to this settlement.  Section 115 of the Copyright Act enables distributors of works to obtain a compulsory license by sending a notice of intent to the copyright owner or—if the owner cannot be located, to the Copyright Office— and paying statutory royalties.  17 U.S.C. § 115.  Frequently, due the much lamented shortcomings of copyright registration records, which the Copyright Office itself has acknowledged, it is impossible to locate the actual copyright owners in order to send them the notice of intent and royalty payments.  *See* U.S. Copyright Office, *Copyright and the Music Marketplace, A Report of the Register of Copyrights*, Feb. 2015, at 123, available at http:// copyright.gov/policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf ("[T]here can be little doubt that the current music licensing landscape is severely hampered by the lack of publicly accessible, authoritative identification and ownership data.").  In other words, with or without the settlement, the musical works of Wixen's clients can still be made available by streaming services without an express license.  But with a compulsory license, copyright owners often have to know to sift through large numbers of Copyright Office filings by music services in order to claim their royalties.  By contrast, under the settlement, it is easy for class members to

16

claim their works and obtain royalty payments—not only can they use a searchable database to claim their works, an independent Settlement Claim Facilitator will proactively identify class members and help them step forward to get paid.

Class members Patrick Boland and James A. Bacon objected that they do not want their music played on Spotify.  *See* Dkt. 201.  But these objectors fail to appreciate that even in the absence of the settlement (or any contract), Spotify and other music services may obtain compulsory licenses to stream their works.  *See* 17 U.S.C. 115.  The settlement simply facilitates compensation to class members for having their works on Spotify.  A class member also objected on the grounds that Spotify should have to put its entire playlist online, Dkt. 241, but Spotify is effectively doing that in conjunction with the claims administration portal it has established to administer this lawsuit.  *See* Bernstein Decl. in Support of Motion for Final Approval.

Objector Phynjuar Saunders-Thomas argued that the release was too broad, but she failed to explain which part of the release was too broad. *See* Dkt. 234.  She also argued that Class Members should not have to pay for audit rights, but under the Settlement, Class Members do not have to pay for audits where the audit reveals 5% or more underpayment – and Class Members can select a Streamlined Audit for which the cost is capped at $100, even if the audit does not reveal an underpayment at all.  Dkt. 176-3 (Settlement Agreement) ¶¶ 5.4(d), 5.5(d). Objector Saunders-Thomas provided no other reason why the provision regarding audit rights is unreasonable.  Objector Laureen Hellouin criticized class members' inability to fill out claim forms and evaluate the litigation costs, *id.*, but Class Counsel's costs are detailed in their Attorneys' Fees Motion, filed concurrently herewith; and class members will be able to submit claim forms online if the Court grants final approval.

## IV.    THE ARGUMENTS OF SERIAL OBJECTORS LACK CREDIBILITY

The Court-approved Notice requirement that Objectors and their lawyers list their prior

recent objections – designed to deter and ferret out frivolous objections – seems to have struck a nerve. And a number of the objections failed to comply with this requirement. *See, e.g.* Dkts. 183, 184, 186, 201, 211, 223.  While "meritorious objectors can be of immense help to a district court in evaluating the fairness of a settlement," courts have correspondingly cautioned that "it is also important for district courts to screen out improper objections because objectors can, by holding up a settlement for the rest of the class, essentially extort a settlement of even unmeritorious objections." *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 84 n.3 (1st Cir. 2015) (citing *Newberg on Class Actions* § 13:21 (5th ed.)).  Baseless rote allegations (such as those before the Court) that class counsel deliberately undervalued the claims, and boilerplate objections (again, like those before the Court) to fees, notice, or the settlement release, provide strong evidence that objections stem from professional objectors' counsel. Such lawyers—who employ objections, and followed by meritless appeals, to merely obtain a payoff—interfere with the system and "often delay and unnecessarily complicate class proceedings." *Newberg on Class Actions* § 15:37.

The Federal Judicial Center therefore advises courts to "[w]atch out . . . for canned objections from professional objectors who seek out class actions to extract a fee by lodging generic, unhelpful protests." Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, at 15 (2d ed. 2009); *see also, In re Elec. Books Antitrust Litig.*, 639 F. App'x 724, 728 (2d Cir. 2016) ("[P]rofessional objectors are lawyers who file stock objections to class action settlements—objections that are [m]ost often . . . nonmeritorious—and then are rewarded with a fee by class counsel to settle their objections."); *In re Checking Account Overdraft Litig.,* 830 F. Supp. 2d at 1362 (recognizing that professional objectors' "sole purpose is to obtain a fee by objecting to whatever aspects of the Settlement they can latch onto" rather than "a concern for the welfare of the Settlement Class").  Contrary to Objector Tracy

Silverman's complaints, the information pertaining to past objections requested in the Notice, which is most likely in the possession of objectors and their counsel, may be relevant to and properly considered by this Court in determining any potential "ulterior motive" of the objectors. *See Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628 (11th Cir. 2015) (noting that the district court "properly considered that [an objector] (or his counsel) may have had an ulterior motive in objecting to the settlement, rather than opting out"). These disclosure requirements reasonably seek to aid this Court in its responsibility to screen out wholly nonmeritorious objections.

The complaint of Objector Silverman that class counsel could just as easily obtain the requested public information misses the point. The Notice's disclosure requirements are not primarily for the benefit of Class Counsel. Instead the information that objectors are required to disclose, not only to Class and Defense Counsel but also directly to this Court, is intended to conserve this Court's time and resources in its administration of this litigation. *See Garber v. Office of Comm'r of Baseball*, No. 12-CV-03704 (VEC), 2017 WL 752183 (S.D.N.Y. Feb. 27, 2017). Requiring an objector to provide information that could shed light on the basis for his objection is not inconsequential to the Court's obligation to ensure that a class action settlement is fair, adequate, and reasonable.  Along these lines, some courts have considered the objector's or counsel's history of objecting to class action settlements relevant to the court's discretion in ordering the posting of an appellate bond. *In re IPO Sec. Litig.,* 728 F. Supp. 2d at 214-16. Accordingly, it was entirely reasonable for this Court to approve the Notice with its litigation-history disclosure requirements, and the information gleaned from those disclosures warrants the Court viewing the positions advanced by the serial objectors with skepticism.

## V.      **CONCLUSION**

For the foregoing reasons, the objections of Class Members to approval of the Settlements, Service Awards, and Class Counsel's fee request should be overruled.

Dated:  November 13, 2017

By: */s/ Steven G. Sklaver*

Stephen E. Morrissey
(WA Bar No. 44710) (CA Bar No. 187865)
**SUSMAN GODFREY LLP**
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
smorrissey@susmangodfrey.com

Jacob Buchdahl (JB1902)
Geng Chen (GC2733)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Fl.
New York, New York 10019
Telephone: 212-336-8330
Facsimile: 212-336-8340
jbuchdahl@susmangodfrey.com
gchen@susmangodfrey.com

Steven G. Sklaver (CA State Bar No. 237612)
Kalpana Srinivasan (CA State Bar No. 237460)
Krysta Kauble Pachman (CA State Bar No. 280951)
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars
Los Angeles, California  90067-6029
Telephone: 310-789-3100
Facsimile: 310-789-3150
ssklaver@susmangodfrey.com
ksrinivasan@susmangodfrey.com
kpachman@susmangodfrey.com

Henry Gradstein (CA State Bar No. 89747)
Maryann R. Marzano (CA State Bar No. 96867)
Matthew A. Slater (CA State Bar No. 259986)
Daniel B. Lifschitz (CA State Bar No. 285068)
**GRADSTEIN & MARZANO, P.C.**
6310 San Vicente Boulevard, Ste 510
Los Angeles, California 90048
Telephone: 323-776-3100
hgradstein@gradstein.com
mmarzano@gradstein.com
mslater@gradstein.com
dlifschitz@gradstein.com
***Interim Co-Lead Class Counsel***

20

## CERTIFICATE OF SERVICE

The undersigned hereby certify that on November 13, 2017, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's SDNY Procedures for Electronic Filing.

Dated:  November 13, 2017

/s/   *Steven G. Sklaver*

Steven G. Sklaver