**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MELISSA FERRICK, et al., | Case No. 1:16-cv-08412 (AJN) |
| Plaintiffs, | **ANDREW PALEY'S** |
| v. | **SUPPLEMENTAL OPPOSITION** |
| SPOTIFY USA INC., et al., | **TO MOTION FOR FINAL** |
| Defendants. | **APPROVAL OF CLASS ACTION** |
| | **SETTLEMENT** |

## I.     INTRODUCTION

Objector Andrew Paley reiterates his opposition to final approval.

In response to Plaintiffs' supplemental papers (ECF No. 410, etc.), Mr. Paley asks that

the Court consider three developments since it held its fairness hearing on the parties' proposed

settlement:

First, virtually every songwriter who received a supplemental notice as approved by the

Court timely opted out of the proposed settlement in this case.

Second, at the beginning of this month, Spotify concluded its initial public offering at a

$26.6 billion valuation; as of today's market close, Spotify's market capitalization stands at

almost $29 billion.

Third, at the beginning of this year, a database derived from records at the U.S. Copyright

Office became readily searchable; that database reveals that from March 2017 to Dec. 2017,

Spotify filed "Notices of Intent" to use song copyrights at a rate of approximately 10,000 *a day*.

II.   **THE REACTION OF WIXEN SONGWRITERS TO THE PROPOSED SETTLEMENT IS OVERWHELMINGLY NEGATIVE**

One so-called Grinnell factor is reaction of the class to the proposed settlement. *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). Newberg views class member reaction as "the central factor" in the federal courts' fairness analysis. 4 Newberg on Class Actions § 13:54 (5th ed.). As previously noted, the reaction of the class as a whole deviated significantly in the negative from the norm. See ECF No. 306, at 4-5; ECF No. 381, at 1.

But take the example of just the Wixen songwriters. They have an experienced music publisher by their side. At the Court's direction, they received additional notice to the postcard sent other class members. See ECF No. 306, at 12-13. That letter notice — which, unlike notice to the rest of the class, included a form to return – went to a confirmed address maintained by Wixen; the claims administrator did not report any unsuccessful transmissions to the intended recipients. As a group, then, these songwriters stand as a proxy for a well-informed class member who received *actual* notice.

The mass exodus of these songwriters and their songs from the proposed settlement should give this Court serious pause. It strongly suggests that the proposed settlement is not in the best interests of absent class members. These songwriters' virtually unanimous negative reaction to that settlement, and their decision to affirm putting their own skin in the game by opting out of it, does not support final approval.

Plaintiffs attempt to downplay this extraordinary vote of no-confidence. They say that it and the poor overall reception to the proposed settlement is merely the doing of a few large rights administrators like Wixen. See ECF No. 410, at 4. But that argument ignores reality. The Court should credit the actions of song administrators like Wixen and Bluewater Music. They

are ideally situated to assess the fairness of the proposed settlement and to protect their songwriters' rights.

Music publishers like Wixen and Bluewater who administer song copyrights understand those rights and entitlements better than most individual songwriters or recording artists. They get the stakes. And they know a raw deal when they see one.

The importance of the objectors and opt outs in this case isn't just their disproportionate numbers (measured by individuals or songs) in relation to the typical commercial class action. With respect to those among them who act as music publishers, the Court should also give weight to their knowledge of the industry and their assessment of the fairness of the proposed deal pending before it.

## III.   THE RESULT OF SPOTIFY'S PUBLIC OFFERING REFLECTS THE MARKET'S CONFIDENCE THAT IT CAN WITHSTAND JUDGMENT IN THIS CASE

Another Grinnell factor is ability of Spotify to withstand judgment. *Grinnell*, 495 F.2d at 463. Spotify's initial public offering took place at the beginning of this month and its result was widely reported. See, e.g., "Spotify's First Day on Wall Street is a $26.5 Billion Success," New York Times, April 4, 2018, at B3 (New York ed.). At the close of today's market, Spotify's market capitalization stood at $28.7 billion. See Feaver Decl. at ¶ 11.

To put these numbers in perspective, taking the notional settlement value of $112.55 million proposed by the parties, that figure represents approximately 0.4% of Spotify's current valuation. Taking just the guaranteed cash payment of $43.45 million, that figure represents approximately 0.15% of Spotify's current valuation.

The market has spoken.  Spotify should have no trouble satisfying a judgment in this case (together with the several other individual cases pending) an order of magnitude (or more) greater than the above amounts.  See Feaver Decl. at ¶ 3 & Ex. A (excerpt from Spotify's Feb. 28, 2018 Form F-1).

Mr. Paley continues to question how anyone can value the future benefit to class members from the "licensing program" proffered by the parties as part of their settlement. Putting aside that it had announced that program before plaintiffs filed suit (ECF No. 75, at 3), the parties have repeatedly told the Court they can't even estimate how many works are at issue in this litigation.  How, then, can they reliably put a value on the licensing revenue Spotify will pay in the future on those same works?

## IV.    A SEARCHABLE DATABASE RECENTLY MADE AVAILABLE TO THE PUBLIC SUGGESTS THAT THE NUMBER OF WORKS AT ISSUE HERE IS EXPONENTIALLY HIGHER THAN WHAT SPOTIFY'S LAWYER CLAIMED (WITHOUT ANY CORROBORATING EVIDENCE)

In early 2018, the digital performing rights organization SoundExchange launched a database allowing the public to search records maintained by the U.S. Copyright Office of "Notices of Intent" ("NOIs") filed by prospective licensees of copyrighted songs.  See Feaver Decl. at ¶ 4.  As described in the operative pleading, NOIs are the "critical first step in the compulsory licensing process that alerts the copyright owner to the use of its musical composition and, in turn, the right to be compensated for that use."  See ECF No. 75, at 2.

A prospective song licensee (like Spotify) files an NOI with the Copyright Office, rather than serve the copyright owner, when the licensee cannot determine who or where the copyright owner is from registration records maintained at the Copyright Office.

See 17 U.S.C. § 115(b)(1); 37 C.F.R. 201.18.  In short, the Copyright Office has a registration

for the song, but the identity or location of its owner is unclear.  To be clear, the NOIs filed with

the Copyright Office represent just that subset of NOIs in the universe of compulsory licensing

of songs under the Copyright Act where the licensee cannot give notice directly to a copyright

owner of an intent to license her work.

The operative pleading here alleges that up to June 2016 Spotify had not availed itself of

a comprehensive compulsory license process designed "to license all of the songs embodied in

phonorecords which it ingests and distributes by means of interactive streaming and temporary

downloads."  See ECF No. 75, at ¶ 41.  This led to the "systemic and willful copyright

infringement" at issue in this case "for which [] statutory damages are the remedy."  Id. at ¶ 7.

From the SoundExchange database, Mr. Paley determined that from March 2017 to Dec.

2017 Spotify filed 10,000 or more NOIs with the Copyright Office *almost every day*.  See Feaver

Decl. at ¶ 6 & Ex. B.  For the same corresponding period its major competitor, Apple, filed zero.

*Id*.

What does this data demonstrate?  Mr. Paley proposes that it shows the following:

*First*, Spotify ingested millions of new songs into its service during the relevant Class

Period.

*Second*, accepting the "ballpark" figure of 300,000 or less songs at issue proffered by

Spotify's lawyer at the fairness hearing (see Tr. at 14:24-15:11) as sufficiently competent

evidence of same (it's more a naked assurance), the real number of class members' songs could

be far greater.  Simple math derived from the number of NOIs filed in the Copyright Office as

revealed on the SoundExchange database suggests the correct figure may be an order of

magnitude or more than that.

*Last*, contrary to its assertions here, Spotify should have the means to determine the number of works at issue in this case – or at the very least, give a reasonably certain estimate thereof.  Spotify is a "technology" company; the word appears in the name of the company, Spotify Technology S.A., that filed the Form F-1 before its public offering.  A program calling for the filing of NOIs at the rate reflected above suggests sufficient personnel and advanced technical resources from which to determine the identity of songs outside the direct licensing protocols Spotify had in place during the relevant Class Period. Moreover, as it must have generated songwriter information from Copyright Office records before filing its NOIs, Spotify should have an audit record in its searches, and therefore a means to replicate that for class members.

To reiterate, the Court does not have before it competent evidence from which to determine a reasonable estimate of the number of works Spotify made available during the Class Period on its service without a license.  Only with that evidence can the Court fulfill its fiduciary obligation to absent class members.

## V.   <u>CONCLUSION</u>

The Wixen songwriters almost uniformly hate this proposed settlement.  Spotify is worth billions.  And there is still no competent evidence in the record on number of works at issue here to support the fairness of the proposed settlement.  All the data outside the parties' supporting papers suggests that the number of works infringed far exceeds anything suggested to the Court so far.

For reasons set forth above and previously, the Court should deny the motion for final approval.  In the alternative, it can and should seek greater clarity from Spotify on the number of songs at issue here.  The Court put Wixen to the test; it's Spotify's turn. See ECF No. 323-1.

Dated:  April 24, 2018           PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP


By: /s/ David M. Given
       David M. Given
       dmg@phillaw.com

Phillips, Erlewine, Given & Carlin LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone:  415-398-0900
Fax:          415-398-0911

*Attorney for Andrew Paley*