UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAY 2 2 2018

Ferrick, et al.,

                                        Plaintiffs,

                    –v–

Spotify USA Inc., et al.,

                                        Defendants.

16-cv-8412 (AJN)

MEMORANDUM
OPINION & ORDER

ALISON J. NATHAN, District Judge:

A hearing was held on December 1, 2017, during which time the Court heard Plaintiffs'

Motion for Final Approval of the Class Action Settlement and their Application for Award of

Attorneys' Fees and Expenses and Incentive Award for Class Representatives. The Court had,

on June 28, 2017, entered an Order of Preliminary Approval approving notice to the Class,

establishing deadlines for objections, and preliminarily approving the Settlement. Dkt. No. 177.

Having considered the written submissions of the parties, having held a final fairness hearing,

and having considered the arguments offered at the final fairness hearing, it is hereby ordered

that the Class is finally certified and the Settlement is finally approved. However, the Court

reduces the attorneys' fee award to $13,035,000 and rejects Class Counsel's request to establish

a $231,000 fund for expert expenses.

## I.    CLASS CERTIFICATION

The Class is defined as

[A]ll persons or entities who own copyrights in one or more musical
compositions (a) for which a certificate of registration has been issued or
applied for on or before the Preliminary Approval Date; and (b) that was made
available by Spotify for interactive streaming and/or limited downloads during
the Class Period (December 28, 2012 through the Preliminary Approval Date)
without a license . . . .

1

Dkt. No. 176, Ex. C.(Settlement Agreement) ¶ 11.2.

For the reasons set forth below, for purposes of this settlement, the Class is certified because it satisfies the requirements of Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

### A. The Settlement Class Meets the Rule 23(a) Criteria

Rule 23(a) imposes four threshold requirements: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"), (2) commonality ("there are questions of law or fact common to the class"), (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"), and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a).

Numerosity is satisfied here. The Settlement Administrator, Garden City Group LLC ("GCG"), mailed more than 535,000 notices to potential class members. *See* Dkt. No. 190 (Cirami Dec.) ¶¶ 5, 9; Dkt. No. 287 (Supplemental Cirami Dec.) ¶ 7; Dkt. No. 283 (Pl. Memo for Approval) at 7, 11; *see also Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("[N]umerosity is presumed at a level of 40 members . . . .").

The commonality and typicality requirements are also met. Commonality demands that the class's claims "depend upon a common contention . . . capable of classwide resolution" such that "its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Typicality "requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v.*

*Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (internal quotation marks omitted). "The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3). The crux of both requirements is to ensure that maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* (alteration in original) (internal citations and quotation marks omitted).

Here, the settlement addresses a question common to all class members. As the class is defined, all class members will have a certificate of registration for a musical composition that Spotify made available for streaming or downloading without Spotify having a license to do so. Indeed, as the Central District of California explained in its decision granting the motion to consolidate in this case, Spotify is alleged to have infringed class members' copyrights by "reproduc[ing] and/or distribut[ing] . . . copyrighted musical compositions using Spotify's streaming service and offline listening service, without identifying and/or locating the owners of those compositions for payment or a notice of intent to reproduce." Dkt. No. 72 at 3. Whether Spotify's alleged conduct constitutes copyright infringement is "a common contention . . . capable of classwide resolution" whose "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. As for typicality, the named Class Plaintiffs are Melissa Ferrick (individually and doing business as Nine Two One Music and Right On Records/Publishing), Jaco Pastorius, Inc., and Gerencia 360 Publishing, Inc. According to the Consolidated Complaint, Ferrick has over 150 copyrighted musical compositions, and her songs have been streamed one million times by Spotify without a license; Jaco Pastorius, Inc. is a corporation that owns the songs of Jaco Pastorius, songs that

3

have been streamed millions of times by Spotify without a license; and Gerencia 360 Publishing, Inc. is a company that owns copyrights to the songs of artists who are signed to the Gerencia 360 record label, and its songs have been streamed millions of times by Spotify without a license. *See* Dkt. No. 75 (Consolidated Complaint) ¶¶ 8-11. Thus the named Class Plaintiffs have claims that are likely typical of the claims of other class members.

Finally, Lead Plaintiffs are adequate representatives of the class. The interests of the named Class Plaintiffs are aligned with the interests of the class, and their claims arose from the same course of events that are the subject of this lawsuit. There is no indication that they have any conflict with Class Counsel or are inadequate representatives. Moreover, the class is represented by experienced counsel. Class Plaintiffs filed their complaint on January 8, 2016, in the Central District of California, asserting a claim of copyright infringement. *See* Dkt. No. 72 at 2. After cross-motions to consolidate related cases, Susman Godfrey L.L.P. and Gradstein & Marzano P.C. were appointed Interim Co-Lead Class Counsel on May 23, 2016. *See* Dkt. No. 72 at 9-10. In that order, the Central District of California recognized that Susman Godfrey and Gradstein & Marzano had significant experience representing plaintiffs in class action lawsuits. *See* Dkt. No. 72 at 9.

## B. The Settlement Class Meets the Relevant Rule 23(b)(3) Criteria

To meet the requirements of Rule 23(b)(3), the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried,

would present intractable management problems, for the proposal is that there be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (internal citation omitted).

Here, Rule 23(b)(3) is satisfied because the Class's claims all involve the same issue— Spotify streaming or making available for download music without a license. Accordingly, the Court concludes that Rule 23(b)(3) was satisfied.

## II.    NOTICE WAS APPROPRIATE

Notice was mailed to putative class members. Spotify provided to GCG the names, addresses, and email addresses of all registered claimants of copyrights in musical compositions whose names and addresses appear in a digital format maintained by the U.S. Copyright Office, and GCG determined that the list contained 535,380 unique records. Cirami Dec. ¶¶ 4-5. GCG then mailed the Court-approved "Postcard Notice" to the persons and entities identified in those records. *Id.* ¶¶ 7-9; *see* Cirami Dec., Ex. C. When a notice was returned as undeliverable, GCG re-mailed the notice if a forwarding address was provided. Cirami Dec. ¶ 10. For mail returned without a forwarding address, GCG conducted and will continue to conduct searches to find new addresses. *Id.* The total number of mailed notices returned as undeliverable and for which a new address could not be located is 20,093. *Id.* GCG estimates that the mailed notices reached 95% of the potential class members for whom Spotify originally provided a mailing address. Supplemental Cirami Dec. ¶ 9.

Notice was also provided via email and via print notice in several music magazines, and through advertisements on the internet, social media outreach, a press release, a settlement website, a toll-free information number, and a disclosure on Spotify's website. Cirami Dec. ¶ 6; *see* Cirami Dec., Exs. D-L. The email notice, like the mailed notice, provided potential class members with the URL of the settlement website. *See* Cirami Dec. ¶ 27. Available on the

5

website are, inter alia, the long form notice, the mailed notice, the publication notice, the terms of the settlement, and the procedures for objecting to or opting out of the settlement. *See id.* ¶ 28; Cirami Dec., Ex. K.

Additional notice and an opportunity to opt out of the class was provided to certain putative class members at the end of February 2018. *See* Dkt. No. 409 (Kierkegaard Dec.) ¶ 4. By the original opt-out deadline, Wixen Music Publishing, Inc. ("Wixen Music") had submitted requests for exclusion on behalf of 435 individuals and entities. *See* Dkt. No. 209. The Court concluded that the language in Wixen Music's agreement with its clients, Dkt. No. 258, Ex. 5, was ambiguous with respect to whether it gave Wixen Music the authority to file requests for exclusion on behalf of its clients, *see* Dkt. No. 361. Accordingly, the Court extended the request for exclusion period for Wixen Music's clients. *See* Dkt. Nos. 361, 392. As part of that supplemental exclusion period, Wixen Music mailed a letter and additional opt-out form to the 436[1] individuals and entities it had sought to opt out, and those individuals and entities then had 30 days to return the forms. *See* Dkt. No. 389, Exs. 1 & 2; Dkt. No. 392; Kierkegaard Dec.

The content of the written notice and the manner in which notice was provided were sufficient to satisfy the requirements of Rule 23 and due process.

## III.    SETTLEMENT

A district court's approval of a settlement is contingent on a finding that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). This entails a review of both procedural and substantive fairness. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85-87 (2d Cir. 2001). In conducting this review, the Court is mindful of the "strong judicial policy in favor of settlements, particularly in the class action context." *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*,

---

[1] The errata included an additional individual. *See* Kierkegaard Dec. ¶ 3.

396 F.3d 96, 116 (2d Cir. 2005) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)). "The compromise of complex litigation is encouraged by the courts and favored by public policy." *Id.* at 117 (quoting 4 Newberg § 11:41, at 87).

## A. Procedural Fairness

With respect to procedural fairness, a proposed settlement is presumed fair, reasonable, and adequate if it culminates from "arm's-length negotiations between experienced, capable counsel after meaningful discovery." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009) (internal quotation marks omitted).

Here, the settlement is entitled to that presumption. The parties reached a settlement after several months of negotiations (September 2016 through May 2017). The negotiations involved two full day, in-person mediation sessions held before a highly experienced mediator (Judge Phillips) and multiple rounds of mediation briefing, as well as extensive in-person, telephone, and email discussions. *See* Pl. Memo for Approval at 9; Dkt. No. 284 (Sklaver Dec.) ¶¶ 6, 9-13; Dkt. No. 169 (Phillips Dec.). In addition, settlement negotiations included the exchange of tens of millions of rows of Spotify's data and work by experts on both sides to evaluate the settlement value of the case. *See* Pl. Memo for Approval at 9; Sklaver Dec. ¶ 5. Settlement negotiations were conducted by qualified and experienced counsel on both sides at arm's length. *See* Sklaver Dec. ¶ 13.

## B. Substantive Fairness

In assessing substantive fairness, the Court considers the nine factors detailed by the Second Circuit in *City of Detroit v. Grinnell Corporation*, 495 F.2d 448 (2d Cir. 1974):

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the

7

trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 463 (internal citations omitted). "All nine factors need not be satisfied; rather, a court should look at the totality of these factors in light of the particular circumstances." *In re Top Tankers, Inc. Sec. Litig.*, No. 06 Civ. 13761, 2008 WL 2944620, at *4 (S.D.N.Y. July 31, 2008) (internal quotation marks omitted).

### 1. The complexity, expense and likely duration of the litigation

This case is complex and involves questions about the application of copyright laws in a relatively novel context, as well as questions regarding whether the class could be certified as a litigation class. *See* Pl. Memo for Approval at 10-11. Indeed, Spotify continues to argue that the case would not be capable of being litigated on a class-wide basis. *See* Dkt. No. 294 (Spotify Memo for Approval) at 4. Moreover, it is likely that the litigation would have been protracted, involving numerous motions—including decertification challenges—and post-verdict and appellate litigation.

### 2. The reaction of the class to the settlement

"If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Wal-Mart Stores, Inc.*, 396 F.3d at 118.

Here, GCG mailed notice to 535,380 potential class members. Supplemental Cirami Dec. ¶ 7. Class members had until September 12, 2017, to object or exclude themselves from the Settlement. *Id.* ¶ 19. GCG initially received 822 timely requests for exclusion, 697 of which included at least one copyright registration number, for a total of 26,426 copyright registration numbers, *see id.*; Dkt. No. 287, Ex. B, and objections from 13 unique individuals or law firms, *see* Supplemental Cirami Dec. ¶ 21; Dkt. No. 376 ¶ 7. During the supplemental exclusion

period, GCG received another 402 timely requests for exclusion, which represent 12,026 compositions and 8,824 unique copyright registration numbers. *See* Kierkegaard Dec. ¶ 6. Despite the exclusions and objections, discussed more fully below, the vast majority of class members did not object to the settlement or opt out of it, which indicates that the settlement is fair. *See Wal-Mart Stores, Inc.*, 396 F.3d at 118; *see also Wright v. Stern*, 553 F. Supp. 2d 337, 345 (S.D.N.Y. 2008) ("The fact that the vast majority of class members neither objected nor opted out is a strong indication that the proposed settlement is fair, reasonable, and adequate."). The content of the objections do not undermine that conclusion. For the reasons explained below, the Court overrules all objections.

### 3. The stage of the proceedings and the amount of discovery completed

While the parties need not have engaged in extensive discovery, a sufficient factual investigation must have been conducted to afford the Court the opportunity to "'intelligently make . . . an appraisal' of the Settlement." *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000) (quoting *Plummer v. Chem. Bank*, 668 F.2d 654, 660 (2d Cir. 1982)), *aff'd*, *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001). In addition, "the pretrial negotiations and discovery must be sufficiently adversarial that they are not designed to justify a settlement . . . [,but] an aggressive effort to ferret out facts helpful to the prosecution of the suit." *Id.* (alterations in original) (quoting *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 263 (S.D.N.Y. 1998)).

Here, there were comprehensive settlement negotiations, and the parties exchanged a significant amount of information, including tens of millions of rows of Spotify's data. Moreover, experts performed substantial work to evaluate the value of the case.

### 4. The risks of establishing liability and damages

Plaintiffs face risks of establishing liability. Spotify moved to strike class action allegations, *see* Dkt. No. 148,—a motion that Plaintiffs had not yet survived—and it maintains that class certification would be improper for a litigation class, *see* Spotify Memo for Approval. In addition, Spotify raised several affirmative defenses to Plaintiffs' claims. *See id.* Moreover, even if Plaintiffs establish liability at trial, it is likely that Spotify would file post-trial motions and an appeal, thereby increasing the duration and cost of the litigation. *See* Pl. Memo for Approval at 19.

Plaintiffs also face risks of establishing damages, and there is a risk that they might recover much less than the value of the settlement. Establishing damages would likely require a battle at trial, and it could be difficult for Plaintiffs to establish recovery without risking decertification of the class. *See* Pl. Memo for Approval at 18.

### 5. The risks of maintaining the class action through the trial

Spotify continues to contend that a litigation class would not and should not be certified in this case. *See* Spotify Memo for Approval. There is thus a significant risk that the Court would not certify the class as a litigation class.

### 6. The ability of the defendants to withstand a greater judgment

That Spotify may be able to withstand a greater judgment, does not, standing alone, suggest that the settlement is unfair. *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 178 n.9.

### 7. The range of reasonableness of the settlement fund in light of the best possible recovery and in light of all the attendant risks of litigation

"The determination whether a settlement is reasonable does not involve the use of a 'mathematical equation yielding a particularized sum.'" *Frank v. Eastman Kodak Co.*, 228

F.R.D. 174, 186 (W.D.N.Y. 2005) (quoting *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d at 178). "[I]n any case there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion—and the judge will not be reversed if the appellate court concludes that the settlement lies within that range." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). "It is well-settled that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair." *Morris v. Affinity Health Plan, Inc.*, 859 F.Supp.2d 611, 621 (S.D.N.Y. 2012) (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982)). Indeed, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell*, 495 F.2d at 455 n. 2.

The overall settlement value exceeds $112.55 million. *See* Pl. Memo for Approval at 20. That amount includes an immediate cash payment of $43.45 million to Class Members to compensate them for Spotify making available tracks embodying their composition for streaming and/or limited download, Settlement Agreement ¶ 3.1(a); Spotify's agreement to pay all settlement administration costs and notice costs, including publication notice, which is estimated to cost more than $1 million, *see id.* ¶ 9; Pl. Memo for Approval at 4; a commitment by Spotify to pay ongoing compensation royalties to complainants for tracks identified by those complainants, a commitment valued at $63.1 million, *see* Dkt. No. 288 (Dos Santos Dec.), Ex. B ¶ 1; Settlement Agreement ¶ 4; and an additional, separate payment of $5 million in attorneys' fees, *see* Settlement Agreement ¶ 15.1. The remaining $8,035,000 in attorneys' fees and the litigation expenses of $718,236.80 will be paid from the settlement fund, thus reducing the

settlement fund, and resulting in an immediate cash payment to Class Members of $34,696,763.20.

In addition, Class Counsel has retained a third-party Settlement Claim Facilitator to assist class members in identifying possible claims they may have, *see* Dkt. No. 285 (Bernstein Dec.) ¶ 3; Spotify will establish an audit procedure so that class members can verify the accuracy of Spotify's royalty payments, *see* Settlement Agreement ¶ 5; and Spotify will work with Class Plaintiffs to develop tools to facilitate the licensing of content on Spotify and will collaborate with others in the industry to improve the sharing of data, including efforts to digitize registration records from the U.S. Copyright Office, *see id.* ¶¶ 6-8. Moreover, each claimant shall receive a minimum guaranteed payment from the Net Settlement Fund, and claimants whose works have been streamed more than 100 times shall receive an additional payment. *See id.* ¶ 3.5.

The combination of the immediate and future monetary relief, along with the non-monetary benefits provided, constitutes a significant recovery.

At the same time, though, although there is a detailed report explaining how and why the parties value the future benefits of the settlement at $63.1 million, *see* Dos Santos Dec., there is not much evidence showing exactly how the parties arrived at the amount of $43.45 million for past damages, or how much the parties anticipate each class member would receive from that fund. The complaint noted that "Plaintiffs and the class members are entitled to recover up to $150,000 in statutory damages for each musical composition infringed," Consolidated Complaint ¶ 49, and sought judgment against Spotify "[f]or compensatory and/or statutory damages in an amount in excess of $200 million," Consolidated Complaint at 17.

Nevertheless, Plaintiffs emphasize that the cash payment is greater than the $30 million amount in a similar case. *See* Sklaver Dec. ¶ 15 ("In March 2016, Spotify reached a settlement

with the National Music Publishers Association ('NMPA') totaling $30 million to compensate publishers and songwriters for infringement of their mechanical licenses."); Dkt. No. 327 (Pl. Reply for Approval) at 8 ("[T]he $30 NMPA settlement [was] for 96% of the market share.");  *see also* Dkt. No. 249, Ex. 3 (Wixen Music Letter to Clients) ("Considering that 96% of NMPA members opted-in to the NMPA settlement and are presumably barred from participating in the *Ferrick* settlement, the financial terms of the *Ferrick* settlement are likely to be several times better than the NMPA settlement.").

Ultimately, the Court is persuaded that determining how many infringements occurred or defining the exact size of the class at this stage would undermine the benefit of the settlement in reducing litigation burdens.  *See* Pl. Reply for Approval at 7-8.

As noted, if Plaintiffs proceeded with litigation, it is far from clear that they would have been able to establish liability or damages—or damages as significant as the recovery established in the settlement.

### C. Objections

The Court overrules all objections.

#### 1.Objections by Wixen Music

If an individual opts out of a settlement, he no longer has standing to challenge the settlement.  *See, e.g.*, *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 753 (S.D.N.Y. 1985) (noting that objectors who had opted out of the class "no longer ha[d] standing to challenge the settlement"); *see also Stinson v. City of New York*, 256 F. Supp. 3d 283, 292 (S.D.N.Y. 2017) ("Class members who opt-out of the settlement extinguish their ability to object to it and those objections need not be considered.").

Here, Wixen Music filed both objections and requests for exclusions for works in its clients' names and for those it owns.[2] *See* Dkt. No. 208. To the extent Wixen Music has opted out the musical compositions it owns, it no longer has standing to raise objections on its own behalf, and the 34 Wixen Music clients who have not filed timely requests for exclusion, *see* Kierkegaard Dec. ¶ 7, have not filed any objections to the Settlement. Accordingly, the Court does not consider Wixen Music's objections. In any event, if the Court were to consider Wixen Music's objections, it would overrule them.

### 2. Objections by Watson Music, DM Records, and Kingfish Music

On January 30, 2018, Watson Music Group, LLC, DM Records, Inc., and Kingfish Music Group, Inc. submitted a letter indicating that they had not received notice of any purported class membership and requesting an opportunity to raise objections both to being included in the class and to the proposed settlement. *See* Dkt. No. 383.

As discussed, the notice that was provided satisfied the requirements of Rule 23 and due process. Accordingly, the Court declines to provide an additional opportunity for the three entities to file requests for exclusion or objections.

### 3. Objections re: Amount

Some Objectors contend that the payment from Spotify should be greater. *See, e.g.*, Dkt. Nos. 183, 184,[3] 211, 241, 244. However, "[t]he question is whether the terms of the settlement as a whole are fair and reasonable, and not whether every member of the class is fully

---

[2] It seems that Wixen Music wanted to submit opt-outs, but decided to submit objections as well because it could not "comply fully with the directions given in the long-form Notice of Settlement because of each Objector's inability to provide an exhaustive list of copyright registration numbers for the works being opted out of the settlement." Dkt. No. 208 at 2.

[3] It is possible that one of these objectors—Mr. Turney, Dkt. No. 184—is not even a class member because his songs may not be on Spotify; in that case, he would lack standing to object to the settlement.

compensated." *In re Nissan Radiator/Transmission Cooler Litig.*, No. 10 CV 7493, 2013 WL

4080946, at *11 (S.D.N.Y. May 30, 2013) (internal quotation marks omitted); *see also Newman*,

464 F.2d at 693 ("[T]here is a range of reasonableness with respect to a settlement . . . ."). Thus

Objectors' claims that the amount of the settlement is insufficient does not automatically render

the settlement inadequate. Moreover, the Objectors tend to focus on the value of the immediate

payment while largely ignoring the future royalty payment program and the nonmonetary

benefits that the settlement provides. As discussed, when all of the benefits of the settlement are

considered, and in light of the risks of litigation, the amount of the settlement is not

unreasonable.

### 4. Objections re: Notice and Lack of Information

Other Objectors complain that the notice was unclear or ambiguous or lacked sufficient

information. *See, e.g.*, Dkt. Nos. 186, 201, 218, 234. But the notice sufficiently summarized the

litigation and the settlement such that it "describe[d] effectively the scope of [the] release." *Wal-

Mart Stores, Inc.*, 396 F.3d at 116. Moreover, the postcard notice and publication notice referred

putative class members to the settlement website where the long-form settlement notice was

displayed, which provided extensive details about the settlement. *See* Settlement Agreement,

Exs. A-C. Although it is true that the notice did not provide information from which a class

member could calculate a potential payment, *see* Dkt. No. 234, the long-form settlement notice

described how payments would be allocated, *see* Settlement Agreement, Ex. A, and the actual

amount that each class member would receive cannot be determined until the number of

participants in the settlement is definite. It would have been impossible to provide more

information from which a class member could calculate a potential payment before the number

of participants in the settlement was more definite—though one Objector takes issue with this

15

very fact. *See* Dkt. No. 306 at 2 ("If a putative class member . . . has no idea whether he would get one dollar or one thousand dollars, . . . how then is he supposed to know whether to opt out?"). Two Objectors make similar arguments regarding the lack of information about the market rate for the claims at issue and/or the amount of money that a class member could expect to receive from the settlement. *See* Dkt. Nos. 218, 234. The settlement agreement describes the plan of allocution, but it does not provide details regarding a class member's expected payment because such a payment depends on the number of participants in the settlement. Although the Court understands the concerns regarding the limited information available about the value of the settlement, the Court also appreciates the difficulty in providing those details at this stage. Ultimately, the Court concludes that there is sufficient evidence to evaluate the value of the settlement. Moreover, as explained, that formal discovery has not occurred does not render the settlement unfair, unreasonable, or inadequate. *See Plummer*, 668 F.2d at 660.

### 5. Objections re: Class Counsel's Fee Request and Incentive Awards

Several Objectors express dissatisfaction with the fees sought by Class Counsel. *See, e.g.*, Dkt. Nos. 204, 234.[4] However, as discussed more fully below, the Court is reducing the attorneys' fee award, and the resulting award is reasonable given the complexity of the case and the quality of representation.

---

[4] One objection that raises the same issue, *see* Dkt. No. 312, is untimely, *see* Dkt. No. 376 ¶¶ 6-7. That the order preliminarily approving the settlement allowed "parties to the action" to file and serve reply papers in response to the papers "in support of an award of attorneys' fees, reimbursement of costs, and Incentive Awards," Dkt. No. 177 ¶ 21, up to seven days before the final approval hearing did not change or extend the timeline to file objections, *see* Dkt. No. 312 at 1 n.1 (incorrectly asserting that objections to the fee award were timely if filed at least seven days before the fairness hearing).

### 6. Miscellaneous Objections

Beyond the objections described above, there are several other objections, several of which lack much detail or explanation. For example, one Objector objects to the "use" of his works "in [the] settlement," but does not describe why. *See* Dkt. No. 328, Ex. A. Other Objectors do not really discuss the settlement but instead state that they do not want Spotify playing their music, or that they want Spotify to put their playlist online. *See* Dkt. Nos. 201, 241. To the extent that those Objectors are objecting to the requirement that they license their works to Spotify, *see* Dkt. No. 211, doing so ensures that they will receive royalties on those works, and Spotify might be able to obtain a compulsory license for their works any way, *see* 17 U.S.C. § 115; Dkt. No. 291 (Pl. Omnibus Response) at 16.

One Objector argues that Class Members should not have to pay for audit rights. *See* Dkt. No. 234. But the settlement establishes that class members do not have to pay for audits if the audit reveals an underpayment greater than or equal to 5%, or class members can pursue a streamlined audit for a cost of $100. *See* Settlement Agreement ¶ 5.5.

Another Objector complains about the "onerous requirement" that Objector's counsel identify any objections filed during the past five years, *see* Dkt. No. 204 at 4, but this requirement may help identify nonmeritorious objections.

In addition, one Objector contends that the settlement is procedurally unfair because it requires members to provide copyright registration numbers to submit claims and to opt out. *See* Dkt. No. 211. But requiring class members to submit copyright registration numbers is reasonable because plaintiffs would have to provide that information to pursue their own copyright infringement action. *See Reed Elsevier, Inc. v. Muchnik*, 559 U.S. 154, 158 (2010) (observing that a plaintiff must ordinarily satisfy the condition of copyright registration "before

filing an infringement claim"). Moreover, as part of the settlement, Spotify will make efforts to digitize records for works registered before 1978 and will make that information available to the class, which will make it easier to obtain copyright registration numbers for pre-1978 works. *See* Settlement Agreement ¶ 7.

Finally, one Objector complains that she could not fill out a claim forms online or that she lacked the requisite information to do so, *see* Dkt. No. 218, but the Settlement will allow class members to submit forms online, *see* Settlement Agreement ¶ 3, and a third-party Settlement Claim Facilitator will assist class members in identifying possible claims they may have, *see* Bernstein Dec. ¶ 3.

Accordingly, the Court overrules all objections.

*    *    *

The Court therefore concludes that the *Grinnell* factors weigh in favor of approving the proposed settlement. For the forgoing reasons, the Court finds the Settlement to be fair, reasonable and adequate.

## IV. ATTORNEYS' FEES AND EXPENSES

### A. Attorneys' Fees

Class Counsel seeks an attorneys' fee award of $15,860,000. *See* Dkt. No. 290 (Pl. Memo for Fees).

It is well-established that in a class action settlement like this one counsel may be entitled to a "reasonable fee." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). Courts may use either of two methods to determine what constitutes a reasonable award of attorneys' fees. *Goldberger*, 209 F.3d at 47. Under the percentage method, the district court simply sets a percentage of the recovery as a fee. *Id.* In setting the percentage, courts consider

18

the time and labor expended by counsel, the magnitude and complexity of the litigation, the risk of litigation, the quality of representation, the requested fee in relation to the settlement, and public policy considerations. *Id.* at 50. Under the second method, known as the lodestar method, "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate." *Id.* at 47. "Once that initial computation has been made, the district court may, in its discretion, increase the lodestar by applying a multiplier" based on the same factors that guide the court's approach to setting a percentage. *Id.*

Here, Class Counsel has expended more than 4,000 hours working on this case. *See* Dkt. No. 411 (Sklaver Supplemental Dec.). The case is large and complex, and prior to settlement, significant risks remained in the litigation. Indeed, Spotify had moved to strike class action allegations and had raised several affirmative defenses to Plaintiffs' claims. *See* Spotify Memo for Approval. In addition, Class Counsel provided high-quality representation. These factors weigh in favor of awarding a significant attorneys' fee award.

On the other hand, the duration of the litigation in this case was relatively short. In addition, Class Counsel is seeking approximately 36.5% of the cash fund of $43.45 million, which translates to 14% of the Gross Settlement Fund.[5] *See* Pl. Memo for Fees at 5-8. Those percentages are less than the 40% that Class Counsel typically receive pursuant to their standard contingency agreements. *See* Sklaver Dec. ¶ 19. However, "[t]o avoid routine windfalls where the recovered fund runs into the multi-millions, courts typically decrease the percentage of the fee as the size of the fund increases." *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527, 2004 WL

---

[5] The attorneys' fees minus the $5 million set aside by Spotify for fees (so, $10,860,000) comprise 9.6% of the Gross Settlement Fund, or 24.99% of the cash fund.

2397190, at *11 (S.D.N.Y. Oct. 26, 2004) (internal quotation marks and citations omitted); *see also Dial Corp. v. News Corp.*, 317 F.R.D. 426, 435 (S.D.N.Y. 2016) ("In mega-fund cases . . . , several courts in this Circuit have subscribed to the view that the percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement." (internal quotation marks omitted)); *see also id.* at 433 ("There is no one-size-fits-all benchmark in determining the appropriate fee—in fact, courts should avoid that practice because it could easily lead to routine windfalls where the recovered fund runs into the multi-millions." (internal quotation marks omitted)); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 486 (S.D.N.Y. 1998) ("[T]he expectation is that absent unusual circumstances, the percentage will decrease as the size of the fund increases." (internal quotation marks omitted)).

The percentage of the cash fund is high for attorneys' fee awards in settlements of this magnitude. *See In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 349-50 (S.D.N.Y. 2014) (describing one study that found that for settlements between $38.3 million and $69.6 million, "the median fee was 21.9% of the fund with a standard deviation of 10%," and another study that found that for "settlements between $30 million and $72.5 million, the median fee percentage was 24.9% with a standard deviation of 8.4%"), though the percentage of the Gross Settlement Fund is within the range of such awards, *see Dial Corp.*, 317 F.R.D. at 436 (noting that in class action settlements ranging from $15 million to $336 million, the court had awarded attorneys' fees amounting to between 12% and 28% of the settlement fund). Nevertheless, "fees in the range of 6-10 percent and even lower are common in megafund cases." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. at 486.

When the lodestar method is applied here to cross-check the reasonableness of the requested percentage, it becomes apparent that the requested award is too high. Susman Godfrey L.L.P. spent 2,642.8 hours[6] on this case through March 31, 2018, resulting in a lodestar value of $1,557,624.50. *See* Sklaver Supplemental Dec. ¶ 8. Hourly rates for attorneys who billed more than ten hours on the case ranged from $800 for two partners to $425 for an associate, and the rates for paralegals, legal assistants, and summer associates ranged from $125-$275. *See id.* Gradstein & Marzano P.C. spent a total of 1,439.7 hours on this case through March 31, 2018, resulting in a lodestar value of $1,040,870 *See id.* ¶¶ 12-13. The hourly rates ranged from $750 for two partners to $350 for an associate. *See id.* ¶ 12. The total lodestar value is thus $2,598,494.50. The resulting multiplier is quite high—6.10—and the billing rates for partners, associates, and paraprofessionals are also relatively high. *Cf. Woburn Ret. Sys. v. Salix Pharm., Ltd.*, 14-CV-8925, 2017 WL 3579892, at *6 (S.D.N.Y. Aug. 18, 2017) ("Although a lodestar multiplier of 3.14 for a settlement of $210 million is high, it is still within the range of lodestar multipliers approved in this Circuit."); *see also Wal-Mart Stores, Inc.*, 396 F.3d at 123 (citing *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir. 2001), for the proposition that a lodestar multiplier of 1.35 to 2.99 is common in megafunds over $100 million); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d at 353 (noting that a lodestar multiplier of five was "on the high end" but "not unreasonable").

The Court concludes that a multiplier of 6.10 in this case is too high and that the percentage of the fee should be decreased to avoid a windfall to Class Counsel. *See Dial Corp.*, 317 F.R.D. at 437 (reducing the multiplier because the "original lodestar was premised on a

---

[6] Class Counsel reports the amount of hours as 2,656.5, *see* Sklaver Supplemental Dec. ¶¶ 8-9, but according to the Court's calculations, the total number of hours is 2,642.8. The lodestar reported by Class Counsel is accurate, though.

blended billing rate saturated by excessive partner time and timekeeper rates, and further bloated by time records reflecting an inscrutable division of labor among the five firms [representing the class]"); *In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517, 528 (S.D.N.Y. 2015) (reducing a multiplier after explaining that the proposed multiplier was not warranted); *Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 276 (E.D.N.Y. 2009) (concluding that no lodestar multiplier was necessary because "any thought of increasing Class Counsel's award for bringing a suit that risked non-payment is overcome by the need to avoid a windfall award that exceeds the value of the benefits to Class Members and unduly incentivizes the prosecution of such claims in the future"). Accordingly, the Court reduces the attorneys' fee award to $13,035,000, which represents approximately 11.6% of the total value of the settlement, or 30% of the $43,450,000 cash fund, and results from a multiplier of approximately 5.02. That amount of fees—$13,035,000—will adequately compensate Class Counsel, and it recognizes the complexity of the case, the risks involved in the litigation, the efforts of Class Counsel and the quality of representation provided, and the benefits to the class from the settlement. The reduction in attorneys' fees shall come from the portion of the fee payment taken from the settlement fund rather than from the $5 million that Spotify has agreed to pay for attorneys' fees over and above the net settlement amount. *See Dial Corp.*, 317 F.R.D. at 436 ("[C]ourts must . . . guard against providing a monetary windfall to class counsel to the detriment of the plaintiff class." (internal quotation marks omitted)); *see also In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173, 2008 WL 1956267, at *15 (S.D.N.Y. May 1, 2008) (noting that when attorneys' fees are not awarded from the common fund created for the class, "the fee award does not reduce the recovery to the class" and therefore "the danger of conflicts of interest between attorneys and class members is diminished").

## B. Litigation Costs and Expenses

Class Counsel initially requested reimbursement for $632,111.92 in litigation expenses, *see* Pl. Memo for Fees, and now requests an additional $86,124.88 for expenses incurred from November 10, 2017 through March 31, 2018, for a total of $718,236.80, *see* Dkt. No. 410 (Pl. Supplemental Memo for Approval) at 9-10. Class Counsel also now requests that the Court establish a fund of $231,000 for "future expert expenses that will be incurred by Class Counsel during the claims administration process and in supporting the Future Royalty Payments Program." Pl. Supplemental Memo for Approval at 10.

Class Counsel is entitled to be reimbursed for litigation costs and expenses. *See In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150 (S.D.N.Y. 2010). The costs and expenses requested by Class Counsel are reasonable. The $718,236.80 reimbursement is thus approved.

However, the Court denies the request to establish a fund of $231,000 for future expert expenses. Although some courts in this District have authorized the establishment of reserves for future attorneys' fees and future expert fees and expenses, *see, e.g.*, *In re Painewebber Ltd. P'ships Litig.*, No. 94 Civ. 8547, 2003 WL 21787410, at *8 (S.D.N.Y. Aug. 4, 2003), the attorneys' fee award and the requested reimbursement for costs and expenses are already significant. Moreover, that Class Counsel did not initially request the $231,000 undermines any argument that such reimbursement is necessary. Accordingly, the request for a fund for future expert expenses is denied.

## C. Incentive Awards

Finally, Class Counsel requests incentive awards of $25,000 for each Class Plaintiff. *See* Pl. Memo for Fees.

In the Second Circuit, Class Plaintiffs may receive additional payments as "incentive awards." *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 200 (S.D.N.Y. 1997). Here, awards of up to $25,000 for each Class Plaintiff are reasonable given their efforts to achieve a positive outcome for the class. Although the awards are at the higher end, they are within the range of what other courts have found to be reasonable. *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 131 (S.D.N.Y. 2009).

### D. Michelman & Robinson LLP Request for Attorneys' Fees

Michelman & Robinson LLP, counsel for David Lowery, Victor Krummenacher, Greg Lisher, and David Faragher, also seek $3,699,148.75 in attorneys' fees and $30,590.91 in costs. *See* Dkt. No. 261. Although Michelman & Robinson sought to be appointed Class Counsel, Susman Godfrey and Gradstein & Marzano, were appointed instead. *See* Dkt. No. 72.

Fees incurred by non-lead counsel after the appointment of lead counsel are not compensable. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 182 (S.D.N.Y. 2003). However, a court may award non-lead counsel fees for work completed prior to the appointment of lead counsel if non-lead counsel "provided a compensable, substantial benefit to the class," and if the requested award is reasonable. *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 88 (2d Cir. 2010). But "non-lead counsel is not automatically entitled to an award from a common fund each time one of its claims is utilized in the complaint that lead counsel ultimately files." *Id.* at 87.

When appointing Susman Godfrey and Gradstein & Marzano Class Counsel, Judge O'Connell found "that both the *Lowery* Plaintiffs' [represented by Michelman & Robinson] and the *Ferrick* Plaintiffs' proposed class counsel have engaged in a substantial amount of time and effort identifying and investigating the potential claims of the putative class in this case." Dkt.

No. 72 at 6. In a footnote, Judge O'Connell noted that Gradstein & Marzano had investigated and filed the *Ferrick* complaint. Dkt. No. 72 at 6 n.3. Thus although Michelman & Robinson filed the first complaint in this action and committed time and effort to investigating potential claims, that commitment was not unique to Michelman & Robinson; to the contrary, Class Counsel took similar actions. Moreover, Michelman & Robinson declined to share information with Class Counsel once they were appointed. Dkt. No. 318 (Sklaver Dec. in Opp. to M&R) ¶¶ 2-4. Accordingly, Michelman & Robinson did not provide any unique or substantial benefit to the class. The Court thus denies their request for attorneys' fees.

## V. CONCLUSION

For the reasons articulated herein, the Settlement is determined to be fair, reasonable and adequate. Accordingly, Plaintiffs' Motion for Final Approval of the Class Action Settlement is GRANTED. The Court awards Class Counsel attorneys' fees in the amount of $13,035,000 and costs in the amount of $718,236.80. The request for a $231,000 fund for future expert expenses is DENIED. The Class Representatives' Application for Incentive Awards is GRANTED. The Court will separately enter a final judgment and order of dismissal.

SO ORDERED.

Dated: May **2 2**, 2018
New York, New York

_____
ALISON J. NATHAN
United States District Judge